# EXHIBIT A

**Christina L. Lotz**
**Seneca County Clerk**
**1 Di Pronio Drive, Waterloo, NY 13165**

Volm-892 Pg-70

Instrument Number: 2014- 00022063
As
**Misc Recording**

Recorded On: **June 26, 2014**

Parties: **TYRE TOWN OF**
To
**WILMORITE INC**                          Billable Pages:      **47**

Recorded By: **BOND SCHOENECK & KING**        Num Of Pages:     **48**
Comment: **AGREEMENT**

## ** Examined and Charged as Follows: **

| | | | | | |
|---|---|---|---|---|---|
| Misc Recording | 146.00 | Cover Page | 3.00 | Cultural Education | 15.00 |
| State Education | 5.00 | | | | |
| **Recording Charge:** | **169.00** | | | | |

## ** THIS PAGE IS PART OF THE INSTRUMENT **

I hereby certify that the within and foregoing was recorded in the Clerk's Office For:  , NY

**File Information:**                    **Record and Return To:**

Document Number:  2014- 00022063        BOND SCHOENECK & KING
Receipt Number:  43140                  110 W FAYETTE ST STE 1800
Recorded Date/Time:  June 26, 2014 10:13:21A    SYRACUSE NY 13202-7508

Cashier / Station:  K Merkley / Cash Station 1

*Christina L. Lotz*

**Christina L. Lotz**
**Seneca County Clerk**

# HOST COMMUNITY AGREEMENT
### CONSTITUTING A
### "COMMUNITY MITIGATION PLAN"
### AS CONTEMPLATED BY THE
### UPSTATE NEW YORK GAMING
### ECONOMIC DEVELOPMENT ACT OF 2013

## among

## TOWN OF TYRE,

## WHITETAIL 414, LLC

## AND

## WILMORITE, INC.

## Dated as of June 17, 2014

**This Agreement is intended to be a covenant which runs with the Land and shall bind all successors and assigns of the Company.**

2307789.14

# TABLE OF CONTENTS

Article I – Representations and Covenants ...............................................................................................2
    Section 1.1.    Representations and Covenants of the Town. .........................................................2
    Section 1.2.    Representations and Covenants of the Company. ..................................................3
    Section 1.3.  Representations and Covenants of Wilmorite. ........................................................3
Article II – Payment of Town Planning and Development Costs. .........................................................4
    Section 2.1.  Reimbursement of Town Costs. .............................................................................4
Article III – Mitigation of Direct Community Impacts. ........................................................................5
    Section 3.1.    Direct Impacts. ........................................................................................................5
    Section 3.2.    Infrastructure Impacts. ...........................................................................................5
    Section 3.3.    Environmental Impacts. ..........................................................................................5
    Section 3.4.    Public Safety and Emergency Services Impacts. ...................................................6
    Section 3.5.    Social, Economic and Other Impacts. ....................................................................8
Article IV – Mitigation of Indirect Impacts; Credit for Gaming Tax Revenue; Purpose of Payments. .............9
    Section 4.1.    Indirect Impacts. .....................................................................................................9
    Section 4.2.    Purpose of Company Payments. ...........................................................................11
    Section 4.3.    Periodic Review. ...................................................................................................11
Article V – Tax Agreement. ...................................................................................................................12
    Section 5.1.    Tax Agreement. .....................................................................................................12
Article VI – Host Community Agreement Mortgage. ...........................................................................13
    Section 6.1.    Host Community Agreement Mortgage Requirements. ........................................13
Article VII – Transfers. ..........................................................................................................................14
    Section 7.1.    Transfers of Agreement or Project. ......................................................................14
Article VIII – Events of Default; Remedies. .........................................................................................16
    Section 8.1.    Events of Default. .................................................................................................16
    Section 8.2.    Remedies. ..............................................................................................................17
    Section 8.3.  Default Interest. ......................................................................................................18
Article IX – Term; Termination. ...........................................................................................................18
    Section 9.1.    Term. .....................................................................................................................18
Article X – Wilmorite Guaranty. ..........................................................................................................18
    Section 10.1.    Wilmorite Guaranty. ...........................................................................................18
Article XI - Miscellaneous. ....................................................................................................................19
    Section 11.1.    Counterparts. ........................................................................................................19
    Section 11.2.    Notices. .................................................................................................................19
    Section 11.3.    Governing Laws. ..................................................................................................20
    Section 11.4.    Assignment. ..........................................................................................................20
    Section 11.5.    Binding Effect. .....................................................................................................20
    Section 11.6.    Severability. .........................................................................................................20
    Section 11.7.    Limited Recourse. ................................................................................................21

Signature Page ........................................................................................................................................ 20

Exhibit A – Legal Description of Land .................................................................................................A-1
Exhibit B – Memorandum of Understanding with Seneca County Department of Mental Health
    Regarding Mitigation of Problem Gambling ............................................................. B-1
Exhibit C – Workforce Development Plan ............................................................................................ C-1
Exhibit D – Wilmorite Guaranty .......................................................................................................... D-1

# HOST COMMUNITY AGREEMENT
## CONSTITUTING A
## "COMMUNITY MITIGATION PLAN"
## AS CONTEMPLATED BY THE
## UPSTATE NEW YORK GAMING
## ECONOMIC DEVELOPMENT ACT OF 2013

**THIS HOST COMMUNITY AGREEMENT** (the "Agreement"), dated as of the 17th day of June 2014, by and among the **TOWN OF TYRE**, a municipal corporation with offices at c/o Town Clerk, Clerk's Office at 636 Sutterby Rd., Seneca Falls, NY 13148 (the "Town"), **WHITETAIL 414, LLC**, a limited liability company formed and existing under the laws of the State of New York, with offices at 1265 Scottsville Road, Rochester, New York 14623 (the "Company"), and **WILMORITE, INC.**, a business corporation formed and existing under the laws of the State of New York, with offices at 1265 Scottsville Road, Rochester, New York 14623 ("Wilmorite").

### W I T N E S S E T H :

WHEREAS, the New York State Legislature passed the Upstate New York Gaming Economic Development Act of 2013 ("2013 Gaming Act") and by statewide voter referendum on November 5, 2013, the electorate approved a constitutional amendment to permit "class 3", or what is considered full casino gaming operations; and

WHEREAS, the 2013 Gaming Act called for establishing "four destination resort casinos in upstate New York" through a competitive process whereby up to four (4) gaming licenses will be awarded in what was identified as Region 1 (Catskill Region – Columbia, Delaware, Dutchess, Greene, Orange, Sullivan and Ulster Counties), Region 2 (Capital Region – Albany, Fulton, Montgomery, Rensselaer, Saratoga, Schenectady, Schoharie and Washington Counties), and Region 5 (Upstate Region – Broome, Seneca, Tioga, Tompkins Counties and portions of Chemung, Schuyler and Wayne east of State Route 14); and

WHEREAS, the Company has proposed to develop and operate a Casino and Resort, as contemplated by the 2013 Gaming Act, in the Town (the "Project") as described in that certain Planned Unit Development application dated March, 2014 (the "PUD Application");

WHEREAS, the Project is proposed to be constructed on a parcel of land located on New York State Route 414 in the Town, which land is more particularly described in <u>Exhibit A</u> hereto (the "Land");

WHEREAS, as part of the Company application for a Region 5 Gaming License, under Section 1316 of the 2013 Gaming Act, the Company must take the following actions which this Agreement is intended to document:

2307789.14

5.    demonstrate to the commission how the applicant proposes to address problem gambling concerns, workforce development and community development and host and nearby municipality impact and mitigation issues;

6.    identify the infrastructure costs of the host municipality incurred in direct relation to the construction and operation of a gaming facility and commit to a community mitigation plan for the host municipality;

7.    identify the service costs of the host municipality incurred for emergency services in direct relation to the operation of a gaming facility and commit to a community mitigation plan for the host municipality;

9.    comply with state building and fire prevention codes;

11.    provide a community impact fee to the host community; and

WHEREAS, the Company recognizes that the Project will impact the Town, its residents and the surrounding community; and

WHEREAS, to mitigate the impacts resulting from the Project, the Company has agreed to provide payments to the Town and to take other actions as set forth in this Agreement (collectively, the "Impact Mitigation"); and

WHEREAS, the Town and the Company wish to memorialize the terms and conditions associated with the Impact Mitigation and to provide evidence of Town support and full compliance with Sub-Sections 1316 (5), (6), (7), (9) and (11) of the 2013 Gaming Act.

NOW, THEREFORE, in consideration of the covenants herein contained, and other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, it is mutually agreed as follows:

## Article I – Representations and Covenants

**Section 1.1.    Representations and Covenants of the Town.**

(a)    The Town makes the following representations and covenants as the basis for the undertakings on its part herein contained:

2

2307789.14

(1)    The Town is a municipal corporation and has the power to enter into this Agreement and to carry out its obligations hereunder.

(2)    The Town has been duly authorized to execute and deliver this Agreement.

(3)    Neither the execution and delivery of this Agreement nor the fulfillment of or compliance with the provisions of this Agreement will conflict with or result in a breach of any of the terms, conditions or provisions of any agreement or instrument to which the Town is a party or by which it is bound, or will constitute default under any of the foregoing.

(4)    The Town has been induced to enter into this Agreement by the undertaking of the Company to acquire, construct, equip, repair, maintain and operate the Project in the Town, to mitigate the local impacts of the Project, and to create jobs in the Town of Tyre, Seneca County, New York.

## Section 1.2.    Representations and Covenants of the Company.

(a)    The Company makes the following representations and covenants as the basis for the undertakings on its part herein contained:

(1)    The Company is a limited liability company formed, existing and in good standing under the laws of the State, has the authority to enter into this Agreement and has duly authorized the execution and delivery of this Agreement.

(2)    Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Agreement will conflict with or result in a breach of any of the terms, conditions or provisions of any restriction or any agreement or instrument to which the Company is a party or by which it is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature upon any of the property of the Company under the terms of any such instrument or agreement.

(3)    The Company has been induced to enter into this Agreement and to pursue the gaming license by the undertaking of the Town to take the actions described herein.

## Section 1.3.    Representations and Covenants of Wilmorite.

(a)    Wilmorite makes the following representations and covenants as the basis for the undertakings on its part herein contained:

(1)    Wilmorite is a New York corporation formed, existing and in good standing under the laws of the State, has the authority to enter into this Agreement and has duly authorized the execution and delivery of this Agreement.

2307789.14

(2)    Neither the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby nor the fulfillment of or compliance with the provisions of this Agreement will conflict with or result in a breach of any of the terms, conditions or provisions of any restriction or any agreement or instrument to which Wilmorite is a party or by which it is bound, or will constitute a default under any of the foregoing, or result in the creation or imposition of any lien of any nature upon any of the property of Wilmorite under the terms of any such instrument or agreement.

(3)    Wilmorite has been induced to enter into this Agreement by the undertaking of the Town to take the actions described herein.

## Article II – Payment of Town Planning and Development Costs.

### Section 2.1.  Reimbursement of Town Costs.

(a)    The Company agrees to pay all costs and expenses in good faith paid or incurred by the Town to third parties (including attorneys, accountants, engineers, consultants and others) in connection with the planning, approval and construction of the Project including, but not limited to, costs relating to the Town's due diligence, mitigation review, study and investigations of the Project; preparation of Town ordinances and other necessary legislative enactments; negotiation, preparation and enforcement of this Agreement and related agreements (including intermunicipal agreements); Project permitting; establishment or extension of water, sewer, fire protection and other special districts for the Project; construction monitoring and inspection; and costs of any litigation filed by or against the Town or in which the Town intervenes in connection with the foregoing.

(b)    The Town shall submit to the Company a budget for all costs for which the Town will seek payment or reimbursement under this Section, which budgets shall be subject to the Company's review and approval, which approval shall not be unreasonably withheld or delayed. Any costs not included in the approved budget(s), and changes to approved budgets, shall require the prior approval of the Company, which shall not be unreasonably delayed or withheld. The Town shall provide reasonable substantiation and documentation for all costs paid or reimbursed by the Company pursuant to this Section but shall not be required to divulge privileged billing entries by its legal counsel.

2307789.14

**Article III – Mitigation of Direct Community Impacts.**

**Section 3.1.    Direct Impacts.**  The Company acknowledges that the construction and operation of the Project will cause direct impacts on the Town and its residents, including but not limited to impacts on Town infrastructure, environment, public safety, emergency services, social and other impacts ("Direct Impacts").  The Company shall mitigate the Direct Impacts in the manner described in this Article III.

**Section 3.2.    Infrastructure Impacts.**  The Company shall take the following actions to mitigate Direct Impacts on infrastructure:

(a)    Sanitary Sewer.  The Company shall construct and install, at its sole cost and expense, a 6" private force main from the Project site to the existing "Petro" or "Route 414" pump station (the "Route 414 PS") located in the Town of Seneca Falls.  The Company shall be solely responsible for the operation and maintenance of the 6" private force main.  The Town, including any Town sewer district or extension now existing or hereafter established, shall have no responsibility regarding this 6" private force main.  Prior to connecting to the Route 414 PS, the Company shall enter into an operation and maintenance and treatment agreement with the Town of Seneca Falls pursuant to which, among other things, the Town of Seneca Falls will directly bill the Company for sanitary sewer costs.

(b)    Potable Water Supply.  The Company shall, at its sole cost and expense, construct and install (1) a new water line connecting to the existing 12" water line located on the east side of NYS Route 414 in the vicinity of the northerly entrance to the Petro Truck Stop, which the Company shall dedicate to the Town, and (2) all other improvements contemplated by the engineer's report submitted with the site plan for the Project.  The Company shall be responsible for all operation, maintenance, water usage and other costs of water service for the Project.  The Company will work with the Town to create a new water district or extension of an existing Town water district (the "Water District") to include the Project site.

(c)    Telecommunications.  The telecommunication infrastructure for the Project shall be designed and constructed in a manner that will enable the Town and its residents to use at least one strand of fiber optic cable.

**Section 3.3.    Environmental Impacts.**

(a)    The Project design is intended to avoid or minimize adverse impacts on the environment, as described in the SEQR Documentation and Engineer's Report dated March, 2014 prepared by BME Associates, including all exhibits and attachments thereto, a copy of which is maintained in the Town's records in the Town Clerk's Office.

The Company shall implement, at its sole cost and expense, all actions described in the Engineer's Report, and shall perform all other traffic improvements recommended or required by the New York State Department of Transportation.

(b)    The Company acknowledges that the Comprehensive Plan for the Town, approved by the Town Board on February 20, 2014, emphasizes the importance of preserving farmland and natural resources within the Town. The proposed Project would reduce the amount of agricultural land within the Town, converting the Project land from agricultural to commercial use.

To mitigate this direct impact on the Town's agricultural resources, the Company shall pay to the Town, or to an appropriate governmental agency or non-profit organization designated by the Town, $100,000 per year on January 15 in each of the years 2016 through 2021 ($600,000 total), to fund the purchase of development rights or other actions reasonably related to the preservation of agricultural land in the Town.

(c)    The Company acknowledges there are six (6) known burial sites on the Land. Unless all known living descendants consent to movement of the burial sites and a court, by court order, has approved the removal and reinterment, the existing graves shall be preserved at their current location. The Company agrees to redesign and preserve the gravesites within the approximately 20 foot by 20 foot area in which the grave markers are currently located, and the Company shall engage an experienced cemetery land developer (such as Grever and Ward of Orchard Park, New York) to repair the gravesites and create a landscaped and fenced area. The Company shall, at its sole cost and expense, maintain the gravesites and landscaping and shall permit access to the graves by descendants of those buried at this site.

**Section 3.4.    Public Safety and Emergency Services Impacts.**  The Company shall take the following actions to mitigate Direct Impacts on public safety and emergency services:

(a)    <u>Public Safety</u>. The Company shall establish a 24/7 security workforce in form acceptable to the Seneca County Sheriff to act as the first responders for the Project. The Company shall have staff trained in "hospitality security" which shall detain those suspected of breaches of the peace or criminal acts, within the limits imposed by New York State law. Issues beyond hospitality events shall warrant a call to the Sheriff's office. The Company will coordinate and offer at its sole cost and expense periodic training unique to gaming issues and public safety for Sheriff's office personnel. The Company shall provide "FAIR" technique or similar training to address issues involving alcohol. The Company shall perform comprehensive background checks of all employees. The Company will comply with New York State regulations that may hereafter be issued for New York gaming facilities and anticipates agreements for presence by the New York State Troopers. The Project will have security and video surveillance and

2307789.14

will employ an investigator. The Project will be open to marked Sheriff vehicles and the Project will make offices available for use by the Sheriff deputies when performing duties at the Project site. Requests for off duty work by Sheriff deputies will be coordinated with the Sheriff whenever the off duty officer is intended to be armed. There will be a continuation of the current protocols as between the State Police and the Sheriff deputies whereby calls are assigned to the "closest car" with the 911 dispatch honoring requests of the caller for a Trooper or Sheriff deputy.

The Company acknowledges that the Seneca County Sheriff's Department will be required to hire at least one additional Sheriff's Deputy as a direct result of the Project. To mitigate this impact, the Company shall pay, commencing on the date the gaming operations open to the public and on each anniversary thereafter during the term of this Agreement, to the Seneca County Sheriff's Department the cost of one Sheriff's Deputy, in an amount equal to the average of the annual salary and benefits paid to all deputies in the Sheriff's Department (currently estimated at $100,000).

(b)     Fire.  The Project facilities shall have defibrillators and shall be equipped with current building code sprinklers and fire safety systems to include a public access emergency response room.  The parties anticipate that Magee Fire Department will use existing mutual aid agreements with North Seneca Ambulance, Inc. ("NSA") for provision of advanced life support services and with nearby fire departments, to include use of ladder trucks. The Project site shall be included in the existing Town fire protection district or an extension thereto.  On the later of the date a building permit is issued for the Project or February 1, 2015, the Company shall pay the cost of new high rise fire-fighting equipment for six (6) firefighters and related training and equipment coordinated with Project facility design features, to provide fire protection services for the 6 story hotel facility. The Company may request that Magee Fire Department purchase a ladder truck provided, however, the Company shall pay all costs associated with that ladder truck including, but not limited to, the cost to purchase the truck, training, maintenance and the cost of expanding the fire house to accommodate the new truck.

(c)     Ambulance/EMT.  The Company shall establish a 24/7 EMT workforce to act as the first responders, with a minimum of 2-4 staff with EMT training available at all times.  The Company will coordinate and offer at its sole cost and expense, periodic training for ambulance/EMT personnel on matters unique to gaming issues.  The Company will coordinate requests for use of off duty NSA staff with the NSA Director of Operations.  The parties acknowledge that there will be a need to coordinate Project facility EMT services with NSA EMT services and

Fire Safety EMT services.  Current protocols for treating Geneva General Hospital as primary will be continued.

NSA bills for its service for all calls with patient contact according to a rate schedule.  NSA is required to accept lesser amounts from their two largest payors (Medicare and Medicaid), and NSA's overall collection rate is approximately 88% for patients it transports to medical facilities.  NSA currently bills $100 for its service to patients that are not transported.  NSA collects approximately 40% of the amount charged for non-transport patients.

The Company acknowledges that NSA will incur costs for patient calls to the Project site that will not be paid by the patients or the patients' insurers.  To mitigate this direct impact on ambulance/EMT services in the community, the Company shall pay to NSA, the standard NSA fee for each call to the Project site that does not result in a patient transport.  The Company shall also pay to NSA (and any other ambulance company providing service to the Project) the portion of their fees for patient transports from the Project site that is not paid by the patients or the patients' insurers.

**Section 3.5.   Social, Economic  and Other Impacts.**  The Company shall take the following actions to mitigate social, economic and other impacts:

(a)   <u>Problem Gaming</u>.  To mitigate problem gaming, gambling addiction and other social impacts on the community, the Company shall take all actions described in the Memorandum of Understanding between the Company and the Seneca County Mental Health Department attached as <u>Exhibit B</u> hereto.  Also, the parties acknowledge that Section 1348 of the New York State Racing, Parimutuel, Wagering and Breeding Law, as amended by Section 2 of the Gaming Act, requires the Company to pay an annual license fee of $500 for each slot machine and gaming table (estimated to be approximately $1,000,000 per year) which, pursuant to State Finance Law Section 97-nnnn(5)(a), as amended by Section 10 of the Gaming Act, shall be used exclusively by the State for problem gaming and treatment purposes.

(b)   <u>Workforce Development</u>.  Subject to any labor agreements and state or federal laws and regulations, the Company shall make reasonable efforts to assist with workforce development as described in <u>Exhibit C</u> hereto.

(c)   <u>Wage Rates</u>.  The Company agrees that all employees working at the Project site shall be paid wages that are no less than 75% of the national average wage rate for each occupation, as reported by the United States Department of Labor, Bureau of Labor Statistics.

2307789.14

(d)     Competitive Impact. The Company acknowledges that an up to 220 room hotel is proposed to be constructed on the Project site and that the hotel may adversely impact other lodging establishments in the region if the number of visitors to the Project is significantly less than forecast. The Company agrees that, during the first ten years after gaming operations open to the public, it will limit its lodging facilities to no more than 220 rooms, unless the Company provides the Town with independent forecasts that demand exists in the area for additional rooms.

(e)     Other.

(1)     The Company acknowledges that area residents frequently use bicycles and horse drawn buggies for transportation. The Company shall make reasonable efforts to caution patrons to be aware of such traffic as they enter and exit the Project.

(2)     The Company acknowledges the importance of farming in the community and acknowledges the rights of property owners near the Project to continue farming consistent with past practice using good agricultural practices.

## Article IV – Mitigation of Indirect Impacts; Credit for Gaming Tax Revenue; Purpose of Payments.

### Section 4.1.    Indirect Impacts.

(a)     The Company acknowledges that, in addition to the Direct Impacts described above, the Project will also have known and unknown indirect impacts on the Town and its residents, related to or indirectly resulting from the construction and operation of the Project from time to time ("Indirect Impacts"). Indirect Impacts include, but are not limited to:

(1)     increased use of Town services;

(2)     increased use of Town infrastructure;

(3)     the need for additional Town infrastructure, facilities, equipment and employees;

(4)     increased traffic and traffic congestion;

(5)     issues related to public health, safety, welfare and addictive behavior;

(6)     issues relating to quality of life; and

2307789.14

(7)    costs related to mitigating other indirect impacts to the Town and its residents.

(b)    Recognizing that the Project will cause Indirect Impacts, and to enable the Town to mitigate Indirect Impacts, the Company hereby agrees to pay to the Town (at its address noted above or as otherwise directed by the Town) on or before January 15 of each calendar year commencing on January 15, 2015 (the "Payment Date"), an Indirect Impact Fee in the following amount:

(1)    For calendar year 2015, the Indirect Impact Fee shall equal $750,000;

(2)    For calendar years 2016 and 2017, the Indirect Impact Fee shall equal the amount, if any, by which the Minimum Fee (as hereinafter defined) exceeds the amount of Gaming Tax Revenue (hereinafter defined) received by the Town during each respective calendar year. On January 15 in each of the years 2016 and 2017, the Company shall pay the Town $2,000,000, as a prepayment of the Indirect Impact Fee for each respective year. No less than twenty (20) days after the Town receives its final payment of Gaming Tax Revenue for each respective year, the Town shall determine the actual amount of the Indirect Impact Fee for each respective year and shall pay to the Company the amount, if any, by which the Company's $2,000,000 prepayment exceeds the actual Indirect Impact Fee for each respective year.

The Company may satisfy its obligation to pay the Town $2,000,000 on January 15, 2016 and January 15, 2017 by delivering to the Town on each such date an irrevocable letter of credit in the principal amount of $2,000,000, issued by a bank or other financial institution acceptable to the Town, which shall allow the Town to draw on such letter of credit without limitation at such times and in such amounts as the Town determines in its sole discretion. All other terms of the letters of credit shall be acceptable to the Town in its sole discretion.

(3)    For calendar years 2018 and thereafter, the Indirect Impact Fee shall equal the amount, if any, by which the Minimum Fee (as hereinafter defined) exceeds the amount of Gaming Tax Revenue (hereinafter defined) actually received by the Town during the preceding calendar year.

The Minimum Fee shall equal $2,000,000 for each of the years 2016 through 2018, subject to annual increases thereafter at the rate of two percent (2%) per year.

2307789.14

The term "Gaming Tax Revenue" shall mean payments received by the Town during the calendar year from the Commercial Gaming Revenue Fund described in New York State Finance Law Section 97-nnnn, as amended by Section 10 of the 2013 Gaming Act.

(c)    As additional compensation to mitigate the impacts of the Project on the Town and its residents, commencing in 2015 the Company shall annually pay to Magee Fire Department and/or any other fire department that may hereafter provide fire protection services in the Town (collectively, the "Fire Department"), the entire amount payable by the Town each year pursuant to any fire protection contract or similar agreement (the "Fire Protection Contract") between the Town and the Fire Department for fire protection services and for the Town's use of Fire Department facilities for Town board meetings, Town Court or other official Town business.    The parties intend that this payment shall be applied against the Town's payment obligation under the Fire Protection Contract.    The amount required to be paid by the Company pursuant to this paragraph shall not exceed $104,000 in the year 2015 and shall not exceed $200,000 per year thereafter.

**Section 4.2.    Purpose of Company Payments.**    The parties agree and acknowledge that payments made hereunder with respect to Direct Impacts and Indirect Impacts are to provide the Town with funds to partially mitigate the additional burdens placed on the Town as a result of the Project, to be used for public purposes undertaken by the Town and/or any duly appointed agent or assignee thereof.    The Company's payments hereunder are not intended to provide additional revenue to the Town but to compensate the Town for providing the Company with the services required to allow the Company to construct and operate the Project and to mitigate the impact of the Company's activities on the Town and its residents.    The monies paid by the Company to the Town shall be utilized at the sole and absolute discretion of the Town, including, but not limited to, as a source of funding for prospective costs and expenses associated with and related to anticipated municipal services and additional infrastructural improvements to be provided as a result of the Project presence within the Town.

**Section 4.3.    Periodic Review.**

(a)    The Company shall meet with the Town Board at least annually, and shall meet with other Town representatives upon request while this Agreement is in effect, to review the effectiveness of the Impact Mitigation, and any concerns the Town Board may have regarding the Project or its operations.

(b)    The Company acknowledges that the Town has ultimate responsibility to mitigate Direct Impacts and Indirect Impacts within the Town and therefore the Town (and other appropriate agencies) must have the power to (1) determine and/or approve the planning and implementation of steps necessary to mitigate Direct Impacts and Indirect Impacts, (2) identify any material deficiencies in the planning, implementation and effectiveness of Direct Impact and Indirect Impact mitigation, and (3) identify any unanticipated Direct Impacts or Indirect Impacts that arise in the future.    The Town and the Company hereby agree to negotiate, in good faith,

11

regarding additional payments the Company shall make in the event additional Direct Impacts or Indirect Impacts that are unanticipated as of the date hereof are identified by the Town to the Company in the future, or the actions taken to mitigate identified Direct Impacts or Indirect Impacts are inadequate or deficient and do not reasonably mitigate those impacts due to either errors in estimating the Direct Impacts or Indirect Impacts (including the cost of mitigating Direct Impacts and Indirect Impacts) or changed circumstances relating to the Project or its operations, which in any such case create a direct, material and adverse impact on the Town that have been substantiated and that cannot reasonably be addressed with the Town's Gaming Tax receipts and amounts already payable under this Agreement; provided that such additional payments shall in no such case exceed $1,000,000 in any calendar year.

## Article V – Tax Agreement.

### Section 5.1.    Tax Agreement.

(a)    The Company may, in its discretion, apply to the Seneca County Industrial Development Agency (the "IDA") for a tax agreement with respect to the Project (such agreement, together with all related leases and other agreements with the IDA, are hereinafter referred to as the "Tax Agreement"). The Town supports the Company entering into a Tax Agreement, provided the Tax Agreement shall include the following terms (the "Required Tax Agreement Terms"):

(1)    an Event of Default under this Agreement, as described in Section 8.1 hereof, shall upon notice from the Town constitute an event of default under the Tax Agreement;

(2)    the Tax Agreement shall expire, and be subject to early termination at the Town's discretion, upon the expiration or termination of this Agreement;

(3)    the Tax Agreement shall not cover special district charges, levies or assessments such as fire protection district, sewer district or water district, which shall be levied and assessed on the Project site in the same manner as if there is no Tax Agreement; and

(4)    customary lender protective provisions requested by lenders for the Project (including delivery of notices of, and provision to such lenders of reasonable rights to cure, defaults under the Tax Agreement and any Tax Agreement Mortgage), provided such terms are reasonably acceptable to the Town and do not adversely impact the amount, timing or priority of payments to the Town (such provisions to be contained in the Tax Agreement or otherwise in a direct agreement with such lenders); and

(5)    the Company's obligations under the Tax Agreement shall be secured by a mortgage on the Project (the "Tax Agreement Mortgage") which shall (a) provide

security equivalent to the statutory lien afforded real estate taxes under agreements whereby the lien may be subordinate to all lenders making funds available for development and operation of the Project but which have a prior right of payment as amounts become due, (b) contain other terms requested by lenders for the Project, provided such terms are reasonably acceptable to the Town and do not adversely impact the amount, timing or priority of payments to the Town, and (c) contain other terms reasonably acceptable to the Town.

(b)     The principal amount of indebtedness secured by the Tax Agreement Mortgage shall equal the largest amount payable by the Company in any year of the Tax Agreement.

(c)     The Tax Agreement shall contain other terms reasonably acceptable to the Town. The Company agrees that it shall not enter into a Tax Agreement or any Tax Agreement Mortgage, or amend any Tax Agreement or Tax Agreement Mortgage, except in compliance with this Article V.  The Company shall provide the Town with a copy of any proposed Tax Agreement and Tax Agreement Mortgage, for the Town's review and approval (such approval not to be unreasonably withheld, conditioned or delayed) prior to execution by the Company.

## Article VI – Host Community Agreement Mortgage.

### Section 6.1.    Host Community Agreement Mortgage Requirements.

(a)     The Company's obligations under this Agreement shall be secured by a mortgage on the Project granting the Town a first priority lien (subject to senior encumbrances for utility, access and other easements, restrictions, rights of way, exceptions, encroachments, reservations or defects which, in the aggregate, do not interfere materially with the continued use of the affected property for the purposes for which it is used and do not affect materially the value thereof and which are reasonably acceptable to the Town, expressly excluding liens securing indebtedness for borrowed money) on the Project (the "Host Community Agreement Mortgage").  The principal amount of indebtedness secured by the Host Community Agreement Mortgage shall be no more than $4,000,000.

(b)     As an alternative to the Host Community Agreement Mortgage, the Company may deliver to the Town a letter of credit in the principal amount of $4,000,000, issued by a bank or other financial institution acceptable to the Town and containing terms acceptable to the Town in its sole discretion.

(c)     The Host Community Agreement Mortgage may contain other terms requested by lenders for the Project, provided those terms are reasonably acceptable to the Town and do not adversely impact the amount, timing or priority of payments to the Town.

(d)     The Host Community Agreement Mortgage shall contain other terms reasonably acceptable to the Town, and shall be executed and delivered no later than issuance of the building permit for the Project.

2307789.14

## Article VII – Transfers.

**Section 7.1.    Transfers of Agreement or Project.**

(a)    The Town is relying upon the Company and the Wilmot Family (as defined below) to exercise their respective skill, judgment, reputation and discretion with respect to the ownership and operation of the Project and the performance of this Agreement. Accordingly, there shall be no Transfer (as hereinafter defined) of this Agreement, and no Transfer of any direct or indirect ownership of the Project, including sale or other conveyances of the Project or transfers of equity interests in any entity or entities that (directly or indirectly through another entity) own and operate the Project (the "Project Entity"), without the prior written consent of the Town (which shall not be unreasonably withheld, conditioned or delayed) provided, however, Transfers described in paragraph (c) below ("Permitted Transfers") shall not require the Town's consent.

(b)    For purposes of this Agreement, (1) the term "Wilmot Family" shall mean Thomas C. Wilmot, Sr., and his wife, siblings, cousins, children and their children and Ronald Cocquyt, James R. Wilmot and other key Wilmorite, Inc. personnel identified from time to time in writing to the Town of Tyre and all trusts or similar estate planning entities formed from time to time by the foregoing individuals and their heirs and Affiliates. Affiliates shall mean with respect to any entity or individual ("Person"), any Person directly or indirectly controlling, controlled by or under common control with such Person. For purposes of this definition, the terms "controlling," "controlled by" or "under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person or entity, whether through the ownership of voting securities, by contract or otherwise, or the power to elect at least 50% of the directors, managers, general partners, or persons exercising similar authority with respect to such Person or entities; (2) the term "Transfer" shall mean any sale (including agreements to sell on an installment basis), lease, assignment, transfer, pledge, alienation, hypothecation, merger, consolidation, reorganization, liquidation, or any other disposition by operation of law or otherwise in a single transaction or series of related transactions; and (3) the term "Transferee" shall mean any person or entity to whom this Agreement or the Project, or any direct or indirect interest therein, is Transferred. Nothing contained in this Section 7.1 shall prevent a pledge by a member of the Company (or a Related Party) of its direct or indirect interest in the Company to an institutional lender, or the exercise of any rights by such lender pursuant to such pledge.

(c)    The following Transfers are hereby permitted without the prior consent of the Town:

(1)    Transfers of the assets comprising the Project to another Project Entity, occurring within 30 days after award of a license to operate the Project as a gaming facility, in connection with the raise of equity capital for the Project provided, however, the Wilmot Family shall own no less than 50% voting control of the Project Entity;

(2)     Transfers of equity or other ownership interests in the Project Entity and/or the issuance of new equity or other ownership interests in the Project Entity shall be permitted at any time, provided, however, the Wilmot Family shall own no less than 50% voting control of the Project Entity.

(3)     Notwithstanding anything herein to the contrary, commencing in the eleventh year after the Project begins commercial gaming operations, the Wilmot Family may own less than 50% voting control of the Project Entity if, pursuant to the terms of agreements with Project investors, the Wilmot Family is required to include its Project equity in a sale to third party investors who have been approved by the New York State Gaming Commission. The Company shall give the Town prior written notice of any Transfer that will reduce the Wilmot Family ownership to less than 50% voting control, including information regarding the identity of the new owners.

(4)     Notwithstanding anything herein to the contrary, the Town agrees that the Wilmot Family's voting control of the Project Entity may be reduced below 50% if, after the Project begins commercial gaming operations, the Project Entity must raise additional equity capital which causes dilution of the Wilmot Family's ownership interest in the Project Entity. The Project Entity shall give the Town prior written notice if the Wilmot Family ownership will be reduced below 50% voting control pursuant to this paragraph.

(d)     All Transferees (other than Transferees of direct or indirect equity interests in the Project Entity) shall be bound by all restrictions and obligations imposed under this Agreement and shall execute and deliver to the Town written acknowledgment and agreement to be bound by this Agreement.

(e)     The parties acknowledge and agree that the covenants contained in this Agreement are meant to "touch and concern land," and that the purpose and effect of said covenants substantially alter legal rights that flow from ownership of the Land. The parties intend that this Agreement shall constitute a covenant which runs with the Land and this Agreement shall bind the Company and all successor owners of the Land. The Company shall record this Agreement in the Seneca County real property records to provide future Transferees with notice of its terms immediately upon acquiring fee simple title to the Land.

(f)     The Company shall notify the Town as promptly as practicable upon the Company becoming aware of any Transfer or potential Transfer requiring the Town's consent hereunder. The Company shall pay all costs, including but not limited to reasonable attorney fees incurred in connection with the Town's review and approval of any Transfer.

(g)     The Company may assign this Agreement as collateral for indebtedness to one or more lenders from time to time, on commercially reasonable terms that permit lenders to step into the Company's shoes under this Agreement if the Company defaults on its obligations to lenders. In connection with any such indebtedness or refinancing thereof, the Town at the

Company's request (and at the Company's sole expense) shall negotiate in good faith with the Company and the Company's lenders to agree upon a reasonable direct agreement with respect to this Agreement, which shall be in form and substance reasonably agreed to by the Town and the Company's lenders, the purpose of which direct agreement shall be to provide the lenders with customary lender protective provisions reasonably requested by such lenders (including delivery of notices of, and the provision to such lenders of reasonable rights to cure, defaults hereunder or under any Host Community Agreement Mortgage).

## Article VIII – Events of Default; Remedies.

**Section 8.1.    Events of Default.**    The occurrence of any of the following shall constitute an "Event of Default" under this Agreement:

(a)    If the Company shall materially default in the performance of any commitment, agreement, covenant, term or condition (other than those specifically described in any other subparagraph of this Section 8.1) of this Agreement, and in such event if the Company shall fail to remedy any such default within thirty (30) days after receipt of written notice of default with respect thereto; provided, however, that if any such default is reasonably susceptible of being cured within ninety (90) days, but cannot with due diligence be cured by the Company within thirty (30) days, and if the Company commences to cure the default within thirty (30) days and diligently prosecutes the cure to completion, then the Company shall not during such period of diligently curing be in default hereunder;

(b)    If the Company shall make a general assignment for the benefit of creditors or shall admit in writing its inability to pay its debts as they become due;

(c)    If the Company shall file a voluntary petition under any title of the United States Bankruptcy Code, as amended from time to time, or if such petition is filed against the Company and an order for relief is entered, or if the Company shall file any petition or answer seeking, consenting to or acquiescing in any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any present or any future federal bankruptcy code or any other present or future applicable federal, state or similar statute or law, or shall seek or consent to or acquiesce to or suffer the appointment of any trustee, receiver, custodian, assignee, liquidator or similar official of the Company, or of all or any substantial part of its properties or of the Project or any interest therein of the Company;

(d)    If within ninety (90) days after the commencement of any proceeding against the Company seeking any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the present or any future federal bankruptcy code or any other present or future applicable federal, state or similar statute or law, such proceeding shall not have been dismissed; or if within ninety (90) days after the appointment, without the consent or acquiescence of the Company of any trustee, receiver, custodian, assignee, liquidator or other similar official of the Company or of all or any substantial part of its properties or of the Project

2307789.14

or any interest therein of the Company, such appointment shall have not been vacated or stayed on appeal or otherwise, or if within ninety (90) days after the expiration of any such stay, such appointment shall not have been vacated;

(e)     If any material representation or warranty made by the Company hereunder shall prove to have been false or misleading in any material respect as of the time made or furnished;

(f)     If a default shall occur under any Tax Agreement, which has not been cured within any applicable cure period, under, or if there is any attempted withdrawal, disaffirmance, cancellation, repudiation, disclaimer of liability or contest of obligations (other than a contest as to performance of such obligations) of, any Tax Agreement but, only upon written notice from the Town to the Company;

(g)     If the Company fails to make any payments required to be made by the Company hereunder as and when due, and fails to make any such payment within thirty (30) days after receiving written notice of default from the Town.

**Section 8.2.     Remedies.**

(a)     Upon an Event of Default, the Town shall have the right if it so elects to: (i) exercise any and all remedies available at law or in equity; (ii) terminate this Agreement; (iii) direct the IDA to declare an event of default under any Tax Agreement; and/or (iv) institute and prosecute proceedings to enforce in whole or in part the specific performance of this Agreement by the Company, and/or to enjoin or restrain the Company from commencing or continuing said breach, and/or to cause by injunction the Company to correct and cure said breach or threatened breach, and otherwise, none of the remedies enumerated herein are exclusive, and nothing herein shall be construed as prohibiting the Town from pursuing any other remedies at law, in equity or otherwise available to it under the Agreement.

(b)     Except as expressly stated otherwise, the rights and remedies of the Town whether provided by law or by this Agreement, shall be cumulative, and the exercise by the Town of any one or more of such remedies shall not preclude the exercise by it, at the same or different times, of any other such remedies for the same default or breach, to the extent permitted by law. No waiver made by the Town shall apply to obligations beyond those expressly waived in writing.

2307789.14

(c)    Upon an Event of Default, the Company and its successors and assigns shall be responsible for all costs of enforcing this Agreement or collecting amounts owed hereunder, including but not limited to reasonable attorneys' fees.

**Section 8.3.    Default Interest.**    All amounts payable by the Company hereunder shall bear interest at the rate of nine percent (9%) per annum from the due date (but if no due date is specified, then five (5) business days from demand for payment) until paid.

## Article IX – Term; Termination.

**Section 9.1.    Term.**

(a)    This Agreement shall terminate and expire on December 31, 2046, provided, however, if a Tax Agreement is then in effect and the Project is not then subject to full real property taxation, this Agreement shall remain in effect until the Project is subject to full real property taxation, unless otherwise terminated by written agreement of the parties hereto or as provided for herein.    Any termination of this Agreement prior to December 31, 2046 shall require the Company to make a pro-rated payment of the Indirect Impact Fee, and a pro-rated payment to mitigate Direct Impacts for the year in which the Agreement terminates, as of the date of termination, such pro-rated payment to be reflective of the number of days within the calendar year of termination that this Agreement was in effect.

(b)    Notwithstanding anything contained herein to the contrary, should the Company not receive a license for the Project to operate as a "gaming facility", as defined in Section 1301 of the New York State Racing, Pari-Mutuel Wagering and Breeding Law, during the pending license review process, this Agreement and the Company's payment obligations hereunder shall terminate and expire (subject to pro-ration of payments as described in paragraph (a) of this section.

(c)    Except as otherwise provided herein, any Tax Agreement for the Project shall also terminate and expire upon expiration or termination of this Agreement.

## Article X – Wilmorite Guaranty.

**Section 10.1.    Wilmorite Guaranty.**

To induce the Town to enter into this Agreement, Wilmorite shall guarantee payment and performance of the obligations of the Company, its successors and assigns hereunder, provided Wilmorite's payment obligation on this guarantee shall not exceed $4,000,000 in the aggregate, Wilmorite shall execute the Guaranty of Payment and Performance in the form attached as Exhibit D to this Agreement.    Notwithstanding anything herein to the contrary, a default under

the Wilmorite guaranty, other than a payment default, shall not be a default under this Agreement.

## Article XI - Miscellaneous.

**Section 11.1.  Counterparts.**  This Agreement may be executed in any number of counterparts each of which shall be deemed an original but which together shall constitute a single instrument.

**Section 11.2.  Notices.**       All notices, claims and other communications hereunder shall be in writing and shall be deemed to be duly given if personally delivered or mailed first class, postage prepaid, or by reputable overnight courier as follows:

> To the Town:
> TOWN OF TYRE
> c/o Town Clerk
> Clerk's Office at 636 Sutterby Rd.
> Seneca Falls, NY 13148
> Attn:  Ronald F. McGreevy, Town Supervisor
>
> With a copy to:
> Charles E. Shaffer, Esq.
> 47 W Bayard St.
> Seneca Falls, New York 13148
>
> With a copy to:
> Virginia C. Robbins, Esq.
> Bond, Schoeneck & King, PLLC
> One Lincoln Center
> Syracuse, NY, 13202-1355
>
> To the Company:
> WHITETAIL 414, LLC
> 1265 Scottsville Road
> Rochester, New York 14623
> Attn: Thomas C. Wilmot, Sr.
>
> With a copy to:
> Shawn M. Griffin, Esq.
> Harris Beach PLLC
> 99 Garnsey Road
> Pittsford, New York 14534

2307789.14

<u>To Wilmorite</u>:
Wilmorite, Inc.
1265 Scottsville Road
Rochester, New York 14623
Attn: Thomas C. Wilmot, Sr.

<u>With a copy to</u>:
Shawn M. Griffin, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, New York 14534

or at such other address as any party may from time to time furnish to the other party by notice given in accordance with the provisions of this Section. All notices shall be deemed given when mailed or personally delivered in the manner provided in this Section.

**Section 11.3. Governing Laws.**    This Agreement shall be governed by, and all matters in connection herewith shall be construed and enforced in accordance with, the laws of the State of New York applicable to agreements executed and to be wholly performed therein and the parties hereto hereby agree to submit to the personal jurisdiction of the federal or state courts located in Seneca County, New York.

**Section 11.4. Assignment.**    The Town, in its exclusive discretion, may assign this Agreement to a third-party for purposes of administering the undertakings outlined herein. The Company may assign this Agreement only in accordance with Section 7.1 hereof. In the event of any such assignments, the assigning party shall notify the other party in writing at least ten (10) days in advance of the effective date of any such assignment.

**Section 11.5. Binding Effect.**    This Agreement shall inure to the benefit of, and shall be binding upon, the Town, the Company and Wilmorite and their respective permitted successors and assigns.

**Section 11.6. Severability.**    If any article, section, subdivision, paragraph, sentence, clause, phrase, provision or portion of this Agreement shall for any reason be held or adjudged to be invalid or illegal or unenforceable by any court of competent jurisdiction, such article, section, subdivision, paragraph, sentence, clause, phrase, provision or portion so adjudged invalid, illegal or unenforceable shall be deemed separate, distinct and independent and the remainder of this Agreement shall be and remain in full force and effect and shall not be invalidated or rendered illegal or unenforceable or otherwise affected by such holding or adjudication.

2307789.14

**Section 11.7.    Limited Recourse.**

(a)    The obligations and agreements of the Town contained herein shall be deemed the obligations and agreements of the Town, and not of any board member, trustee, officer, agent or employee of the Town in his or her individual capacity, and the board members, trustees, officers, agents and employees of the Town shall not be liable personally hereon or thereon or be subject to any personal liability or accountability based upon or in respect hereof or thereof or of any transaction contemplated hereby or thereby.

(b)    The obligations and agreements of the Company and Wilmorite contained herein shall be deemed the obligations and agreements of the Company and Wilmorite, and not of any member, officer, agent or employee of the Company or Wilmorite in his or her individual capacity, and the members, officers, agents and employees of the Company and Wilmorite shall

2307789.14

not be liable personally hereon or thereon or be subject to any personal liability or accountability based upon or in respect hereof or thereof or of any transaction contemplated hereby or thereby.

[Signature pages follow]

22

2307789.14

**[Signature Page to Host Community Agreement]**

IN WITNESS WHEREOF, the parties hereto have executed this Host Community Agreement as of the day and year first above written.

**TOWN OF TYRE**

By: *Ronald F. McGreevy*
Ronald F. McGreevy, Town Supervisor


**WHITETAIL 414, LLC**


By: _____
Thomas C. Wilmot, Sr., President

**WILMORITE, INC.**


By:_____
Thomas C. Wilmot, Sr., President

23

2307789.14

**[Signature Page to Host Community Agreement]**

IN WITNESS WHEREOF, the parties hereto have executed this Host Community Agreement as of the day and year first above written.

**TOWN OF TYRE**

By: _____
Ronald F. McGreevy, Town Supervisor

**WHITETAIL 414, LLC**

By: _____
Thomas C. Wilmot, Sr., President

**WILMORITE, INC.**

By: _____
Thomas C. Wilmot, Sr., President

23

2307789.14

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF *Seneca*         )

On the *18th* day of *June* in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared *Ronald F. McCreevy* personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed this instrument.

ELIZABETH A. SUTTERBY
Notary Public, State of New York
Qualified in Seneca Co.  No. 5013450
My Commission Expires July 15, 20 *15*

_____
Notary Public

STATE OF NEW YORK          )
                          ) ss.:
COUNTY OF                  )

On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

2307789.14

VOL: 892 PG: 97

STATE OF NEW YORK                    )
                                     ) ss.:
COUNTY OF                            )

On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed this instrument.


_____
                Notary Public


STATE OF NEW YORK                    )
                                     ) ss.:
COUNTY OF *Monroe*                   )

On the *18* day of _____*June*_____ in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared *Thomas C. Wilmot Sr* personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed this instrument.


_____
                Notary Public

SHAWN M. GRIFFIN
Notary Public, State of New York
Reg. 02GR4972698
MONROE COUNTY
Commission Expires Oct. 1, 20__

24

2307789.14

STATE OF NEW YORK       )
                             ) ss.:
COUNTY OF *Monroe*    )

On the *18* day of _____*June*_____ in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared _____*Thomas C. Wilmot Sr*_____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her capacity, and that by his/her signature on the instrument, the individual or the person upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

SHAWN M. GRIFFIN
Notary Public, State of New York
Reg. 02GR4972696
MONROE COUNTY
Commission Expires Oct. 1, 20*14*

2307769.14

VOL: 892 PG: 99

## EXHIBIT A

## Legal Description of Land

Tax Account No. 12.00-01-36

ALL THAT TRACT OR PARCEL OF LAND containing 84.957 acres more or less, situate in the Military Tract, Junius Township, Lot 45, Town of Tyre, County of Seneca, and State of New York, as shown on the drawing entitled "Lands of James R. & Jeanne C. Leonard," prepared by BME Associates, having drawing number 2392-07, dated March, 2014 and revised March 27, 2014, being more particularly bounded and described as follows:

Beginning at the intersection of the easterly right-of-way line of State Route 414 (Right-of-Way width varies) with the northerly right-of-way line of The Governor Thomas E. Dewey Thruway (Right-of-Way width varies), said point having a Thruway baseline station 343+04.65 and offset 148.20 feet, said point also having a Route 414 baseline station 26+86.00 and offset 70.00 feet; thence

1. N 07°37'42" W, along said easterly right-of-way line, a distance of 265.99 feet to a point having Route 414 baseline station 29+50.00 and offset 70.00 feet; thence

2. N 13°51'23" W, continuing along said easterly right-of-way line, a distance of 402.30 feet to a point having Route 414 baseline station 33+50.00 and offset 27.00 feet; thence

3. N 07°58'55" W, continuing along said easterly right-of-way line, a distance of 657.17 feet to a point having Route 414 baseline station 40+07.16 and offset 24.00 feet; thence

4. N 85°42'49" E, along the southerly boundary line of lands now or formerly of John D. and Jane A. Morelli (T.A. No. 12.00-01-4.2), a distance of 304.66 feet to the southeast corner thereof, marked by a 2 foot tall 1" pipe; thence

The following five (5) courses are along the southerly boundary line of lands now or formerly of Lorraine H. Newcomb (T.A. No. 12.00-01-4.11)

5. N 87°56'08" E, a distance of 1268.14 feet to a point; thence

6. S 02°21'39" E, a distance of 639.75 feet to a point; thence

A-1

7. N 87°34'10" E, a distance of 895.00 feet to a point; thence

8. N 00°10'52" E, a distance of 492.27 feet to a point; thence

9. N 84°16'48" E, a distance of 409.87 feet to the southwest corner of lands now or formerly of Desiree Dawley (T.A. No. 12.00-01-4.12), marked by a 1" pipe; thence

10. N 87°24'40" E, along the southerly boundary line of said lands of Desiree Dawley (T.A. No. 12.00-01-4.12), a distance of 550.00 feet to a point on the westerly boundary line of lands now or formerly of James Nearpass (T.A. No. 12.00-01-5.11); thence

11. S 03°41'17" E, along said westerly boundary line and lands now or formerly of James Nearpass (T.A. No. 12.00-01-38.1), a distance of 1031.96 feet to a point on the aforementioned northerly right-of-way line of The Governor Thomas E. Dewey Thruway having baseline station 376+65.00 and offset 140.00 feet; thence

12. S 75°26'35" W, along said northerly right-of-way line, a distance of 464.83 feet to a concrete monument having Thruway baseline station 372+00.17 and offset 139.67 feet; thence

13. S 82°14'28" W, continuing along said northerly right-of-way line, a distance of 856.05 feet to a concrete monument having Thruway baseline station 363+01.46 and offset 175.23 feet; thence

14. S 87°30'37" W, continuing along said northerly right-of-way line, a distance of 597.35 feet to a concrete monument having Thruway baseline station 357+04.26 and offset 161.52 feet; thence

15. S 88°16'47" W, continuing along said northerly right-of-way line, a distance of 1399.68 feet to the Point of Beginning.

A-2

2307789.14

## EXHIBIT B

## Memorandum of Understanding with Seneca County Department of Mental Health Regarding Mitigation of Problem Gaming

See attached.

B-1

2307789.14

<u>COUNTY OF SENECA</u>

**<u>Memorandum of Understanding Between:</u>**

Whitetail 414, LLC.
AND
Seneca County Mental Health Department

AGREEMENT made as of the 14th day of June, 2014 by and between SENECA COUNTY, acting by and through its local Board of mental health, SENECA COUNTY COMMUNITY SERVICES BOARD, having been designated the Local Government Unit for purposes of Article 41 of the Mental Hygiene Law and possessing an office for the transaction of business located at: 31 Thurber Drive, Waterloo, NY 13165, collectively hereinafter referred to as **"COUNTY"**, and Whitetail 414, LLC, a limited liability corporation duly organized and existing under the law of the State of New York, hereinafter referred to as **"COMPANY"**, having its principal office at 1265 Scottsville Rd, Rochester, NY 14624.

WITNESSETH

WHEREAS, it is the intent of the COMPANY to build and responsibly operate a casino in Town of Tyre, Seneca County at tax parcel 12-1-36 (the "Casino"), and to develop a comprehensive mitigation plan, one component of which would be to Address Problem Gambling at the Community Level; and

WHEREAS, The COMPANY intends to address Problem Gambling at the Community level through the direct funding for the provision of gambling treatment and gambling prevention services in Seneca County; and

WHEREAS, the Seneca County Mental Health Department is the primary mental health and substance abuse provider within the County; and

WHEREAS the COUNTY conducts an annual mental hygiene planning process which includes but is not limited to: needs assessments; review of utilization and prevalence data; active input from mental hygiene agency providers within Seneca County; and input from several key informants, including the Seneca County Community Services Board; and

WHEREAS, should the proposed casino come to fruition, the COUNTY desires to include stakeholders from the Town of Tyre, Seneca County and the COMPANY in subsequent annual mental hygiene planning activities; and

WHEREAS, COUNTY desires to participate in the establishment and operation of programs which will enable children, youth, and their families to receive (whenever possible) gambling prevention education and (whenever needed) treatment for problem and pathological gambling; and

WHEREAS, the COUNTY possesses the requisite skill and expertise, as well as use and enjoyment of the facilities required for the provision of such services through contract with the COMPANY; and

WHEREAS, the COUNTY is authorized by its charter to provide the aforesaid Agency Services; and

WHEREAS, the Board acknowledges the need for said services in the County of Seneca should the casino come to fruition, and considers such services an element in the Board's plan for comprehensive services for the County of Seneca;

B-2

NOW, THEREFORE, it is mutually agreed between the parties as follows:

FIRST:        The COMPANY agrees to enter into contract to provide funding to the COUNTY such that one full-time gambling prevention professional and one full-time gambling treatment professional can be maintained within the county as long as the casino remains in operation; and

SECOND:        With funding in place from the Company, the COUNTY agrees to provide gambling prevention and treatment services as outlined in Exhibit A; and

THIRD:        The COUNTY agrees to include the subsequent contract for gambling prevention and treatment services in its Local Services Plan to be submitted for the approval of the Commissioner of the Office of Substance Abuse Services hereinafter referred to as "COMMISSIONER", covering all annual mental hygiene planning cycles in which the casino is in operation; and

FOURTH:        The COUNTY agrees to maintain and provide services as outlined Exhibit A and to provide a yearly budget and utilization statistics for the proposed services on a quarterly basis; and

FIFTH:        The COUNTY agrees to comply with the rules and regulations of the Board, the County and the Office of Substance Abuse Services; and

SIXTH:        In consideration of the COUNTY Services maintained and provided, as specified Exhibit A, the COMPANY shall pay to the COUNTY a sum sufficient to cover the salary and all related expenses for one full time gambling prevention professional and one full time gambling treatment professional, with the required amounts of COMPANY funding being submitted by the COUNTY to the COMPANY as soon as possible before the COUNTY's fiscal year (January 1st through December 31st); and

SEVENTH:        Notwithstanding anything to the contrary provided herein, any contract entered into between the COUNTY and the COMPANY as a result of this MOU shall be deemed executory only to the extent that the casino remains in operation, and for the performance of the terms hereof and no liability on account thereof shall be incurred by the COMPANY beyond the company's cessation of casino operations in Seneca County; and

EIGHTH:        The sums to be paid to the COUNTY as herein before provided shall be paid annually in one lump sum installment, to fund the position(s).  The schedule for this payment will be worked out as part of the contract between the COMPANY and the COUNTY.

NINTH:        The COMPANY shall indemnify and hold harmless the Board and county from the claims, costs, damages or injuries to persons or property of whatsoever kind or nature arising out of the services to be rendered pursuant to the making of this agreement.  In addition, the COUNTY shall take out and maintain liability insurance satisfactory to the County on all locations and facilities and in an amount not less than $300,000. The COUNTY shall furnish the COMPANY with copies of such insurance policies or memoranda of such insurance, should the COMPANY desire such documentation.

TENTH:        The COUNTY's status shall be that of an independent principal and not as an agent or employee of the COMPANY.

ELEVENTH:        Notwithstanding any of the provisions hereinbefore provided, the services and responsibilities outlined in this agreement shall not become effective until such time as a contract between the COMPANY and COUNTY is in full force and effect.

TWELFTH:        The COUNTY shall abide by the guidelines herein which specify fiscal, programmatic and reporting requirements.

A.        Fiscal Reporting Requirements:
        COUNTY and COMPANY will develop and abide by mutually agreed

B-3

2307789.14

upon fiscal claiming and reporting requirements that will be outlined within any subsequent contract;

B.    Programmatic Requirements:
All programming must be provided as specified in the program/services descriptions outlined in Exhibit A.

C.    Reporting Requirements:
1.    In order to evaluate the effectiveness of each funded program, quarterly reports of activities, outcome studies and annual consumer satisfaction surveys may be provided to the COMPANY.
2.    Additional specific reports may be required from time to time at the discretion of the COUNTY and the COMPANY.

THIRTEENTH:  Any equipment, furniture, supplies or other property purchased pursuant to this agreement is deemed to the property of the COUNTY or will be returned to the County in the event of termination of this contract agreement.

FOURTEENTH: This Agreement may be terminated without cause by any of the parties upon giving sixty days written notice to the other parties.

FIFTEENTH:    This Agreement may be assigned by Whitetail 414, LLC upon written notice to the County to an entity affiliated with Whitetail 414, LLC and formed as the project entity and intended licensed operator of the Casino.

IN WITNESS WHEREOF, the parties hereto have executed this agreement as of the day and year first written above.

SENECA COUNTY

BY:_____
_____
Date                                        Chairperson
                                              Seneca County Board of Supervisors


Whitetail 414, LLC

BY:_____
_____
Date                                        Chief Executive Officer (or Designee)


B-4

2307789.14

# SENECA COUNTY
# MENTAL HEALTH DEPARTMENT
# EXHIBIT A

**A-1.** <u>Gambling Treatment Services</u> provided by the COUNTY shall include the following:

- In partnership with Seneca County Mental Health the Wilmot Casino will provide funding for programs to address (up to 2 FTEs one full time and/or others part time) that problem gambling specific treatment for individuals and family members is available in Tyre and the surrounding area.
- Treatment will be high quality, culturally competent and provided regardless of ability to pay.
- Wilmot Onsite Responsible Gambling Resource Center (RGRC) Staff will refer patrons requesting assistance or those who have self-excluded to Seneca County Mental Health
- Wilmot Onsite RGRC staff will contact the appropriate clinic to schedule an initial intake assessment, when requested by the casino patron.
- Seneca County Mental Health will provide problem gambling treatment at any of its satellite offices (currently Waterloo, Ovid and 5 Schools in the County)
- The Seneca County Mental Health office will provide daily scheduled walk-in hours so that casino patrons in need will be able to see a clinician specialized in Problem Gambling Treatment within 24 hours of being referred. Clinic hours will be extended to accommodate evening and with a change in any necessary operating certificates and in response to demand, weekend clients when necessary.
- The Seneca County Mental Health will make available for the convenience of the client Problem Gambling specific treatment services at any of its sites providing behavioral health care.
- Individual, family and group therapy will be available for problem gambling clients.
- Individual therapy will focus on the use of Cognitive Behavioral Therapy and Motivational Interviewing or other evidenced based practices for treating Problem Gambling as they become available.
- Clinicians will encourage that the client/ family member also participate in Gamblers Anonymous, Gam-Anon or another self-help program.
- All patients will be encouraged to participate in the development of a care plan to address problem gambling or risk behaviors for the development of a gambling disorder
- Seneca County Mental Health will provide comprehensive outreach attempts for individuals who do not keep initial appointments which includes at least 3 telephone outreach attempts (at least one off hours) and one mail/ letter outreach attempt.
- Certified gambling treatment providers will provide assistance and counseling to Gaming Facility employees when needed.

2307789.14

VOL: 892 PG: 106

SENECA COUNTY
MENTAL HEALTH DEPARTMENT
EXHIBIT A
(Continued)

**A-2.** **Gambling Prevention, Outreach and Education** in the Local Community shall be provided by the
COUNTY as follows:

- o  In partnership with **Seneca County Mental Health** Wilmot Casino will fund materials to be
     used for prevention, outreach and education to vulnerable populations in the Seneca County
     area.
- o  Seneca County Mental Health will be contracted and begin their outreach and education
     efforts once Wilmot Casino is granted the casino license, prior to the opening of the casino.
- o  All Seneca County Mental Health staff will be trained on Problem Gambling related issues.
     Staff delivering problem gambling programming will be required to complete the New York
     Council on Problem Gambling 30 hour Problem Gambling Prevention Specialist training.
- o  Wilmot Casino will fund this program at the rate of 1 professional full time equivalent (FTE)
     and will provide for adequate public awareness efforts and program expenses. The funding
     will be directly negotiated between Wilmot and Seneca County Mental Health.
- o  Initiatives to address problem gambling will focus on impacts in the workplace, family,
     neighborhood, youth, older adults, public safety and crime prevention and public awareness.
- o  Problem gambling public awareness efforts will target messaging at specifically vulnerable
     populations including youth, parents as influencers on youth, family members of problem
     gamblers, individuals and families with substance abuse disorders, college students, low
     income residents and aging adults.
- o  Based on the target population of each campaign, problem gambling public awareness efforts
     will be developed to specifically reach each population where they currently receive other
     types of messaging. Family impact issues to be addressed include child abuse and neglect, co-
     occurring substance abuse and gambling, divorce, domestic violence, homelessness,
     bankruptcy and suicide.
- o  Partners in this process will minimally include Faith-based programs (if any materialize),
     school districts, mental health providers, Department of Social Services, local Office for the
     Aging chapter, Finger Lakes Community College, local law enforcement agencies, and
     suicide prevention networks.
- o  The problem gambling version of the evidenced-based screening and brief intervention
     program "Teen Intervene" will be utilized at all sites currently implementing the "Teen
     Intervene" program.
- o  Seneca County Mental Health will when and where possible include the evidenced-based
     problem gambling prevention program "Stacked Deck" in local school districts or other
     youth-based programs in Seneca County. The program is intended for grades 9-12 and must
     be implemented with fidelity.
- o  Seneca County Mental Health will work with all local school districts to develop and
     implement a no gambling policy on school premises and at all school sponsored events
- o  Outreach and education sessions will be conducted with school personnel, parent teacher
     associations and students.
- o  Age appropriate programming and education on problem gambling will target youth
     beginning no later than age 12.

B-6

2307789.14

SENECA COUNTY
MENTAL HEALTH DEPARTMENT
EXHIBIT A
(Continued)

- o  Problem gambling education will be infused into all Seneca County Mental Health programs including but not limited to summer camps, Family Education Programs, Crime Victims Assistance Program, Domestic Violence Services and Domestic Abuse Awareness Classes.
- o  Problem gambling resources and materials will be available at all Seneca County Mental Health programs
- o  Outreach and education specifically targeted at the Aging Adult population will take place at senior centers, retirement community events, etc.
- o  All counseling based services provided by Seneca County Mental Health and its subsidiaries will implement problem gambling screening into the intake assessment process and refer to problem gambling specific treatment in the local community.

**A-3.  Related Services, Affiliations, Practices and Reporting** shall be provided by and/or the service will be facilitated by the COUNTY as follows:

- o  Seneca County Mental Health will work with the New York Council on Problem Gambling and utilize their expertise and institutional knowledge as it relates to treatment program successes and challenges.
- o  All Executive level and supervisory level staff will be trained in problem gambling
- o  All behavioral health providers delivering direct problem gambling treatment services must complete a specialized training program in problem gambling as well as hold a NYS recognized mental health license.
- o  School based health center staff will be trained in the warning signs of problem gambling and learn how to utilize problem gambling screening tools.
- o  Seneca County Mental Health will advertise its problem gambling services in all of its facilities and on the organization website.
- o  Encourage and support the development of additional Gambler's Anonymous and Gam-Anon meetings in the areas where treatment is provided.
- o  Seneca County Mental Health will develop a specific system for tracking problem gambling client outcomes.
- o  With the exclusion of individual identifying information these outcomes will be shared with Wilmot and The New York Council on Problem Gambling upon request, in an effort to assess and improve onsite and community based programs intended to assist problem gamblers.
- o  Wilmot Casino will pay for one full time gambling treatment professional such that this clinician's services shall be to providing outreach and treating problem and pathological gambling, without regard for client ability to pay, or insurance coverage.
- o  Wilmot Casino will provide funds to cover the cost of problem gambling related outreach and staff training.

2307789.14

## EXHIBIT C

### Workforce Development: Hiring Preference for Town Residents [Discuss]

**A.    Construction Jobs**

The Company will work in a good faith, legal and non-discriminatory manner to give preferential treatment to qualified Town and Seneca County residents for contracting, subcontracting and servicing opportunities in the development and construction of the Project. Prior to hiring/retaining contractors, subcontractors or servicers in connection with construction of the Project, the Company shall advertise and hold at least two events for Town and Seneca County residents at venues to be approved by the Town, at which it will publicize its construction needs and explain to attendees the process by which they may seek to be hired in connection with construction of the Project.

**B.    Permanent Jobs**

Prior to beginning the process of hiring employees for the Project, the Company shall advertise and hold at least two events for Town and Seneca County residents at venues to be approved by the Town, at which it will publicize its hiring needs and explain to attendees the process by which they may seek to be hired in connection with the Project.

In seeking to fill vacancies at the Project, the Company will give reasonable preference to properly qualified residents of the Town and Seneca County, to the extent that such a practice and its implementation is consistent with applicable laws or union contracts. Further, the Company shall make every effort to afford Town and Seneca County residents the opportunity to be trained for such trade/craft positions through all training opportunities offered by the Company or its affiliates. The Company agrees to allow the Town to monitor and enforce this Agreement.

The Company shall provide to the Town an annual report beginning in the month of January immediately following commencement of operations of the Project and for each successive year thereafter. Said annual report shall include full and part-time employment levels by the Company and any Project tenants at the beginning and end of the reporting period and the number of Town residents hired by the Company and any Project tenants. The information provided in the report shall be supported by reasonable documentation, which shall be submitted with and be considered part of, said report. The Town may reasonably identify additional information to be provided by the Company in the annual report required by this section.

**C.    Local Vendors**

The Company shall make a good faith effort to utilize local contractors and suppliers for the construction and future operations of the Project and shall afford such opportunities to local

vendors when such contractors and suppliers are properly qualified and price competitive. Such efforts shall include actively soliciting bids from Town and Seneca County vendors through local advertisements and such other reasonable measures as the Town may from time to time request.

In addition, the Company agrees that it will include as part of its rewards/frequent guest/loyalty or similar programs vouchers/gift certificates to Seneca County businesses outside of the Project site. The Company commits to purchase and issue at least $50,000 in such vouchers/gift certificates during each year of casino operation.

C-2

## Exhibit D

## Wilmorite Guaranty

GUARANTY OF PAYMENT AND PERFORMANCE

This Guaranty of Payment and Performance (the "Guaranty"), dated June ___, 2014, is executed by WILMORITE, INC., a business corporation formed and existing under the laws of the State of New York, with offices at 1265 Scottsville Road, Rochester, New York 14623 (the "Guarantor") and delivered to TOWN OF TYRE, a municipal corporation with offices at c/o Town Clerk, 636 Sutterby Road, Seneca Falls, 13148 (the "Town").

RECITALS

A.    On or about June 1, 2014, Whitetail 414, LLC (hereinafter referred to, along with its successors and assigns, as the "Company"), the Town and Guarantor executed a host community agreement, dated as of June ___, 2014 (such agreement, as may hereafter be amended, modified or assigned, is defined to herein as the "Host Community Agreement").

B.    Pursuant to the Host Community Agreement, the Company agreed to take certain actions, and make certain payments, as described in the Host Community Agreement, to mitigate impacts on the Town and surrounding community resulting from the construction and operation of the casino and resort proposed to be constructed by the Company on New York State Route 414 in the Town (the "Project").

C.    Pursuant to Section 10.1 of the Host Community Agreement, in order to induce the Town to enter into the Host Community Agreement with the Company, the Guarantor agreed to guaranty payment and performance of the obligations of the Company, its successors and assigns, under the Host Community Agreement.

NOW, THEREFORE, for value received and to induce the Town to enter into the Host Community Agreement with the Company, the Guarantor hereby guarantees to the Town, its successors and assigns, the prompt payment, performance, and discharge of all obligations of the Company, its successors and assigns under the Host Community Agreement including any future modification or amendment of the Host Community Agreement; **provided, however, the Guarantor's total aggregate payment obligation under this Guaranty shall not exceed $4,000,000.**

1.    This Guaranty is and shall be construed to be an absolute, unconditional, present, and continuing Guaranty and is in no way conditioned or contingent upon any attempt to collect payments or require performance by the Company, its assignees or transferees. The obligations of the Guarantor under this Guaranty are independent of the obligations of the

D-1

Company under the Host Community Agreement and a separate action may be brought and prosecuted against the Guarantor whether or not an action is brought against the Company, its assignees, or transferees, or whether the Company, its assignees or transferees be joined in any action. The Guarantor may satisfy any of its obligations under this Guaranty either directly or by causing the Company to satisfy the obligation.

2.    This Guaranty shall remain in full force and effect until the Host Community Agreement is no longer in effect and all sums due thereunder are paid in full, and shall not be affected, modified or impaired by any state of facts or the happening from time to time of any event, including, without limitation, any of the following, whether or not with notice to or the consent of the Guarantor:

(a)    The invalidity, irregularity, illegality or unenforceability of, or any defect in, the Host Community Agreement or any collateral security for the Host Community Agreement (the "Collateral").

(b)    The conveyance, transfer or assignment of the Project, or any interest therein, by the Company.

(c)    Any present or future law or order of any government (de jure or de facto) or of any agency thereof purporting to reduce, amend or otherwise affect the Host Community Agreement or any other obligation of the Company or any other obligor or to any other terms of payment.

(d)    The waiver, compromise, settlement, release or termination of any or all of the obligations, covenants or agreements of the Company under the Host Community Agreement or of the Guarantor under this Guaranty.

(e)    The failure to give notice to the Guarantor of the occurrence of an event of default under the Host Community Agreement.

(f)    The loss, release, sale, exchange, surrender or other change in any Collateral.

(g)    The extension of the time for payment of any amounts due under the Host Community Agreement or of the time for performance of any other obligations, covenants or agreements under or arising out of the Host Community Agreement or the extension or the renewal of any thereof.

(h)    The modification or amendment (whether material or otherwise) of any obligation, covenant or agreement set forth in the Host Community Agreement.

2307789.14

(i)     The taking of, or the omission to take, any of the actions referred to in the Host Community Agreement.

(j)     Any failure, omission or delay on the part of the Town to enforce, assert or exercise any right, power or remedy conferred on the Town in the Host Community Agreement.

(k)     The voluntary or involuntary liquidation, dissolution, sale or other disposition of all or substantially all the assets, marshalling of assets and liabilities, receivership, insolvency, bankruptcy, assignment for the benefit of creditors, reorganization, arrangement, composition with creditors or readjustment of, or other similar proceedings affecting the Guarantor or the Company or any of their assets, or any allegation or contest of the validity of the Host Community Agreement.

(l)     The default or failure of the Guarantor to fully perform any obligations set forth in this Guaranty.

(m)     Any event or action that would, in the absence of this paragraph, result in the release or discharge of the Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty.

(n)     Any other circumstances which might otherwise constitute a legal or equitable discharge or defense of a surety or a guarantor.

3.     The Guarantor hereby waives:

(a)     Notice of acceptance of this Guaranty.

(b)     Diligence, presentment and demand for payment of the amounts due under the Host Community Agreement.

(c)     Protest and notice of protest, dishonor or default to the Guarantor or to any other party with respect to the Host Community Agreement.

(d)     Any and all notices to which the Guarantor might otherwise be entitled.

(e)     Any demand for payment under this Guaranty.

(f)     Any and all defenses to payment including, without limitation, any defenses and counterclaims of the Guarantor or the Company based upon fraud, negligence or the failure of any condition precedent or claims of offset or defenses involving the invalidity,

irregularity or unenforceability of all or any part of the liabilities herein guaranteed or any defense otherwise available to the Guarantor or the Company.

(g)    Any and all rights of subrogation, reimbursement, indemnity, exoneration, contribution or any other claim which the Guarantor may now or hereafter have against the Company or any other person directly or contingently liable for the obligations guaranteed hereunder, or against or with respect to the Company's property (including, without limitation, property collateralizing the Host Community Agreement), arising from the existence or performance of this Guaranty and whether or not such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise.

4.    This Guaranty is a guaranty of payment and not of collection and the Guarantor hereby waives the right to require that any action be brought first against the Company or any other Guarantor, or any security, or to require that resort be made to any security or to any balance of any deposit account on credit on the books of the Lender in favor of the Company or of any Guarantor.

(a)    No remedy herein conferred upon or reserved to the Town is intended to be exclusive of any other available remedy or remedies, but each and every such remedy shall be cumulative and shall be in addition to every other remedy given under this Guaranty now or hereafter existing at law or in equity or by statute.

(b)    No delay or omission to exercise any right or power of the Town shall impair any such right or power or shall be construed to be a waiver thereof, but any such right or power may be exercised from time to time and as often as may be deemed expedient.

(c)    In order to entitle the Town to exercise any remedy reserved to it in this Guaranty, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Guaranty.

(d)    No waiver, amendment, release or modification of this Guaranty shall be established by conduct, custom or course of dealing.

5.    The invalidity or unenforceability of any one or more phrases, sentences, clauses or sections in this Guaranty shall not affect the validity or enforceability of the remaining portions of the Guaranty or any part thereof.

6.    The Guarantor hereby consents to personal jurisdiction in New York Supreme Court, Seneca County in any action to enforce the Town's rights under this Guaranty.

7.    If the Guarantor fails to perform any obligation required by it under this Guaranty, the Town shall be entitled to recover from the Guarantor all reasonable attorneys' fees

incurred by the Town in commencing any action against the Guarantor to recover under this Guaranty.

8.    This Guaranty constitutes the entire understanding between the parties hereto with respect to the subject matter hereof, and supersedes all prior agreements and understandings between the parties with respect to such subject matter.

9.    This Guaranty shall be construed in accordance with and governed by the laws of the State of New York.

10.    All notices, requests and demands hereunder shall be in writing, delivered personally or by certified mail, addressed:

To the Town:
TOWN OF TYRE
c/o Town Clerk
Clerk's Office at 636 Sutterby Rd.
Seneca Falls, NY 13148
Attn:  Ronald F. McGreevy, Town Supervisor

With a copy to:
Charles E. Shaffer, Esq.
47 W Bayard St.
Seneca Falls, New York 13148


With a copy to:
Virginia C. Robbins, Esq.
Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, NY, 13202-1355

D-5

2307789.14

To the Guarantor:
WILMORITE, INC.
1265 Scottsville Road
Rochester, New York 14623
Attn: Thomas C. Wilmot, Sr.

With a copy to:
Shawn M. Griffin, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, New York 14534

or at such other addresses as the party receiving notice may have furnished to the other parties in writing. All notices, demands or requests shall be deemed given or made upon delivery or mailing as provided above. If sent by certified mail, notice shall be deemed to have been received five days after mailing.

11.    This Guaranty shall bind the respective successors and assigns of the Guarantor and shall inure to the benefit of the Town, its successors and assigns.

[signature page follows]

D-6

This Guaranty is executed on this _____ day of June, 2014.

**WILMORITE, INC.**


By:_____
Title:

STATE OF NEW YORK    )
                        ) ss.:
COUNTY OF             )

On the _____ day of June in the year 2014 before me, the undersigned, a notary public in and for said State, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s) or the person upon behalf of which the individual(s) acted, executed this instrument.


_____
Notary Public

D-7

2307789.14