UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

**MOTION RETURN DATE AND TIME:**
**November 28, 2018 at 2:00 p.m.**

In re:

SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION,

CHAPTER 9
CASE NO. 12-43503-CEC

_____ Adjusted Debtor

JENNIFER TOMASINO, KEVIN MONTANO,
RICHARD MEYER, APRYL MEYER,

Adv. Proc. No. 1-18-01033-CEC

_____ Plaintiffs,

v.

INCORPORATED VILLAGE OF ISLANDIA,
BOARD OF TRUSTEES OF THE
INCORPORATED VILLAGE OF ISLANDIA,
DELAWARE NORTH ISLANDIA
PROPERTIES, LLC, a/k/a DELAWARE
NORTH, and SUFFOLK REGIONAL OFF-
TRACK BETTING CORPORATION,

_____ Defendants.

## DEFENDANT DELAWARE NORTH ISLANDIA PROPERTIES, LLC'S
## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**HODGSON RUSS LLP**
*Attorneys for Defendant Delaware North*
*Islandia Properties, LLC*
Charles W. Malcomb, Esq.
Daniel A. Spitzer, Esq.
Carmine J. Castellano, Esq.
Richard L. Weisz, Esq.
The Guaranty Building
140 Pearl Street, Suite 100
Buffalo, New York 14202
(716) 856-4000
*cmalcomb@hodgsonruss.com*
*dspitzer@hodgsonruss.com*
*ccastell@hodgsonruss.com*
*rweisz@hodgsonruss.com*

**FARRELL FRITZ, P.C.**
*Attorneys for Defendant Delaware North*
*Islandia Properties, LLC*
Anthony S. Guardino, Esq.
John C. Stellakis, Esq.
Patrick T. Collins, Esq.
100 Motor Parkway, Suite 138
Hauppauge, New York 11788
(631) 547-8400
*aguardino@farrellfritz.com*
*jstellakis@farrellfritz.com*
*pcollins@farrellfritz.com*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................1

FACTUAL BACKGROUND ..............................................................................................3

    A.    The Special Use Permit Application And The State Court Decision. ..............................................................................................3

    B.    The Village Adopts A Local Law Making A Hotel/Gaming Facility A Permitted As-Of-Right Use In The OI Zoning District. .........................4

    C.    The Board Specifically Considered The Village's Comprehensive Plan And Community Character When Adopting The Local Law..........................5

    D.    SEQRA Mitigation For The VLT Facility And The Taxpayer Relief Agreement. ....................................................................................7

    E.    The Instant Action And Procedural History After Removal. ..................9

SUMMARY JUDGMENT STANDARD......................................................................10

    A.    There Are No Genuine Issues Of Material Fact And Summary Judgment Is Appropriate On Plaintiffs' Remaining Causes Of Action...........................................................................................................11

ARGUMENT ....................................................................................................................12

POINT I.    NOWHERE IN EITHER THE TRA OR THE AMENDED TRA DID THE BOARD BARGAIN AWAY ITS LEGISLATIVE AUTHORITY.  THE BOARD AT ALL TIMES EXERCISED ITS INDEPENDENT LEGISLATIVE JUDGMENT.  THUS, PLAINTIFFS' CONTRACT ZONING CLAIM MUST BE DISMISSED. ...................................................12

    A.    Nowhere In Either The TRA Or The Amended TRA Did The Village Bind Itself With Respect To The Exercise Of Its Legislative Power........................................................................................13

    B.    Both The TRA And The Amended TRA Are Host Community Agreements, Which Are Common Land Use Tools To Provide For Environmental Impact Mitigation Under SEQRA...............................15

    C.    Plaintiffs Lack Standing To Challenge The Local Law On The Basis Of Illegal Contract Zoning. ...........................................................18

POINT II.    PLAINTIFFS' SPOT ZONING CLAIM SHOULD BE DISMISSED BECAUSE THEY CANNOT MEET THEIR HEAVY BURDEN OF DEMONSTRATING THAT THE LOCAL LAW IS INVALID. .....................................................................18

    A.    Plaintiffs Bear A Heavy Burden Because They Are Challenging The Validity Of A Legislative Act........................................................19

B.  The Board's Adoption Of The Local Law, Which Did Not Rezone Any Property But Merely Clarified That A Gaming Use Was Permitted In The OI Zoning District, Is Not Spot Zoning. ...................................20

1.  The Local Law Does Not Rezone The Property At All; There Is No Change In Use Classification. ...............................................22

2.  The Local Law Applies To The Entire OI Zoning District. ...........................................................................................24

3.  It Is Undisputed That The Local Law Benefits The Village As A Whole, Not Solely Delaware North. ...................................24

4.  The Land Uses Surrounding The Property Demonstrate That No Spot Zoning Occurred. ...........................................27

5.  The Process The Board Followed, Including The SUP Application Review And Response To Supreme Court, Suffolk County's Decision, Confirms The Board Did Not Engage In Spot Zoning. .......................................................28

6.  Plaintiffs Cannot Prove That The Local Law Is Inconsistent With The Comprehensive Plan Because The Comprehensive Plan Plainly Designates The Property For Heavy Commercial And Industrial Uses. ............................30

POINT III.    THE COURT SHOULD DISMISS PLAINTIFFS' FOURTH CAUSE OF ACTION FOR A PERMANENT INJUNCTION BECAUSE IT IS A REMEDY WITH NO SUBSTANTIVE CAUSE OF ACTION TO SUPPORT THE REQUEST. ..................................33

A.  Plaintiffs' Request For A Permanent Injunction Must Be Denied Because Their Substantive Claims — Alleging Contract Zoning And Spot Zoning — Fail As A Matter Of Law. ....................................33

B.  Plaintiffs' Injunction Request Should Also Be Dismissed Because Plaintiffs Cannot Make The Required Showing. ...............................34

1.  Plaintiffs Cannot Demonstrate Any Violation Of A Right Presently Occurring Or That They Will Suffer Serious And Irreparable Harm. ..................................................35

2.  Plaintiffs Cannot Demonstrate That They Have No Adequate Remedy At Law. ........................................................37

3.  Plaintiffs Cannot Demonstrate That The Equities Balance In Their Favor. ...........................................................38

CONCLUSION ...................................................................................................40

# <u>TABLE OFAUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Celotex v. Catrett*,
  477 U.S. 317 (1986)............................................................................................11

*Fisher v. Tice*,
  2016 WL 4626205 (S.D.N.Y. July 5, 2016) ........................................................10

*Li v. Zhao*,
  35 F. Supp. 3d 300 (E.D.N.Y. 2014) ...................................................................11

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
  542 F.3d 290 (2d Cir. 2008)................................................................................11

*Rodriguez v. Allstate Indemnity Co.*,
  2015 WL 3823730 (W.D.N.Y June 19, 2015)......................................................10

*Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*,
  424 F.3d 659 (7th Cir. 2005) ..............................................................................11

**State Cases**

*A&G Research, Inc. v. GC Metrics, Inc.*,
  19 Misc. 3d 1136(A) (Sup. Ct. Westchester Cnty. 2008).......................................34

*Asian Americans for Equality v. Koch*,
  72 N.Y.2d 121 (1988)..........................................................................................19

*Baier v. Town of Ellery*,
  182 A.D.2d 1083 (4th Dep't 1992)......................................................................19

*Carlyle, LLC v. Quik Park 1633 Garage LLC*,
  160 A.D.3d 476 (1st Dep't 2018) ...................................................................33, 34

*Caruso v. Bumgarner*,
  120 A.D.3d 1174 (2d Dep't 2014)......................................................................34

*Chicago Research and Trading v. New York Futures Exchange, Inc.*,
  84 A.D.2d 413 (1st Dep't 1982) ..........................................................................37

*Church v. Town of Islip*,
  8 N.Y.2d 254 (1960) ...............................................................................16, 18, 19

# TABLE OF AUTHORITIES (cont.)

*Citizens for Responsible Zoning v. Common Council of the City of Albany*,
    56 A.D.3d 1060 (3d Dep't 2008) ............................................................................22

*Citizens to Save Minnewaska v. New Paltz Cent. Sch. Dist.*,
    95 A.D.2d 532 (3d Dep't 1983), *appeal dismissed*, 61 N.Y.2d 853 (1984) ...........................12

*Collard v. Inc. Vill. of Flower Hill*,
    52 N.Y.2d 594 (1981) .........................................................................................12, 14

*DePaolo v. Town of Ithaca*,
    258 A.D.2d 68 (3d Dep't 1999) ................................................................13, 14, 15

*Eaton Associates, Inc. v. Egan*,
    142 A.D.2d 330 (3d Dep't 1988) ............................................................................36

*Goodrich v. Town of Southampton*,
    39 N.Y.2d 1008 (1976) ..........................................................................................19

*Guido v. Town of Ulster Town Board*,
    74 A.D.3d 1536 (3d Dep't 2010) ............................................................................33

*Hart v. Town Bd. of Huntington*,
    114 A.D.3d 680 (2d Dep't 2014) ............................................................................22

*Kravetz v. Plenge*,
    84 A.D.2d 422 (4th Dep't 1982) .......................................................................20, 22

*Levine v. Town of Oyster Bay*,
    26 A.D.2d 583 (2d Dep't 1966), *aff'd on other grounds*, 112 A.D.2d 726 (2d
    Dep't 2013) ...........................................................................................................12

*McDonough v. Apton*,
    48 A.D.2d 195 (4th Dep't 1975) ............................................................................19

*Merkos L'Inyonei Chinuch, Inc. v. Sharf*,
    59 A.D.3d 403 (2d Dep't 2009) ............................................................................34

*Parry v. Murphy*,
    79 A.D.3d 713 (2d Dep't 2010) ............................................................................34

*Place v. Hack*,
    34 Misc. 2d 777 (Sup. Ct. Wayne County 1962) ..........................................14, 25, 26

*Rayle v. Town of Cato Board*,
    295 A.D.2d 978 (4th Dep't 2002) ..........................................................................21

*Restuccio v. City of Oswego*,
    114 A.D.3d 1191 (4th Dep't 2014) ........................................................................22

## TABLE OF AUTHORITIES (cont.)

*Rogers v. Village of Tarrytown,*
    302 N.Y. 115 (1951) ................................................................19, 20, 21, 22, 25

*Rye Citizens Comm. v. Bd. of Trustees for Vil. of Port Chester,*
    249 A.D.2d 478 (2d Dep't 1998) .........................................................22

*Save Our Forest Action Coalition v. City of Kingston,*
    246 A.D.2d 217 (3d Dep't 1998) ..........................................21, 26, 27, 28

*Shepard v. Village of Skaneateles,*
    300 N.Y. 115 (1949) ............................................................................25

*Stringfellow's of N.Y. v. City of New York,*
    91 N.Y.2d 382 (1998) ..........................................................................20

*Thomas v. Town of Bedford,*
    11 N.Y.2d 428 (1962) ...............................................................21, 22, 24

*Town of Macedon v. Village of Macedon,*
    129 A.D.3d 1639 (4th Dep't 2015) ......................................................33

*Tuxedo Land Trust, Inc. v. Town of Tuxedo,*
    34 Misc.3d 1235(A), (Sup. Ct. Orange County 2012) ...................12, 13, 14, 15, 16

*Ultra Fuel Corp. v. Johnston,*
    30 A.D.2d 801 (1st Dep't 1968) ..........................................................34

*Van Berkel v. Power,*
    16 N.Y.2d 37 (1965) ............................................................................20

*Weinreb v. 37 Apartments Corp.,*
    97 A.D.3d 54 (1st Dep't 2012) ......................................................33, 34

*Wiggins v. Town of Somers,*
    4 N.Y.2d 215 (1958) ............................................................................19

*Yellow Lantern Kampground v. Cortlandville,*
    279 A.D.2d 6 (2000) ............................................................................27

*Youngewirth v. Town of Ramapo Town Bd.,*
    155 A.D.3d 755 (2d Dep't 2017) .........................................................21

## State Statutes

N.Y. GEN. CONSTR. LAW § 41 ....................................................................14

N.Y. GEN. MUN. LAW § 239-m ....................................................................5

N.Y. RAC. PARI-MUT. WAG. & BREED. LAW §§ 1316(6)-(7) ......................17

# TABLE OF AUTHORITIES (cont.)

N.Y. TAX LAW § 1617-a ................................................................................4, 5, 22

N.Y. VILLAGE LAW § 4-412(1)........................................................................14

N.Y. VILLAGE LAW §§ 7-725-a(4)....................................................................16

**Rules**

Fed. R. Civ. P. 56...........................................................................................10

Federal Rule of Bankruptcy Procedure 7056..............................................10

**Other Authorities**

HOST COMMUNITY AGREEMENTS FOR WIND FARM DEVELOPMENT, N.Y. ZONING
    LAW & PRAC. REPORT, Mar./Apr. 2009 .................................................17

New York State Gaming Commission, available at
    https://www.gaming.ny.gov/pdf/finance/Web%20Site%20Report%20-
    %20Jakes%2058%20Suffolk%20OTB.pdf (last accessed October 28, 2018) .......................39

## PRELIMINARY STATEMENT

Faced with a judicial determination that Video Lottery Terminals ("VLTs") could not qualify as an accessory use to a hotel in the Office/Industry ("OI") Zoning District, the Village of Islandia (the "Village") Board of Trustees (the "Board") undertook a legislative process evaluating the placement of VLTs in the OI Zoning District. The OI Zoning District allows a wide range of intense uses, including hotels, office complexes, warehousing uses, distribution facilities, and manufacturing plants and factories. After conducting a review under the State Environmental Quality Review Act ("SEQRA") and holding a public hearing, the Board found that the placement of gaming facilities in the OI Zoning District was consistent with the Village's comprehensive plan (the "Comprehensive Plan") and adopted Local Law No. 3 of 2017 (the "Local Law"). The spot zoning claim before the Court fails because the gaming facility use is consistent with the OI Zoning District and other uses in the area. Unlike successful spot zoning claims, the issue here is not the singling out of a small property for a change in use classification through a rezoning; rather, it is a change in zoning regulations to allow an additional complimentary use in an existing heavy commercial and industrial zone. Thus, Plaintiffs' spot zoning cause of action fails.

Similarly unavailing is the attack upon the host community agreement — the Taxpayer Relief Agreement ("TRA") — as contract zoning. There is simply no evidence in the undisputed record that the Board bargained away its legislative power. Nothing in the TRA contains any obligation on the Village's part to make any legislative decision whatsoever. The TRA is a host community agreement that was proposed as SEQRA mitigation as part of a development application to the Village. Such agreements are authorized and even required by New York law. Host community agreements providing payments to offset impacts are important

1

land use tools employed by municipalities across the State.  Agreements like the TRA are commonplace and provide a mechanism for implementing and applying land use regulations and are important factors when permitting authorities balance the benefits and impacts to the community against individual property rights.  A claim for contract zoning requires a showing that the agreement purports to bind the legislature, in advance, to exercise its zoning authority in a bargained-for manner; the TRA and the record before the Court presents no such bargain.  Accordingly, the contract zoning cause of action fails as a matter of law.

As to the permanent injunction cause of action, New York law is settled that an injunction is not really an independent cause of action at all, but is a remedy to be considered only when a plaintiff has successfully proven all the elements of another substantive claim.  In other words, a permanent injunction claim is a contingent one.  While it is permissible to plead a cause of action for a permanent injunction, it must be denied if a plaintiff's other substantive causes of action fail.  As set forth herein, Plaintiffs' spot zoning and contract zoning claims should be dismissed as a matter of law and thus there is no basis to employ the remedy of an injunction, even if Plaintiffs could establish the required elements, which they cannot.

For these and the reasons set forth more fully below, Defendant's Motion for Summary Judgment should be granted in its entirety.

## **FACTUAL BACKGROUND**

The full history of this dispute is already before the Court in the submittals related to Defendants' partial Motion to Dismiss and the related Bankruptcy Proceeding. Accordingly, presented here are only the key facts relevant to the remaining causes of action and the Court's consideration of Defendant's Motion for Summary Judgment.

### **A.      The Special Use Permit Application And The State Court Decision.**

The events at issue in this proceeding arise from Supreme Court, Suffolk County's decision to set aside the Board's determination to grant Defendant Delaware North Islandia Properties, LLC's ("Delaware North") application for a special use permit (the "SUP Application") to operate a VLT facility (the "VLT Facility")[1] as an accessory use to an existing hotel at 3635 Express Drive North (the "Property") in the Village's OI Zoning District. Declaration of Michael Zaleski, dated October 26, 2018 ("Zaleski Decl."), Ex. B (the "Supreme Court Decision"). Justice Ford concluded that there was no rational basis to support the granting of the SUP Application because there was no evidence in the record to support a finding that a VLT and off-track-betting ("OTB") simulcast facility constitute an accessory use in the OI Zoning District. *Id.* at 5-6.

But while Justice Ford found that the proposed VLT and OTB simulcast facility did not fit within the Village's existing law regarding accessory uses, he expressly acknowledged that "[l]ocal standards, of course, may change over time." Zaleski Decl., Ex. B at 6. Thus,

---

[1]      In adapting the hotel for the VLT Facility, Delaware North did not change the exterior of the Property. There were no additional parking spaces or significant lights added; indeed, the only physical exterior change was to add a sally port and an opaque fence around the Property, including for the first time between Plaintiffs' homes on Dawson Court and the parking lot. Declaration of Daniel A. Spitzer, dated October 29, 2018 ("Spitzer Decl."), Ex. D (Montano Deposition Transcript ("Dep.") at 12:21-25, 13:2-25, 14:2-25, 15:2-6); *see generally* Declaration of Mayor Allan M. Dorman, dated October 26, 2018 ("Dorman Decl."), Ex. B ("Notice of Determination of Non-Significance Negative Declaration," at 1-2).

Supreme Court's Decision set the stage for the Board's exercise of its legislative authority to

evaluate the placement of such facilities within the Village.

**B.     The Village Adopts A Local Law Making A Hotel/Gaming Facility A Permitted As-Of-Right Use In The OI Zoning District.**

Following Supreme Court's Decision, the Board introduced a proposed Local

Law amending the Village's zoning regulations with respect to game rooms and hotel/gaming

facilities in the Village.  Zaleski Decl., ¶¶ 9-10; Dorman Decl., ¶ 15, Ex. F.  Specifically, the

Local Law proposed to amend Section 177-3 B of the Code of the Village of Islandia ("Village

Code") to add definitions for "Game Room" and "Hotel/Gaming Facility," amend Village Code,

Chapter 177, Attachment 5, to provide for "Hotel/Gaming Facility" as a permitted use in the

Village's OI Zoning District, and amend Village Code, Chapter 177, Attachment 7, to establish

parking requirements for a "Hotel/Gaming Facility" use.  *See* Dorman Decl., Ex. F.

Pursuant to the proposed Local Law, a permitted "Hotel/Gaming Facility" is

defined as follows:

> A Hotel with more than 150 rooms with an indoor facility
> containing video lottery terminals (VLTs) authorized by Section
> 1617-a of the New York State Tax Law and licensed by the New
> York State Gaming Commission and/or simulcast off-track betting
> simulcast facilities authorized pursuant to the New York State
> Racing, Pari-Mutuel Wagering and Breeding Law, located on a site
> having a minimum lot area of seven (7) acres and at least 600 feet
> of frontage on the Long Island Expressway (Interstate 495) and/or
> a Long Island Expressway Service Road.  A restaurant and/or other
> such uses which are primarily intended for use by visitors, guests
> or customers of the Hotel/Gaming Facility may be provided and/or
> operated.

*Id.* at Section 2.1.2.[2]

---

[2]     The proposed Local Law also clarified the definition of "Game Room" to expressly exclude any gaming facility licensed by the New York State Gaming Commission and/or authorized by the New York State Racing, Pari-Mutuel Wagering and Breeding Law.  Dorman Decl., Ex. F at Section 2.1.1.

Importantly, the Local Law referenced the amendment of New York Tax Law § 1617-a, which authorized the VLT Facility in Suffolk County.  N.Y. Session Law 2013, Ch. 174. Such facilities were not legal when the Village's Comprehensive Plan and current zoning were adopted in 1995.  *See generally* Zaleski Decl., Exs. D and E.

> **C.    The Board Specifically Considered The Village's Comprehensive Plan And Community Character When Adopting The Local Law.**

As required by SEQRA, the Board prepared a full environmental assessment form ("EAF") to assist it in considering the potential adverse environmental impacts associated with the proposed Local Law.  Zaleski Decl., ¶¶ 11-12, Ex. C.  Two questions on the EAF (Part 2) are of especial importance:

Question 17 addresses "Consistency with Community Plans," which asks if "[t]he proposed action is not consistent with the adopted land use plans."  Question 18, on "Consistency with Community Character," asks whether "[t]he proposed project is inconsistent with the existing community character."  Zaleski Decl., Ex. C, Part 2 at 10.  The Board answered "no" to both questions (signifying the Local Law was consistent with the Village's Comprehensive Plan and community character).  *Id.*  Since Plaintiffs have asserted no SEQRA cause of action challenging those determinations, Plaintiffs have left those findings uncontested. *See generally* Docket No. 43, Plaintiffs' Amended Complaint, dated July 25, 2018 (the "Amended Complaint").  The Board's determination in that regard was consistent with the conclusion reached by the staff of the Suffolk County Department of Economic Development and Planning when it evaluated the SUP Application pursuant to Section 239-m of the N.Y. General Municipal Law.  *See* Spitzer Decl., Ex. B at 3 (Suffolk County Department of Economic Development and Planning - Staff Report) ("The surrounding zoning and land use pattern in the

vicinity of the subject property are predominantly a mix of light industrial (consisting of office

and distribution/warehouse) uses, and vacant Office Industry zoned lands to the north and west"

as well as a "'park & ride' lot" and "the Long Island Expressway . . . ."); *see also id.* at 3 (Staff

Analysis:  "In terms of the compatibility of land uses, the principal use (hotel) has not changed

and the physical properties of the site remain constant, ***the physical character of the community***

***remains unchanged by the proposal as there are no major modifications to the exterior of the***

***principal building***." (emphasis added)); Spitzer Decl., Ex. C.

   In addition to the review required under SEQRA, the Board considered, among

other things, the Comprehensive Plan, the Village's 2003 comprehensive plan update (the

"Comprehensive Plan Update"), the Village's current zoning law and the OI Zoning District,

Board members' knowledge of the community and uses in and surrounding the OI Zoning

District, the Property's proximity to major highways, including the Long Island Expressway and

the Long Island Motor Parkway, the residential uses in proximity to the Property, the condition

of the Property, the deteriorating condition of the existing hotel, and the opportunity for reuse

and repurposing of an existing structure in the Village.  Zaleski Decl., ¶¶ 15-16; Dorman Decl.,

¶¶ 18-20.

   After duly complying with all applicable substantive and procedural laws and

regulations, the Board noticed and held a public hearing on the Local Law.  At the outset of the

hearing, the Village Attorney summarized the proposed Local Law for the Board and the

members of the public who were in attendance.  Dorman Decl., Ex. F (Resolution adopting the

Local Law dated November 28, 2017).  The Board then provided all persons in attendance with

an opportunity to comment upon the proposed Local Law.  After hearing from all persons who

wished to be heard, the Board voted to adopt a 6-page "Notice of Determination of Non-

Significance" (the "2017 SEQRA Negative Declaration"). Dorman Decl., Ex. F (Resolution issuing SEQRA Negative Declaration); Zaleski Decl., Ex. C (Parts 2 and 3 of the EAF with Part 3 Attachment). The 2017 SEQRA Negative Declaration concluded that the adoption of the proposed Local Law would not result in any significant adverse environmental impacts and provided a reasoned elaboration for its determination. *Id.* The Board then unanimously voted to approve a resolution adopting the Local Law, which was effective upon filing in the Office of the Secretary of State on November 29, 2017. Dorman Decl., Ex. F.[3]

### D. SEQRA Mitigation For The VLT Facility And The Taxpayer Relief Agreement.

Following the submittal of the SUP Application in 2016, the Board was required to evaluate potential adverse environmental impacts under SEQRA, just as the Board was required to do for the Local Law. SEQRA required the Board to mitigate adverse environmental impacts from the VLT Facility to the maximum extent practicable and the Board has the authority and obligation to utilize its jurisdiction to impose conditions on projects to achieve that end. Dorman Decl., ¶ 4. As is common, Delaware North incorporated mitigation measures into its development proposal in the form of a host community agreement and consented to the imposition of certain conditions to achieve impact mitigation. Dorman Decl., ¶¶ 5-7. This was accomplished through the host community agreement, entitled the "Taxpayer Relief Agreement between the Village of Islandia and Delaware North Islandia Properties, LLC" (the "TRA"). Dorman Decl., Ex. C. Delaware North and the Village entered into the TRA on August 16, 2016. Dorman Decl., ¶ 8, Ex. C.

---

[3]     While correspondence from the New York State Secretary of State indicated that the Local Law was filed on November 3, that is incorrect. The Local Law may be searched on the Secretary of State's website database, showing a file-stamped date of November 29, 2017.

The language of the TRA itself spelled out its purpose: environmental impact mitigation. The TRA noted that the payments due form Delaware North to the Village were to promote community development in the Village and to offset infrastructure, public safety, and emergency services burdens on the Village as the result of the SUP Application. Dorman Decl., Ex. C at 2-3. The TRA required the construction of recreational resources in the form of ballfields and associated improvements at a park, which is also critical impact mitigation. Dorman Decl., Ex. C, at 3. These mitigation measures were relied upon by the Board when it issued a negative declaration for the SUP Application. Dorman Decl., ¶ 7.

As set forth above, after the SUP Application was granted and after Delaware North and the Village entered into the TRA, Supreme Court, Suffolk County annulled the special use permit for the VLT Facility. Zaleski Decl., ¶ 7, Ex. B; Dorman Decl., ¶ 11. Thus, the Board evaluated the proposed Local Law, which again required a review of impacts under SEQRA. In evaluating the Local Law, the Board properly considered the impacts from the VLT Facility, since it was then operating in the Village. Zaleski Decl., ¶¶ 11-12, Ex. C; Dorman Decl., ¶¶ 16-17. In issuing the 2017 SEQRA Negative Declaration, the Board relied upon the impact mitigation that was proposed by Delaware North as part of its SUP Application. Dorman Decl., ¶ 16. Approximately two months after the Village's adoption of the Local Law, Delaware North and the Village amended and restated the host community agreement by entering into the "Amended and Restated Taxpayer Relief Agreement between the Incorporated Village of Islandia and Delaware North Islandia Properties, LLC" (the "Amended TRA"). Dorman Decl., ¶ 21, Ex. G.

Essentially, the Amended TRA was nothing new, but reflected Delaware North's continued commitment to the SEQRA impact mitigation that it proposed as part of its SUP

Application and that was relied upon when the Board issued a negative declaration for the Local

Law.  Dorman Decl., ¶ 22.  Both the Village and Delaware North desired to enter into the

Amended TRA because a special use permit (and the conditions previously imposed) was no

longer in effect, given Supreme Court's decision and the new Local Law.  Dorman Decl., ¶ 23.

Thus, for the avoidance of doubt, the parties entered into the Amended TRA to ensure that the

mitigation would be a part of the VLT Facility regardless of how it was permitted under the law

(either by special use permit with conditions or as-of-right).  Dorman Decl., Ex. G at 4

("WHEREAS, in connection with the issuance of the Hotel/Gaming Permit, the Village and the

Owner desire to maintain the covenants and obligations made to each other in . . . connection

with the prior zoning approval and, therefore, desire to amend and restate the Original

Agreement in its entirety in the manner set forth herein.").

Nothing in either the TRA or the Amended TRA, by their own plain terms,

obligates the Board to take any legislative action whatsoever.  The Board at all times maintained

its legislative discretion to evaluate the proposed Local Law and render a determination

consistent with the Comprehensive Plan and the best interests of the Village.  Dorman Decl., ¶¶

25-26; Zaleski Decl., ¶ 16.

### E.    The Instant Action And Procedural History After Removal.

Plaintiffs commenced the instant action seeking a judgment declaring the Local

Law (and Delaware North's certificate of occupancy issued thereunder) to be null and void based

upon five causes of action: (i) contract zoning, (ii) spot zoning, (iii) failure to conduct a

mandatory referendum, (iv) a challenge to the 2018 Certificate of Occupancy, and (v) a request

for a permanent injunction.  Following removal to this Court by Intervenor-Defendant Suffolk

Regional Off-Track Betting Corporation ("Suffolk OTB"), the Court granted Delaware North's

motion to dismiss Plaintiffs' third (mandatory referendum), fourth (certificate of occupancy) and fifth (permanent injunction) causes of action, with permission for Plaintiffs to replead the fifth (permanent injunction) cause of action. Plaintiffs ultimately elected to replead their fifth cause of action for a permanent injunction in the Amended Complaint. Notably, Plaintiffs modified other portions and abandoned their fourth cause of action by omitting it from the Amended Complaint.

Delaware North now moves for summary judgment on Plaintiffs' three remaining claims, namely as follows: (i) Plaintiffs' first cause of action claiming contract zoning; (ii) Plaintiffs' second cause of action alleging spot zoning; and (iii) Plaintiffs' fourth cause of action for a permanent injunction. As set forth herein, Delaware North's Motion for Summary Judgment should be granted in its entirety.

## <u>SUMMARY JUDGMENT STANDARD</u>

A bankruptcy court may grant summary judgment under Federal Rule of Civil Procedure 56, made applicable to adversary proceedings pursuant to Federal Rule of Bankruptcy Procedure 7056, when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a defendant's summary judgment motion, a plaintiff "must lay bare his proof in evidentiary form and raise an issue of fact sufficient to send to the jury." *Fisher v. Tice*, 2016 WL 4626205, at *9 (S.D.N.Y. July 5, 2016) (Report & Recommendation) *adopted by* 2016 WL 4719759 (S.D.N.Y. Sept. 8, 2016) (quotation omitted); *Rodriguez v. Allstate Indemnity Co.*, 2015 WL 3823730, at *2 (W.D.N.Y June 19, 2015) ("[T]he non-movant must produce *specific facts* indicating that a genuine factual issue exists.") (emphasis in original, quotation omitted)).

Summary judgment is proper where a party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party bears the burden of proof at trial. *Celotex v. Catrett*, 477 U.S. 317, 322-323 (1986).

A party opposing summary judgment cannot create a genuine issue of material fact through conclusory assertions, speculation, or insubstantial evidence. *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310-312 (2d Cir. 2008) ("A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory or based on speculation"); *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 669 (7th Cir. 2005) (granting summary judgment to defendant because plaintiffs' opposition amounted to no more than "bare speculation or a scintilla of evidence").

Where, as here, the non-movant must carry the burden of proof at trial, the movant may establish entitlement to summary judgment in one of two ways:  (1) the movant may proffer evidence that negates a necessary element of the non-movant's claim; or (2) the movant may identify portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *See, e.g.*, *Li v. Zhao*, 35 F. Supp. 3d 300, 304 (E.D.N.Y. 2014) (quotation omitted).

### A.    There Are No Genuine Issues Of Material Fact And Summary Judgment Is Appropriate On Plaintiffs' Remaining Causes Of Action.

The issues before this Court can be determined by the record before it.  The actions of the Village are undisputed as are the contents of the documents upon which the Board relied and the resolutions and Local Law it enacted.  No genuine issue of material fact necessary

for determining the remaining causes of action exists and therefore summary judgment is appropriate.

## ARGUMENT

POINT I.    **NOWHERE IN EITHER THE TRA OR THE AMENDED TRA DID THE BOARD BARGAIN AWAY ITS LEGISLATIVE AUTHORITY.  THE BOARD AT ALL TIMES EXERCISED ITS INDEPENDENT LEGISLATIVE JUDGMENT.  THUS, PLAINTIFFS' CONTRACT ZONING CLAIM MUST BE DISMISSED.**

Plaintiffs' first cause of action, seeking to invalidate the Local Law on the basis that the Village engaged in illegal contract zoning, fails as a matter of law.  Contract zoning is "an agreement whereby a legislature binds itself, **_in advance_**, to exercise its zoning authority in the future for the benefit of a landowner upon the landowner's provision of a consideration." *Tuxedo Land Trust, Inc. v. Town of Tuxedo*, 34 Misc.3d 1235(A), at *13 (Sup. Ct. Orange County 2012) (emphasis added) (citing *Citizens to Save Minnewaska v. New Paltz Cent. Sch. Dist.*, 95 A.D.2d 532, 534 (3d Dep't 1983), *appeal dismissed*, 61 N.Y.2d 853 (1984), and *Levine v. Town of Oyster Bay*, 26 A.D.2d 583 (2d Dep't 1966) (denying contract zoning claim where the agreement did not commit the municipality to a specific course of action with respect the zoning amendment and where no provision in the agreement obligated the municipality to issue approvals), *aff'd on other grounds*, 112 A.D.2d 726 (2d Dep't 2013)); *accord Collard v. Inc. Vill. of Flower Hill*, 52 N.Y.2d 594, 601 (1981) (affirming Appellate Division, Second Department, dismissing contract zoning claim and holding municipalities cannot make contracts that control or limit their prospective exercise of legislative powers).

Thus, a plaintiff must prove the following to sustain a contract zoning claim:  (1) that an agreement exists between the legislative body and a landowner; (2) that the agreement

was entered into in advance of the zoning decision; (3) that the agreement contains a specific provision wherein the legislative body binds itself to exercise its zoning authority in the future for the benefit of the landowner; and (4) that the legislative body's covenant to exercise its zoning authority in a certain manner is made in exchange for consideration. *Tuxedo Land Trust, Inc.*, 34 Misc.3d 1235(A), at *13. Moreover, in *DePaolo v. Town of Ithaca*, 258 A.D.2d 68 (3d Dep't 1999), the Third Department made clear that agreements between landowners and legislative bodies with respect to development projects do not constitute contract zoning ***unless*** the agreement contains a specific provision binding the legislative body to a certain course of action.

> We likewise reject petitioners' assertion that the Town Board engaged in illegal "contract zoning" by amending its zoning ordinance to accommodate the [project] in exchange for Cornell's granting the Town a 99-year license to use certain property as a public park, thereby allowing continued public access to Cayuga Lake. Here again, the record fails to support petitioners' claim, and in fact refutes it. ***Nothing in its agreement with Cornell committed the Town to a specific course of action with respect to the zoning amendment*** and, indeed, the Town expressly rejected language which could have arguably been so interpreted. While Cornell's grant of the license to the Town was conditioned upon its receipt of all approvals required for the project, including rezoning, ***no provision in the agreement obligated the Town to issue such approvals or approve Cornell's rezoning application***.

*Id.* at 71 (emphasis added). As set forth below, Plaintiffs cannot establish any of the required elements here.

     **A.**    **Nowhere In Either The TRA Or The Amended TRA Did The Village Bind Itself With Respect To The Exercise Of Its Legislative Power.**

The plain language of both the TRA and Amended TRA demonstrates that the Village did not enter into a contractual arrangement whereby it "committed the [Village] to a specific course of action" with respect to any legislative or zoning decision. *DePaolo*, 258

A.D.2d at 71. As noted above, a claim for contract zoning requires a showing that the agreement purports to bind the legislature "***in advance*** to exercise its zoning authority in a bargained-for manner." *Collard*, 52 N.Y.2d at 601; *Tuxedo*, 34 Misc.3d 1235(A), at *14 (finding no language in the pertinent documents indicated that the municipality committed itself to a course of action before it actually adopted the approvals and dismissing the contract zoning claim); s*ee also Place v. Hack*, 34 Misc. 2d 777, 779 (Sup. Ct. Wayne County 1962) (upholding zoning amendment and denying contract zoning claim, even where the municipality acknowledged the amendment to its zoning ordinance was adopted to enable and induce an industrial developer to bring its operations to the affect site).

As a first matter, the TRA was not even entered into until after the SUP Application was granted. Dorman Decl., ¶¶ 7-8, Exs. A and C. Thus, at the time the Board made its decision on Delaware North's SUP Application, there was no enforceable agreement in place at all.[4] As *DePaolo* makes clear, even agreements between developers and permitting authorities that are "conditioned upon receipt of all approvals required for the project, including rezoning," do not establish that a legislative body bargained away its zoning power. *DePaolo*, 258 A.D.2d at 71. A specific provision in an agreement requiring legislative action in exchange for consideration is required. *Id.*; *Tuxedo Land Trust, Inc.*, 34 Misc.3d 1235(A), at *13. Moreover, with respect to the Local Law, it cannot be said that the TRA obligated the Board to

---

[4]     Plaintiffs may argue that the approval of the TRA ***after*** the SUP Application was granted is not dispositive by relying on their allegations that there was some other undefined "contractual arrangement" prior to the Board's approval of the TRA on August 16, 2016. Docket No. 43, Amended Complaint, ¶¶ 23, 32. But this contention is without support in law since the Village may only enter into contractual arrangements by a vote of a majority of the Board at a public meeting. *See* N.Y. VILLAGE LAW § 4-412(1) (providing that "the board of trustees of a village shall have management of village property and finances"); *see also* 1988 N.Y. Op. Att'y Gen. (Inf.) 146 (The board of trustees has responsibility for authorizing the village to enter into all contracts). And a village board of trustees may only act by "a majority of the whole number" of the board. N.Y. GEN. CONSTR. LAW § 41. Thus, until August 16, 2016, after the Board approved the SUP Application, there was no enforceable agreement in place.

exercise its zoning authority to permit the VLT Facility because the TRA and the SUP

Application both recognized and contemplated that such uses were already permitted.  Dorman

Decl., Ex. C at 3 ("WHEREAS, by resolution dated August 12, 2016, the Board of Trustees of

the Village . . . conditionally approved the application and granted a special permit . . . .");

Dorman Decl., Ex. A at 7-18.  It was only later, after Supreme Court, Suffolk County's decision

annulling the special permit for the VTL, that contemplation of the Local Law began.  Dorman

Decl., ¶¶ 13-14, Ex. F; Zaleski Decl., ¶¶ 9-10.  Not surprisingly, the TRA contains absolutely no

provision whatsoever obligating the Board to take any legislative action.  Further, the Amended

TRA was entered into approximately two months after the Local Law was adopted, meaning

Plaintiffs cannot demonstrate that the Board agreed ***in advance*** to change its zoning laws.

Dorman Decl., ¶ 21, Ex. G.  And, like the TRA, there is absolutely no obligation whatsoever

requiring the Board to take any legislative action.  This alone requires dismissal of Plaintiffs'

contract zoning claim as there can be no illegal contract zoning "so long as the municipality has

not committed itself to a specific course of action with respect to the zoning amendment as

consideration . . . ."  *See Tuxedo*, 34 Misc.3d 1235(A), at *13 (holding it is not unlawful to

require an applicant to donate or give up rights, even when these are conditioned upon approval).

> **B.      Both The TRA And The Amended TRA Are Host Community
>           Agreements, Which Are Common Land Use Tools To Provide For
>           Environmental Impact Mitigation Under SEQRA.**

As demonstrated above, no illegal "contract zoning" occurred with respect to the

Local Law because the Board never bargained away or sold its powers.  But it is important to

point out that developers and public bodies with land use authority enter into agreements as a

matter of course.  *See, e.g.*, *DePaolo*, 258 A.D.2d at 71 (rejecting the claim of contract zoning

where there was an agreement to grant the town a 99-year lease to use land as a public park);

*Tuxedo Land Trust, Inc.*, 34 Misc.3d 1235(A), at *13 (rejecting the allegation of contract zoning where there was an agreement to donate land to the village subject to a conservation easement). Such agreements are necessary and important land use tools and their circumscription would severely hinder effective land use planning and the exercise of lawful zoning authority to impose conditions on development projects and to mitigate potential adverse environmental impacts under SEQRA. Such agreements may be entered into voluntarily by developers, or they may be imposed as conditions pursuant to a municipality's land use authority. *See* N.Y. VILLAGE LAW §§ 7-725-a(4) (providing authority for a board to impose conditions on the approval of site plans), 7-725-b(4) (authorizing the imposition of conditions on the approval of special use permits); *Church v. Town of Islip*, 8 N.Y.2d 254, 259 (1960) (holding that conditions imposed on a rezoning local law requiring the developer to enter into a restrictive covenant limiting the use of property was permitted and was not improper contract zoning); *Tuxedo Land Trust, Inc.*, 34 Misc. 3d 1235(A), at *13 ("[I]t is not unlawful for a municipality to require that an applicant donate land or property rights or record a restrictive covenant — even if the applicant's obligation to do so is conditioned upon its receipt of necessary approvals — so long as the municipality had not committed itself to a specific course of action with respect to the zoning amendment as consideration therefor.").

The TRA and Amended TRA make their purposes clear: they are host community agreements providing for the mitigation of impacts under SEQRA. Dorman Decl., ¶¶ 8-10, 21-23, Exs. C and G. The TRA noted that the payments due form Delaware North to the Village were to promote community development in the Village and to offset infrastructure, public safety, and emergency services burdens on the Village as the result of the SUP Application. Dorman Decl., ¶ 9, Ex. C at 2-3. The TRA required the construction of

recreational resources in the form of ballfields and associated improvements at a park, which is also critical impact mitigation.  Dorman Decl., ¶ 9, Ex. C at 3.

Host community agreements like the TRA and Amended TRA are commonly found in New York, including housing projects, landfills, and energy facilities.  *See* Daniel A. Spitzer, *et al.*, HOST COMMUNITY AGREEMENTS FOR WIND FARM DEVELOPMENT, N.Y. ZONING LAW & PRAC. REPORT, Mar./Apr. 2009 at 1.  The Amended TRA embodies specific promises made by Delaware North to mitigate impacts, for example, in addition to the above, operating valet parking service at the Property at all times and limiting hours of operation of the restaurant, food, and service locations.  Dorman Decl., Ex. G at 5-6.  This carried out the SEQRA mitigation purposes of the Village.  Dorman Decl., ¶¶ 8-10, 21-23.

The State Legislature has recognized the inherent power of municipalities to enter into host community agreements in the gaming context.  For example, in the statute authorizing additional casino licenses throughout New York, the Legislature required applicants to demonstrate that they had identified infrastructure costs and service costs that would be incurred by the host municipality, and that the applicant had committed to a mitigation plan for the community.  N.Y. RAC. PARI-MUT. WAG. & BREED. LAW §§ 1316(6)-(7).  Applicants complied with the statute by entering into host community agreements, like the TRA and Amended TRA. Spitzer Decl., ¶¶ 13-14, Ex. A.  Significantly, while the Legislature imposed these requirements on applicants, it did not provide for any enabling legislation authorizing host community agreements, recognizing the already existing authority of communities to mitigate impacts through such agreements.  Spitzer Decl., ¶ 14.

**C.      Plaintiffs Lack Standing To Challenge The Local Law On The Basis Of Illegal Contract Zoning.**

With respect to challenges to the SEQRA mitigation for the VLT Facility in the form of the TRA and the Amended TRA, the Plaintiffs abandoned their claims.  In litigation challenging the Board's issuance of a special use permit to Delaware North, Plaintiffs stipulated to the dismissal of their SEQRA claim.  Dorman Decl., ¶ 12, Ex. E.  And, in this proceeding, Plaintiffs never bothered to assert any type of SEQRA claims whatsoever.  *See generally* Docket No. 43, Amended Complaint.  Thus, they are prohibited from challenging the mitigation employed by the Board when issuing the SUP Application or when adopting the Local Law.

Most critically, however, is that Plaintiffs lack standing to challenge the Local Law on the ground that the TRA and/or the Amended TRA are not proper conditions and/or impact mitigation.  Delaware North agreed to the mitigation measures voluntarily and does not contest them.  As the Court of Appeals has held, where the developer accepts conditions or impact mitigation "there is no one in a position to contest them."  *Church*, 8 N.Y.2d at 259.  The Plaintiffs simply are not aggrieved by the obligations Delaware North bears as the result of the Amended TRA.

**POINT II.      PLAINTIFFS' SPOT ZONING CLAIM SHOULD BE DISMISSED BECAUSE THEY CANNOT MEET THEIR HEAVY BURDEN OF DEMONSTRATING THAT THE LOCAL LAW IS INVALID.**

Plaintiffs' second cause of action alleged that the Board engaged in illegal spot zoning when it adopted the Local Law.  For several reasons set forth below, the Board acted reasonably when it determined that a hotel and gaming facility use in an industrial-commercial district is consistent with the current uses in the area, the physical location, and the Comprehensive Plan; thus, Plaintiffs' spot zoning claim fails.

### A.    Plaintiffs Bear A Heavy Burden Because They Are Challenging The Validity Of A Legislative Act.

Because zoning laws are legislative enactments, they enjoy a strong presumption of validity, which can be overcome only by a showing that the decision to rezone was unreasonable and arbitrary, a very deferential standard of review.  As explained by the Court of Appeals, because zoning laws are legislative acts, they are presumed valid and "the burden rests on the party attacking them to overcome that presumption beyond a reasonable doubt."  *Asian Americans for Equality v. Koch*, 72 N.Y.2d 121, 131-32 (1988); *Church*, 8 N.Y.2d at 258 (holding that local legislative acts are "entitled to the strongest possible presumption of validity and must stand if there was any factual basis therefor"); *Goodrich v. Town of Southampton*, 39 N.Y.2d 1008, 1009 (1976) ("Petitioners have failed to overcome the strong presumption of validity which attaches to legislative determinations of a town board . . . ."); *Baier v. Town of Ellery*, 182 A.D.2d 1083 (4th Dep't 1992) (Town Board's amendment to zoning ordinance was a legislative act entitled to strong presumption of validity).

Indeed, courts will strike down local legislative enactments only "as a last resort." *Wiggins v. Town of Somers*, 4 N.Y.2d 215, 218 (1958).  Even if the reviewing court would have made a different choice, the legislative enactment must nonetheless be upheld because "[t]he court will not pass on its wisdom." *Asian Americans for Equality*, 72 N.Y.2d at 132.  A reviewing court may not substitute its decision for that of the legislative body.  *See Rogers v. Village of Tarrytown*, 302 N.Y. 115, 121 (1951); *McDonough v. Apton*, 48 A.D.2d 195, 199 (4th Dep't 1975) (if the validity of a local legislative act is "fairly debatable," the judgment of the legislature which enacted it must stand).  As New York Courts have repeatedly held, "legislative enactments [are] supported by a presumption of validity so strong as to demand of those who attack them a demonstration of invalidity ***beyond a reasonable doubt***, and the courts strike them

19

down **_only as a last unavoidable result_**." *Van Berkel v. Power*, 16 N.Y.2d 37, 40 (1965)

(emphasis added); *see also Stringfellow's of N.Y. v. City of New York*, 91 N.Y.2d 382, 395-396

(1998), *Kravetz v. Plenge*, 84 A.D.2d 422, 428 (4th Dep't 1982).

Before this Court is no more than a disagreement on the wisdom as to a particular

allowable use, the precise calculation assigned to legislative bodies like the Board.  As set forth

below, Plaintiffs can come nowhere close to meeting their heavy burden to show that under no

possible reasonable viewpoint could the VLT Facility be permitting in the OI Zoning District.

Therefore, Plaintiffs' attack on the Local Law should be rejected.

> **B.      The Board's Adoption Of The Local Law, Which Did Not Rezone Any**
> **Property But Merely Clarified That A Gaming Use Was Permitted In**
> **The OI Zoning District, Is Not Spot Zoning.**

The Court of Appeals has explained that the ability to make changes is integral to

a community's promulgation and enforcement of a successful zoning ordinance.  "While stability

and regularity are undoubtedly essential to the operation of zoning plans, zoning is by no means

static." *Rogers*, 302 N.Y. at 121.

> Changed or changing conditions call for changed plans, and
> persons who own property in a particular zone or use district enjoy
> no eternally vested right to that classification if the public interest
> demands otherwise.  Accordingly, the power of a village to amend
> its basic zoning ordinance in such a way as reasonably to promote
> the general welfare cannot be questioned.  Just as clearly,
> decision[s] as to how a community shall be zoned or rezoned, as to
> how various properties shall be classified or reclassified, rests with
> the local legislative body; its judgment and determination will be
> conclusive, beyond interference from the courts, unless shown to
> be arbitrary, and the burden of establishing such arbitrariness is
> imposed upon him who asserts it.

*Id.*

Spot zoning is "the process of singling out a small parcel of land for a use classification totally different from that of the surrounding area, for the benefit of the owner of such property and to the detriment of other owners." *Id.* at 123-124. "It is the antithesis of planned zoning." *Id.* When spot zoning is alleged, courts must determine whether the zoning amendment is calculated to serve the general welfare of the community or if it is intended *solely* to benefit a single owner. *Thomas v. Town of Bedford*, 11 N.Y.2d 428, 435 (1962) ("The vice of spot zoning is its inevitable effect of granting to a single owner a discriminatory benefit at the expense and to the detriment of his neighbors, ***without <u>any</u> public advantage or justification***." (emphasis added)).

In evaluating a claim of spot zoning, courts consider the following factors: (1) the nature of the zoning change; (2) the size of the area subject to the amendment; (3) the relative benefit to the landowner and to the public; (4) the nature and use of the land surrounding the new classification; (5) the process by which the decision was reached; and (6) whether the change is part of a well-considered and comprehensive plan. *See Save Our Forest Action Coalition v. City of Kingston*, 246 A.D.2d 217, 221-22 (3d Dep't 1998); *Youngewirth v. Town of Ramapo Town Bd.*, 155 A.D.3d 755, 760 (2d Dep't 2017) ("In evaluating a claim of spot zoning, courts may consider several factors, including whether the rezoning is consistent with a comprehensive land use plan, whether it is compatible with surrounding uses, the likelihood of harm to surrounding properties, the availability and suitability of other parcels, and the recommendations of professional planning staff."). However, the "ultimate test" in evaluating a spot zoning claim "is whether the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community." *Rayle v. Town of Cato Board*, 295 A.D.2d 978, 979 (4th Dep't 2002) (internal quotation, citation omitted); *Rogers*, 302 N.Y. at 124 (holding that

the inquiry ultimately distills to "whether the change is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community"). Where the zoning amendment is in accordance with the community's comprehensive plan, it is not spot zoning as a matter of law.[5] *See Kravetz*, 84 A.D.2d at 428; *Restuccio v. City of Oswego*, 114 A.D.3d 1191, 1191-1192 (4th Dep't 2014); *Hart v. Town Bd. of Huntington*, 114 A.D.3d 680, 683 (2d Dep't 2014); *Rye Citizens Comm. v. Bd. of Trustees for Vil. of Port Chester*, 249 A.D.2d 478, 479 (2d Dep't 1998). And, this review is conducted under the framework set forth above: a plaintiff bears a heavy burden in challenging the validity of a local legislative enactment and the local legislative body's "'judgment must be allowed to control if the classification is 'fairly debatable.'" *Thomas*, 11 N.Y.2d at 433 (*quoting Rogers*, 302 N.Y. at 121). As set forth below, Plaintiffs cannot meet any of the above elements and their spot zoning claim should be dismissed as a matter of law.

### 1. The Local Law Does Not Rezone The Property At All; There Is No Change In Use Classification.

A foundational element of any spot zoning claim is the rezoning of an area of land to a new use classification. *Rogers*, 302 N.Y. at 121. Thus, there must be, for example, a change in zoning district from one type of use classification to another, *i.e.*, residential to commercial or commercial to industrial. *See, e.g.*, *Citizens for Responsible Zoning v. Common Council of the City of Albany*, 56 A.D.3d 1060, 1062 (3d Dep't 2008) (rejecting spot zoning claim challenging a

---

[5]     While changed circumstances are not required to justify zoning changes, the requirement that a legislative enactment be consistent with a comprehensive plan does not require "slavish servitude to any particular plan," but rather "comprehensive planning with recognition of the dynamics of change . . . ." *Kravetz*, 84 A.D.2d at 430, 446 (4th Dep't 1982). Here, the VLT Facility at issue was not possible until the State Legislature adopted N.Y. TAX LAW § 1617-a; thus, the Village properly responded to changed circumstances when it undertook its evaluation.

rezoning of a parcel of land from commercial office to highway commercial).[6]  By its own terms, the Local Law is not spot zoning as a matter of law because it cannot be disputed that the Local Law never changed the use classification of the Property.  Rather, the Board amended the Village's zoning law to clarify that a VLT Facility is indeed permitted in the Village's OI Zoning District as the result of a court decision which overruled the Village's prior determination that such a use was already permitted and consistent with the OI Zoning District.  The Local Law merely changed the regulations applicable to the OI Zoning District, which applied at the Property in a manner consistent with the Board's prior determination in 2016.  Dorman Decl., ¶ 15.  Nothing changed the character of the zoning district.  As set forth more fully below, the OI Zoning District was reserved for more intense uses, including heavy commercial and industrial uses.  Dormal Decl., ¶ 18; Zaleski Decl., ¶ 15(b), Ex. F.  Even the Plaintiffs admit that a gaming use would be appropriate in a zoning district that permits manufacturing and warehousing uses.  Spitzer Decl., Ex. F (A. Meyer Dep. at 35:7-15 ("Q: I'm just asking you in a zoning district that allows industrial and manufacturing type uses, warehousing uses, would it be appropriate to locate a VLT facility in that zoning district? . . .  A: If it was within legal ramifications, yes.")).

The fact that no use classification of the Property was changed alone requires dismissal of Plaintiffs' spot zoning claim.

---

[6]    While it is conceivable that an argument could be made that a *de facto* rezoning may occur where a legislative body, for example, incorporates heavy industrial uses as allowed uses in a residential zoning district, nothing of the kind has been alleged here.  The question in such a case would necessarily turn on whether the nature of the zoning district changed based on the addition of permitted uses.  With respect to the Local Law, no such thing occurred as the OI Zoning District already permitted heavy commercial and industrial uses.  Allowing a gaming use as a permitted use in no way changes the nature of the zoning district.  And, even Plaintiffs agreed that such a zoning district was appropriate for a VLT Facility.  Spitzer Decl., Ex. F (A. Meyer Dep. at 35:7-15 ("Q: I'm just asking you in a zoning district that allows industrial and manufacturing type uses, warehousing uses, would it be appropriate to locate a VLT facility in that zoning district? . . . A: If it was within legal ramifications, yes.")).

### 2.    The Local Law Applies To The Entire OI Zoning District.

Turning to the next factor, courts may consider the size of the area subject to a rezoning when evaluating a spot zoning claim.  The Local Law does not rezone a particular piece of property; rather, it applies to the entire OI Zoning District.  Dorman Decl., ¶ 15, Ex. F.  While it is true that the change in regulation is only likely to apply to the Property because Delaware North's VLT Facility is the only such gaming facility likely to be permitted under State law in the Village, the Property itself is approximately 8 acres and is located in a heavy commercial and industrial zoning district.  *See Thomas*, 11 N.Y.2d at 435 ("Since the Town Board acted in accordance with a comprehensive plan, even the singling out of one lot or the creation of a small area in the center of a large zone devoted to a different use will not be condemned as spot zoning.").  There has been no rezoning of a small parcel in a manner inconsistent with all surrounding land uses.  The Property is surrounded by a trucking/distribution facility, commercial offices, a wholesale warehouse store, a park and ride, and major highways.  Zaleski Decl., ¶ 15(c).

### 3.    It Is Undisputed That The Local Law Benefits The Village As A Whole, Not Solely Delaware North.

Setting aside the benefits to the people of the State of New York and Suffolk County in general, it cannot be seriously contested that the Local Law benefits the Village as a whole, which precludes any spot zoning claim.  Dorman Decl., ¶¶ 20, 26; Zaleski Decl., ¶ 16.  The VLT Facility resuscitated a declining hotel at the Property, which was in danger of becoming blight.  Dorman Decl., ¶ 20.  The Local Law furthered the economic development goals of the Village, protected the jobs that had been created as the result of the VLT Facility, ensured the continued viability of the hotel at the Property, and furthered the vitality and purposes of the OI Zoning District.  Dorman Decl., ¶ 20, 26; Zaleski Decl., ¶¶ 15(c)-(d), 16.

As the Court of Appeals has long held, "cardinal is the principle that what is best for the body politic in the long run must prevail over the interests of particular individuals." *Shepard v. Village of Skaneateles*, 300 N.Y. 115, 118 (1949).  This is exemplified by *Place v. Hack*, 34 Misc. 2d 777, 783 (Sup. Ct. Wayne Cnty. 1962), where neighboring homeowners challenged the Town's rezoning of an area from farming to industrial use to accommodate quarry operations and asphalt production by a single company, a far more significant change than presented by the Local Law.  Challenging the amendment as spot zoning, the plaintiffs asserted the quarry operation would make their properties less desirable and less valuable, that the amendment was not consistent with a comprehensive plan, and that the Town had no industry and no industrial district other than that permitted by the amendment.

On review, the court noted that "the relevant inquiry is not whether the particular zoning under attack consists of areas fixed within larger areas of different uses, but whether it was accomplished for the benefit of individual owners rather than pursuant to a comprehensive plan for the general welfare of the community."  *Id.* at 780 (*quoting Rodgers*, 302 N.Y. at 124).  Consequently, the question at issue was whether the Town acted in good faith to promote the general welfare.  *Id.* at 783.

On balance, the court found that the Town was motivated to rezone the area in order to stimulate industrial, business and residential growth, give rise to the creation of jobs, and increase the value of properties in the town.  *Id*. at 786.  The Town had been trying to get new industries to relocate there, studied the nature of the business the rezoning would facilitate, and had reasonable grounds to believe the area was well suited to the business.  Moreover, the business would be a substantial benefit to the town and based on the neighboring community's experiences, the Town could reasonably conclude that there would be little detriment to the

surrounding properties and, in time, substantial benefit in general. *Id*. at 783. The court clarified that "whether or not the Board's optimistic views in these respects materialize is not for the court to consider." *Id*.

Regarding potential depreciation in plaintiffs' home values, the court held that this was not of major significance, for the pecuniary profit of the individual is secondary to the public welfare as a whole. *Id*. Consequently, the court found plaintiffs failed to make a showing that the Town acted for the benefit of an individual rather than the general welfare and the spot zoning challenge necessarily failed. *Id*. Here too, the challenge must fail because Plaintiffs at best present speculative claims of harm (*see* Point III, *infra*) that do not outweigh the benefits to the community.

In *Save Our Forest Action Coalition v. City of Kingston*, 246 A.D.2d 217 (3d Dep't 1998), the Third Department rejected a spot zoning challenge on similar grounds. There, litigation was commenced challenging a city's amendment to its zoning code to accommodate a manufacturing facility built by the community's largest employer. *Id*. at 221. On review, Supreme Court dismissed the action and the Third Department affirmed, finding that the "primary motivation" for the zoning amendment was to support local economic development through retention of the city's largest employer and to reap associated economic and tax benefits in connection with the development of the employer's facilities. *Id*. at 221-222. The court reasoned that the rezoning decision had been made "after an extensive review process," including a consideration of the impact on adjoining residential areas, consistency with existing zoning plans, environmental concerns, and the availability of other suitable sites. *Id*. Consequently, the Third Department held that sufficient forethought had been given to the community's land use issues and that there was a "reasonable relation" between the rezoning

determination and the "worthwhile goal of improving the economic health of the community."
*Id*. at 222; *see also Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6 (2000)
(affirming that a decision to rezone may be motivated by a desire to promote economic
development).

That Delaware North may benefit from the Local Law is not the issue; rather, the
question is whether the Board had evidence allowing it to balance the benefits to the entire
community — jobs, increased business activity, new recreational facilities, lower taxes —
against potential negative impacts.  It is undisputed that this was the case.  This determination is
a uniquely legislative function and it is undisputed that there is significant evidence the Board
could reasonably rely upon in making its decision.  Thus, Plaintiffs' spot zoning claim fails.

**4.      The Land Uses Surrounding The Property Demonstrate That
No Spot Zoning Occurred.**

Courts also may look to "whether [a rezoning] is compatible with surrounding
land uses" when evaluating a spot zoning claim.  *Save Our Forest Action Coalition, Inc.*, 246
A.D.2d at 221.  If any portion of land in the area is out of character with the surrounding land
uses, it is Plaintiffs' own properties.  Plaintiffs' lots are surrounded by heavy commercial and
industrial uses and by zoning districts that contemplate intensive uses.  Zaleski Decl., ¶¶ 15(b)-
(c).  Specifically, Plaintiffs' properties are an anomaly in an otherwise commercial and industrial
area, with neighboring uses such as a truck distribution facility, a park and ride, office uses, and
a wholesale shopping facility.  Zaleski Decl., ¶ 15(c).  Also nearby, making the area highly
desirable for heavy commercial and industrial uses, are major highways, including the Long
Island Expressway and the Long Island Motor Parkway.  *Id.*  While Plaintiffs testified that they
had not even reviewed the zoning law or the Village's Comprehensive Plan, the Board members

did and they properly determined that use of the Property for a VLT Facility is consistent with

surrounding uses and the zoning district in which it was located.  Spitzer Decl., Exs. D, E, F, and

G (A. Meyer Dep. at 16:11-23, 87:13-24; R. Meyer Dep. at 12:17-25, 14:14-22; Montano Dep. at

11:20-25, 12:2-11; Tomasino Dep. at 14:20-25, 15:2-5); Dorman Decl., ¶¶18-19; Zaleski Decl., ¶

15.

> **5.      The Process The Board Followed, Including The SUP Application Review And Response To Supreme Court, Suffolk County's Decision, Confirms The Board Did Not Engage In Spot Zoning.**

In evaluating the VLT Facility, from the SUP Application to Supreme Court,

Suffolk County's decision, to the Board's evaluation of the Local Law, the Board completed a

comprehensive review.  The Board's determination to adopt the Local Law "was made after an

extensive review process, including a consideration of the impact on adjoining residential areas,

consistency with existing zoning plans, environmental concerns and the availability of other

suitable sites."  *Save Our Forest Action Coalition, Inc.*, 246 A.D.2d at 222.

With respect to the SUP Application, Delaware North submitted a full

environmental assessment form ("EAF") under SEQRA, which was supplemented by an

expanded environmental assessment and traffic study.  Dorman Decl., ¶¶ 3, 7, Ex. B; Zaleski

Decl., ¶ 3.  The Board referred the SUP Application to the Suffolk County Planning

Commission, conducted public meetings and public hearings, evaluated the Village's zoning

code, and utilized its own engineers and consultants to review the material submitted by

Delaware North.  *Id.*  Following this comprehensive process, including the issuance of a negative

declaration under SEQRA, the Board adopted a resolution granting Delaware North's SUP

Application and issued a 21-page decision document setting forth the Board's findings and

determination, in which the Board unanimously determined that a VLT Facility was an accessory use allowed by special use permit in the OI Zoning District. Zaleski Decl., ¶¶ 4-6, Ex. A at 7-18; Dorman Decl., ¶ 15. The Board specifically found that the VLT Facility, as part of the existing hotel, was consistent with the community, appropriate in the OI Zoning District, and would be "in harmony with and promote the general purposes and intent of Chapter 177." Zaleski Decl., Ex. A at 12.

In 2016, even before consideration of the Local Law, the Board unanimously determined that the VLT Facility was consistent with the Village's comprehensive plan, was allowed by the zoning law, was consistent with uses permitted in the OI Zoning District, and would further the Village's land use purposes and goals. Dorman Decl., ¶ 15; Zaleski Decl., ¶¶ 5-6.

Only after Supreme Court, Suffolk County annulled the VTL special permit did the Board consider the Local Law. Zaleski Decl., ¶¶ 9-10; Dorman Decl., ¶¶ 14-15. And, in doing so, the Board essentially followed the Supreme Court, Suffolk County's counsel that zoning laws and standards may be modified to allow new uses, but doing so requires a legislative change. Dorman Decl., ¶ 13; Zaleski Decl., ¶ 8, Ex. B at 6. Consistent with its prior determination, and following the court's decision annulling the VLT Facility special use permit, the Board considered the adoption of the Local Law, which would add a hotel/gaming facility as an allowed use in the Village's OI Zoning District. In doing so, the Board complied with SEQRA by evaluating the potential adverse environmental impacts that would result from its adoption. Zaleski Decl., ¶ 11-14, Ex. C. The Board evaluated the EAF and the SUP Application record, including the traffic analyses and information from planning and engineering consultants, and issued a SEQRA negative declaration. Zaleski Decl., ¶ 11; Dorman Decl., ¶ 16. Plaintiffs

have not challenged the Board's SEQRA determination with respect to its adoption of the Local Law.  Zaleski Decl., ¶ 24; *see generally* Docket No. 43, Amended Complaint.  The Board also considered the Comprehensive Plan, the zoning law, the community character, and surrounding land uses.  Zaleski Decl., ¶ 15; Dorman Decl., ¶¶ 18-20, 26.  A public hearing was held on the Local Law, the Local Law was referred to the Suffolk County Department of Economic Development and Planning, and the Village utilized its attorney, consultants, and engineers to evaluate the proposed Local Law.  Zaleski Decl., ¶ 11; Dorman Decl., ¶ 16, Ex. F.  It is undisputed that the process undertaken by the Board was thorough and comprehensive; thus, Plaintiffs' spot zoning claim should be dismissed.

> **6.    Plaintiffs Cannot Prove That The Local Law Is Inconsistent With The Comprehensive Plan Because The Comprehensive Plan Plainly Designates The Property For Heavy Commercial And Industrial Uses.**

The Local Law, which clarifies that a VLT Facility is permitted in the Village's OI Zoning District, is consistent with the Village's Comprehensive Plan.  The OI Zoning District was always designed for more intensive land uses, including heavy commercial and industrial.  Zaleski Decl., ¶ 15; Dorman Decl., ¶ 18-19.  The OI Zoning District was itself created as "a combination of provisions from the Office District and the Industrial District," meaning the Village designed the zoning district to include both commercial and industrial uses in the area.  Zaleski Decl., ¶ 15(a), Ex. D at 122.  Thus, the OI Zoning District was of a "mixed land use character," which, as the Comprehensive Plan recognized, would necessarily result in some impacts to the adjoining residential properties in the area.  Zaleski Decl., Ex. D at 107; *see also id.* at 17 (noting that "noise generated by Metroplex had a substantial impact on the neighbors" on Shafter Avenue, the dead end street off which is Dawson Court and Plaintiffs' properties are located).

The Comprehensive Plan even specifically addresses the hotel use at the Property and noted the convenient location with respect to the Long Island Expressway. Zaleski Decl., Ex. D at 24. The Comprehensive Plan even encourages industrial uses in the OI Zoning District because "[t]o restrict such areas to purely office use[s] would create a high number of unnecessary non-conforming uses and deny the existence and legitimacy of lighter industrial uses being able to coexist with office uses." Zaleski Decl., Ex. D at 107. The Village maintained a mix of hotel, industrial, office, and heavy retail (including automotive repair) in these areas. *Id.* Given that the Comprehensive Plan contemplated even more intensive uses in the OI Zoning District than a VLT Facility, the Board's determination to adopt the Local Law could hardly be considered inconsistent with the Comprehensive Plan. The Comprehensive Plan Update reiterated these principles, noting that the OI Zoning District, in addition to office uses, "permits manufacturing and warehousing uses . . . ." Zaleski Decl., Ex. E at 15.

The Village's zoning law supports the consistency of the Local Law with the Comprehensive Plan, which specifically permits much more intense uses than hotels and gaming facilities. Specifically, the OI Zoning District allows manufacturing uses and warehousing/distribution facilities. Zaleski Decl., ¶ 15(b). Section 177-71(B) of the Village's zoning law provides that "[t]he intent of the Office/Industry District is to continue the orderly mixed-use development consisting of high quality, nonintensive light industrial and warehouse uses along with office development in accordance with appropriate standards of design and site development." Zaleski Decl., Ex. F. Of note, when asked in which zoning district a VLT Facility would be appropriate, Plaintiff Apryl Meyer testified that an appropriate zoning district would be one in which manufacturing and industrial uses are permitted. Spitzer Decl., Ex. F (A. Meyer Dep. at 35:7-15 ("Q: I'm just asking you in a zoning district that allows industrial and

manufacturing type uses, warehousing uses, would it be appropriate to locate a VLT facility in that zoning district? . . . A: If it was within legal ramifications, yes.")).  Ms. Meyer exactly described the OI Zoning District, where the Property and VLT Facility are located.

All of the above was buttressed by the Board members' knowledge of the community and uses in and surrounding the OI Zoning District, which include a truck distribution facility, a park and ride, office uses, a wholesale shopping facility, and major highways.  Zaleski Decl., ¶ 15(c); Dorman Decl., ¶¶ 18-20.  Moreover, ensuring that the hotel use and economic development continued was part and parcel of the Village's planning goals.  Dorman Decl., ¶ 20.

Importantly, during the SEQRA review of the Local Law, the Board made a specific finding that a VLT Facility and the Local Law were consistent with the community plans and with the community character.  Zaleski Decl., ¶¶ 13-14, Ex. C (EAF Part 2 at 10).  These findings stand unchallenged in the record as there is no SEQRA cause of action and, as referenced above, Plaintiffs abandoned their SEQRA cause of action challenging the SUP Application.  In addition, the independent staff of the Suffolk County Department of Economic Development and Planning reached the same conclusion when it reviewed the SUP Application.  Spitzer Decl., Ex. B at 3 (Suffolk County Department of Economic Development and Planning - Staff Report); Spitzer Decl., Ex. C.  Thus, upon the undisputed evidence in the record of the Comprehensive Plan, the existing zoning, the actual use of an existing hotel near the Long Island Expressway and a highway service road, the neighboring park and ride, along with even more intensive uses, placement of gaming uses in the OI Zoning District cannot be deemed unreasonable.  Thus, the Local Law must be upheld.

**POINT III.    THE COURT SHOULD DISMISS PLAINTIFFS' FOURTH CAUSE OF ACTION FOR A PERMANENT INJUNCTION BECAUSE IT IS A REMEDY WITH NO SUBSTANTIVE CAUSE OF ACTION TO SUPPORT THE REQUEST.**

**A.    Plaintiffs' Request For A Permanent Injunction Must Be Denied Because Their Substantive Claims — Alleging Contract Zoning And Spot Zoning — Fail As A Matter Of Law.**

It is well established under New York law that a request for a permanent injunction is not a cause of action in and of itself.  Rather, "[a]n injunction is a remedy, a form of relief that may be granted against a defendant when its proponent establishes the merits of its substantive cause of action against the defendant." *Weinreb v. 37 Apartments Corp.*, 97 A.D.3d 54, 59 (1st Dep't 2012); *Guido v. Town of Ulster Town Board*, 74 A.D.3d 1536, 1538 (3d Dep't 2010) (affirming dismissal of permanent injunction cause of action noting that the permanent injunction request was linked to another substantive cause of action); *Town of Macedon v. Village of Macedon*, 129 A.D.3d 1639 (4th Dep't 2015) (applying *Weinreb* and holding that injunctive relief is not available when plaintiff does not have any substantive cause of action).  "Although it is permissible to plead a cause of action for a permanent injunction, permanent injunctive relief is, at its core, a remedy that is dependent on the merits of the substantive claims asserted." *Weinreb*, 97 A.D.2d at 59 (internal citation and quotation omitted).  "[I]njunctive relief is simply ***not available*** when the plaintiff does not have any remaining substantive cause of action against th[e] defendants." *Id*. (emphasis added); *see also Carlyle, LLC v. Quik Park 1633 Garage LLC*, 160 A.D.3d 476, 477-478 (1st Dep't 2018) ("In light of the dismissal of all of plaintiff's substantive claims, its claims for piercing the corporate veil and a permanent injunction must likewise be dismissed, as they do not constitute independent causes of action.").

Following the Court's decision on Defendants' Motion to Dismiss, Plaintiffs have only two substantive causes of action remaining, one alleging contract zoning and another

alleging spot zoning.  As set forth in Points I and II, *supra*, there is no genuine issue of material

fact with respect to these claims and summary judgment should be granted dismissing them.  As

a result, Plaintiffs' permanent injunction claim should also be dismissed.  *Carlyle, LLC*, 160

A.D.3d at 477-478.

        **B.**       **Plaintiffs' Injunction Request Should Also Be Dismissed Because Plaintiffs Cannot Make The Required Showing.**

       As noted above, although contingent, "it is permissible to plead a cause of action

for a permanent injunction . . . ."  *Weinreb*, 97 A.D.2d at 59.  To do so, a plaintiff must "allege

that there was a violation of a right presently occurring, or threatened and imminent, that he or

she has no adequate remedy at law, that serious and irreparable harm will result absent the

injunction, and that the equities are balanced in his or her favor."  *Caruso v. Bumgarner*, 120

A.D.3d 1174, 1175 (2d Dep't 2014) (internal quotation and citation omitted).  To be entitled to a

permanent injunction, a plaintiff must not only prevail on a substantive cause of action, but they

must prove each of the above elements.  A permanent injunction is often characterized by the

courts as an "extraordinary" or "drastic" remedy.  *DiMarzo v. Fast Trak Structures*, Inc., 298

A.D.2d 909, 910 (4th Dep't 2002); *Merkos L'Inyonei Chinuch, Inc. v. Sharf*, 59 A.D.3d 403, 408

(2d Dep't 2009).  Thus, it "should be awarded only where the right to such relief [is] clear and

where the plaintiff has made out a strong case for such relief; injunctive relief should be denied

in doubtful cases."  *A&G Research, Inc. v. GC Metrics, Inc.*, 19 Misc. 3d 1136(A), *16 (Sup. Ct.

Westchester Cnty. 2008); *Parry v. Murphy*, 79 A.D.3d 713, 715 (2d Dep't 2010); *Ultra Fuel

Corp. v. Johnston*, 30 A.D.2d 801 (1st Dep't 1968).

1.    **Plaintiffs Cannot Demonstrate Any Violation Of A Right Presently Occurring Or That They Will Suffer Serious And Irreparable Harm.**

Plaintiffs' Amended Complaint essentially claims that Delaware North's operation of the VLT Facility has resulted in the following:  (1) increased crime rates; (2) prostitution; (3) public intoxication; (4) gambling; (5) drug addiction; and (6) a diminution in the value of Plaintiffs' properties.  Docket No. 43, Amended Complaint, ¶ 78.  As Plaintiffs' own testimony demonstrates, there is no evidence whatsoever to support these allegations.  Rather, Plaintiffs' testimony contradicts their own allegations in the Amended Complaint.

With respect to the alleged increased crime rates, Plaintiffs admitted calling the police several times to complain, but were unaware of any person that was arrested or charged with a crime related to the VLT Facility.  Spitzer Decl., Exs. F and G (Tomasino Dep. at 50:16-21; A. Meyer Dep. at 97:9-18).  Plaintiff Apryl Meyer testified that the only "criminal activity" she observed was one incident of public urination when the VLT Facility first opened.  Spitzer Decl., Ex. F (A. Meyer Dep. at 100:18-24).  Other than that, Ms. Meyer testified:  "I haven't seen the crime, no, but I also choose not to."  Spitzer Decl., Ex. F (A. Meyer Dep. at 102:4-7).  Plaintiff Kevin Montano had generalized fear about crime before the VLT Facility even opened, which could not be attributed to Delaware North's operation of the VLT Facility.  Spitzer Decl., Ex. D (Montano at 30:17-25, 31:2-6, 33:2-7).

When discussing specific criminal allegations, Plaintiffs' claims become even more untenable.  For example, when addressing the prostitution allegations, Plaintiffs backtracked completely.  Plaintiff Richard Meyer, a police officer, was unaware of any prostitution arrests that have occurred after the VLT Facility became operational.  Spitzer Decl., Ex. E (R. Meyer Dep. at 31:10-17).  Mr. Montano admitted total ignorance on all these issues,

stating "[o]bviously I'm not in the actual venue, so I don't know, you know, about the actual

prostitution . . . ." Spitzer Decl., Ex. D (Montano Dep. at 35:4-10). And, when asked if he ever

saw any incidents of prostitution in his neighborhood after the VLT Facility opened, Mr.

Montano testified: "I have not." Spitzer Decl., Ex. D (Montano Dep. at 31:17-20). Ms.

Tomasino admitted that this allegation is based on "rumors." Spitzer Decl., Ex. G (Tomasino

Dep. at 7:2-12). And strikingly, Plaintiff Apryl Meyer refused to answer questions on this

allegation and seemed to indicate that she had improper inside information from the police

department through "friends" who are undercover police officers. Spitzer Decl., Ex. F (A.

Meyer Dep. at 56: 14-24, 66:10-23). But in the same breath, she wanted to admit that the

prostitution allegations were not specific to Delaware North's VLT Facility, but were only about

casinos in general. Spitzer Decl., Ex. F (A. Meyer Dep. at 61:6-10 ("A. I mean, first of all, some

of these allegations are just based off what goes on in casinos in general.")).

Moving on to Plaintiffs' allegation of "gambling," no doubt all parties will

concede that the VLT Facility has increased gambling at the Property. But that is lawful, not

criminal conduct. On the issue of "drug addiction," Plaintiffs have not alleged in the Amended

Complaint that the VLT Facility has caused them to suffer personally from drug addiction and

they do not have standing to address the injuries of others. *See, e.g., Eaton Associates, Inc. v.*

*Egan*, 142 A.D.2d 330, 334 (3d Dep't 1988). Moreover, the claims of "drug addiction" are

based on the same anecdotal, hearsay, and rumored information as the spurious prostitution

claims. Ms. Meyer testified that the drug addiction allegations were based on "[t]he exact thing

as the prostitution . . . ." Spitzer Decl., Ex. F (A. Meyer Dep. at 66:24-25, 67:2-4). She also

refused to answer any further questions on this topic. Spitzer Decl., Ex. F (A. Meyer Dep. at

69:3-14). Ms. Tomasino again relied on "rumors." Spitzer Decl., Ex. G (Tomasino Dep. at 7:2-

17).  Mr. Montano admitted he never saw any drug deals.  Spitzer Decl., Ex. D (Montano Dep. at 32:6-9).  And police officer Richard Meyer testified the he never saw anyone using drugs on Dawson Court at any time.  Spitzer Decl., Ex. E (R. Meyer Dep. at 67:12-16).

Perhaps most striking is Plaintiffs' complete lack of any evidence or information whatsoever on their allegation of diminution in property value.  All of Plaintiffs' allegations are based on speculation and generalized information not germane to their own properties.  Mr. Meyer has no idea what his home is even worth, hoping "it would be more than [he] paid for it, but [he doesn't] know for sure."  Spitzer Decl., Ex. E (R. Meyer Dep. at 12:9-12).  Mr. Montano testified that he had no idea what his home was worth or whether it has ***increased*** in value.  Spitzer Decl., Ex. D (Montano Dep. at 39:15-25, 40:2-5).  Ms. Meyer testified that the allegations of diminution of property value were based on her internet research, not specific to her property at all.  Spitzer Decl., Ex. F (A. Meyer Dep. at 44:4-25, 45:2-3).  No expert was ever retained to evaluate property values.  Spitzer Decl., Exs. F and G (A. Meyer Dep. at 45:23-25, 46:2-12; *see also* Tomasino Dep. at 24:9-25).

Plaintiffs have utterly failed to show harm at all, let alone irreparable harm.  On this basis alone, their permanent injunction claim should be dismissed.

## 2. Plaintiffs Cannot Demonstrate That They Have No Adequate Remedy At Law.

It is a well-understood rule in New York that "[i]njunctive relief will be afforded only in those extraordinary situations where the plaintiff has no adequate remedy at law and such relief is necessary to avert irreparable injury."  *Chicago Research and Trading v. New York Futures Exchange, Inc*., 84 A.D.2d 413, 416 (1st Dep't 1982).  Plaintiffs cannot make that demonstration here.  Plaintiffs are not entitled to monetary damages because their claims lack

merit.  As a result, Plaintiffs are not seeking monetary damages here.  That a plaintiff is not entitled to damages does not mean there is an inadequate remedy at law.  Rather, it demonstrates that Plaintiffs have no injury and, if not entitled to damages, they certainly are not entitled to the drastic remedy of an injunction.

### 3.      Plaintiffs Cannot Demonstrate That The Equities Balance In Their Favor.

Plaintiffs moved into an area surrounded by major highways and a heavy commercial and industrial zoning district.  The Village's Comprehensive Plan and zoning law make clear that the area surrounding Dawson Court was intended for more intense uses.  Around Plaintiffs' property includes a distribution/trucking facility, a wholesale distributor store, a park and ride, office buildings, the Long Island Expressway, and the Long Island Motor Parkway.  Zaleski Decl., ¶ 15(c).  Plaintiffs knew of the hotel use at the Property.  Spitzer Decl., Exs. D, E, F, and G (Montano Dep. at 12:12-14; R. Meyer Dep. at 14:23-25, 15:2-8; A. Meyer Dep. at 17:11-21; Tomasino Dep. at 17:15-19).  None of them reviewed the Village's Comprehensive Plan — either before or after buying their property — and none of them reviewed the Village's zoning law.  Spitzer Decl., Exs. D, E, F, and G (A. Meyer Dep. at 16:11-23, 87:13-24; R. Meyer Dep. at 12:17-25, 14:14-22; Montano Dep. at 11:20-25, 12:2-11; Tomasino Dep. at 14:20-25, 15:2-5).  Thus, they had no realistic expectation as to what could or could not be located near their properties.  As the OI Zoning District regulations provide, manufacturing uses, warehousing uses, distribution facilities, and other high-intensity uses were always allowed and contemplated for this area.  Zaleski Decl., ¶ 15(b), Ex. F.  If any properties are out of place in the area, they are the Plaintiffs' homes.

The VLT Facility is a lawful use, permitted by the Local Law. Plaintiffs' allegations of harm are based on nothing more than generalized information of secondary effects of gaming uses, not specific to Delaware North's VLT Facility, "rumors," and information passed from unnamed police officer "friends." The significant harm that Defendants would suffer if an injunction were granted must be weighed against these baseless and speculative accusations. Enjoining the operation of Delaware North's VLT Facility would cause significant harm to Delaware North, Suffolk OTB, the Village of Islandia, the State of New York, and the general public. As Suffolk OTB noted in its motion to intervene in this action in Supreme Court, Suffolk County, an injunction would threaten its very existence. Docket No. 9 (Order of Supreme Court, Suffolk County granting Suffolk OTB's Motion to Intervene at 3). Indeed, Justice Ford made specific reference to this risk of harm to Suffolk OTB in his May 14, 2018 Order granting Suffolk OTB's motion to intervene. *Id.* at 5. Moreover, as noted in Delaware North's required revenue filing with the New York State Gaming Commission, more than $120 million has been generated for New York education purposes alone.[7] In addition, the harm to the Village would be significant, as the Property would become blighted, jobs would be lost, economic development opportunities would be harmed, and revenues would drastically be reduced. It is respectfully suggested that Plaintiffs cannot demonstrate that the equities balance in their favor.

---

[7]    Delaware North's VLT Facility's (Jake's 58) revenue filing with the New York State Gaming Commission, available at https://www.gaming.ny.gov/pdf/finance/Web%20Site%20Report%20-%20Jakes%2058%20Suffolk%20OTB.pdf (last accessed October 28, 2018).

## **CONCLUSION**

In approving Delaware North's SUP Application for a VLT Facility and in adopting the Local Law in response to Justice Ford's decision, the Village determined, time and again, that the VLT Facility was an appropriate use in the OI Zoning District and is in the best interests of the Village as a whole.  In adopting the Local Law, the Board considered and followed the Village's Comprehensive Plan and the purpose and intent of the OI Zoning District. It properly considered and acted consistent with surrounding land uses in a heavy commercial/industrial district that is serviced by major highways.  The Board also ensured appropriate impact mitigation was in place to protect the Village.  The best evidence that can be provided that the Village acted in the best interest of the general welfare of the community are the benefits that the entire Village, Suffolk County, and the State of New York have seen from the VLT Facility.

On the undisputed record, the Board's actions were reasonable, benefitted the community, and did not improperly transfer the Village's legislative power.  For the foregoing reasons, Delaware North asserts that it is entitled to judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 56 and Federal Rule of Bankruptcy Procedure 7056, dismissing Plaintiffs' first, second, and fourth causes of action.

Dated:    October 29, 2018
          Buffalo, New York

        **HODGSON RUSS LLP**
        *Attorneys for Defendant Delaware North Islandia*
        *Properties, LLC*

        By:_____s/  Charles W. Malcomb_____
                Charles W. Malcomb
                Daniel A. Spitzer
                Carmine J. Castellano
                Richard L. Weisz
        The Guaranty Building
        140 Pearl Street, Suite 100
        Buffalo, New York 14202
        (716) 856-4000
        *cmalcomb@hodgsonruss.com*
        *dspitzer@hodgsonruss.com*
        *ccastell@hodgsonruss.com*
        *rweisz@hodgsonruss.com*

            and

        **FARRELL FRITZ, P.C.**
        *Attorneys for Defendant Delaware North Islandia*
        *Properties, LLC*
        Anthony S. Guardino
        John C. Stellakis
        Patrick T. Collins
        100 Motor Parkway, Suite 138
        Hauppauge, New York 11788
        (631) 367-0716
        *aguardino@farrellfritz.com*
        *jstellakis@farrellfritz.com*
        *pcollins@farrellfritz.com*