# EXHIBIT D

1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------X
In re:                                    Chapter 9

SUFFOLK REGIONAL OFF-TRACK BETTING    Case No.
CORPORATION,                          12-43503-CEC

                Adjusted Debtor.
------------------------------------------X
JENNIFER TOMASINO, KEVIN MONTANO, RICHARD
MEYER, and APRYL L. MEYER,

                Plaintiffs,


         -against-              Adv. Proc. No.
                                   18-1033-CEC

INCORPORATED VILLAGE OF ISLANDIA, BOARD OF
TRUSTEES OF THE VILLAGE OF ISLANDIA, DELAWARE
NORTH ISLANDIA PROPERTIES, LLC, aka DELAWARE
NORTH, and SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION,

                Defendants.
------------------------------------------X
                    October 12, 2018
                    10:22 a.m.

                    100 Motor Parkway
                    Hauppauge, New York


     DEPOSITION of KEVIN MONTANO, a Plaintiff

herein, taken by Adversarial Parties, pursuant

to Federal Rules of Civil Procedure, and Notice,

held at the above-mentioned time and place,

before Edward Leto, a Notary Public of the State

of New York.

```
                                                              2
 1
 2    A P P E A R A N C E S:
 3
 4        LAW OFFICES OF ANTON J. BOROVINA
              Attorneys for Plaintiffs
 5            225 Broad Hollow Road, Suite 303
              Melville, New York  11747
 6
          BY:  ANTON J. BOROVINA, ESQ.
 7
 8
          SINNREICH KOSAKOFF MESSINA, LLP
 9            Attorneys for Defendants Incorporated
              Village of Islandia and Board of
10            Trustees of the Village of Islandia
              267 Carleton Avenue, Suite 301
11            Central Islip, New York  11722

12        BY:  MICHAEL STANTON, ESQ.

13

14        HODGSON RUSS, LLP
              Attorneys for Defendants Delaware
15            North Islandia Properties, LLC aka
              Delaware North
16            140 Pearl Street, Suite 100
              Buffalo, New York  14202
17
          BY:  DANIEL A. SPITZER, ESQ.
18
19
          ECKERT SEAMANS CHERIN & MELLOTT, LLC
20            Attorneys for Adjusted
              Debtor/Defendant Suffolk Regional
21            Off-Track Betting Corporation
              10 Bank Street, Suite 700
22            White Plains, New York 10606

23        BY:  CHRISTOPHER F. GRAHAM, ESQ.
               REN-ANN WANG, ESQ., of Counsel
24
25
```

3

1

2                FEDERAL STIPULATIONS

3

4        IT IS HEREBY STIPULATED AND AGREED by

5   and between the parties hereto, through their

6   respective counsel, that the certification,

7   sealing and filing of the within examination

8   will be and the same are hereby waived;

9        IT IS FURTHER STIPULATED AND AGREED

10  that all objections, except as to the form of

11  the question, will be reserved to the time of

12  the trial;

13       IT IS FURTHER STIPULATED AND AGREED that

14  the within examination may be signed before any

15  Notary Public with the same force and effect as

16  if signed and sworn to before this Court.

17

18

19

20

21

22

23

24

25

1                    K. Montano

2    K E V I N   M O N T A N O, the Witness herein,

3        having been first duly sworn by a Notary

4        Public in and of the State of New York, was

5        examined and testified as follows:

6    EXAMINATION BY

7    MR. SPITZER:

8         Q    Please state your full name for

9    the record.

10        A    Kevin Montano.

11        Q    What is your current address?

12        A    4 Dawson Court, Islandia, New York

13   11749.

14                  (K. Montano Exhibit A,

15                  Amended Complaint, was marked for

16                  identification, as of this date.)

17        Q    Good morning, Mr. Montano.

18        A    How are you?

19        Q    Good.  Thank you for coming in

20   today.  My name is Daniel Spitzer.  I represent

21   Delaware North in the proceeding that has been

22   brought against Delaware North and the Village

23   of Islandia.

24                  Have you ever been deposed before?

25        A    No.

 1                      K. Montano
 2    There was no neighbors next to us, so it was a
 3    lot.
 4          Q     Were you the first house built in
 5    the subdivision?
 6          A     I think we did the first deal, but
 7    the other house got built, like, a little bit
 8    faster.
 9          Q     Do you know who's in the other
10    house?
11          A     I mean, the neighbors but I don't
12    really, like -- you know.
13          Q     I just wanted to know if you know
14    their names?
15          A     They're the Pekors.
16          Q     Did you at the time you were
17    investigating the house, look at the Village
18    zoning code?
19          A     No.
20          Q     Did you at the time you were
21    looking at the house, look at the Village Master
22    Plan?
23          A     I don't even know what that is.
24          Q     So, then you also didn't look at
25    the Master Plan Update?

1                     K. Montano

2          A     No.

3          Q     Did you know that the Master Plan

4    for the Village of Islandia says that there is a

5    concern about single family homes being built

6    along north -- excuse me -- Shafter Street,

7    S-H-A-F-T-E-R --

8          A     Yes, Shafter.

9          Q     -- because of noise generated by

10   the metroplex?

11         A     No, I didn't know.

12         Q     So, was the hotel there when you

13   moved in?

14         A     Yes.

15         Q     And let's talk about the hotel

16   property for a little while if we could.  How

17   has the hotel property physically changed since

18   you moved in?

19         A     Since before the casino or when we

20   moved in?

21         Q     You're getting to the question.

22   You phrased it frankly better than I did.  What

23   I'm looking for is any changes that happened as

24   a result of the casino in terms of the physical

25   aspects of the property?

13

K. Montano

```
 2      A     The physical aspects, I mean, they
 3  put a fence.  That's a physical.
 4      Q     Yes, it is.
 5      A     But besides that, I mean, before
 6  that, before we moved in there was no fence.  It
 7  was, you know, but then after they put up a
 8  fence.
 9      Q     When you're talking about a fence,
10  you're talking specifically the fence between
11  the parking lot and Dawson Court?
12      A     Correct.
13      Q     Did they change the lighting in
14  the parking lot?
15      A     I think they put an extra light
16  somewhere in there, but, like, in the back in
17  the parking lot.
18      Q     That light that you just
19  mentioned, is that visible from your house?
20      A     Yes.
21      Q     So tell me where in the back you
22  think that extra light is.
23      A     Just in I guess the parking --
24  remember, the front parking lot for the casino
25  is my backyard, so it's the front of the casino
```

14

1                    K. Montano
2    which is my backyard.  So when I'm in the
3    backyard, you can see it.
4         Q    If I was standing in front of the
5    casino, your house is --
6         A    The one on the left.  If you're
7    standing in front of the casino, my house is on
8    the left.
9         Q    And the light is basically on the
10   left side of the casino?
11        A    Yes.  I mean, on the left side.
12   Correct.
13        Q    How high up on the building is
14   this lighting?
15        A    No.  It's in the parking lot.
16        Q    It's in the parking lot?
17        A    Yes.  It's not on the building,
18   it's on the parking lot.
19        Q    Like a --
20        A    Like a light post.
21        Q    Other than the fence and the light
22   post, are there any other physical changes to
23   the property that you're aware of?
24        A    That I'm aware of, no.
25        Q    And just to be clear, I'm not

1                    K. Montano
2    asking you about the inside at all.
3         A     No.
4         Q     So, to your knowledge, they didn't
5    increase the amount of parking spaces?
6         A     No.
7         Q     Do any of the windows in your
8    house face the parking lot and casino?
9         A     Yes.
10        Q     Tell me about those rooms in the
11   houses that face the casino.
12        A     My daughter's room and we have,
13   like, a bay window that you can see inside the
14   house.  It's pretty big, so you can see from the
15   casino in the parking lot, you can see to the
16   house.
17        Q     Let's start with your daughter's
18   room, if I may.  Which floor of the house is
19   that on?
20        A     Second floor.
21        Q     And which daughter is that?
22        A     Isabella.
23        Q     Is that window above the level of
24   the fence?
25        A     No, because -- it would be kind of

1                    K. Montano

2        Q      Just to jog your memory, might it
3    have been sometime in 2016?
4        A      Yes, it had to be.  Had to be.
5        Q      As part of your concern, did you
6    go to any public hearings?
7        A      After that, yes.  We started
8    educating ourselves on what was going on.
9        Q      And what did you learn?
10                   MR. BOROVINA:  Sorry,
11              what's the question?
12                   MR. SPITZER:  He said that
13              he started educating himself, so I
14              asked him what did he learn.
15                   MR. BOROVINA:  If you can
16              answer.
17       A      We started finding out more what a
18   casino could bring to a town, a city and so on
19   so forth, and what are the pluses and negatives
20   and that was kind of, like, the beginning of how
21   we started discussing what was going on.
22       Q      Do you remember any specifics that
23   you learned?
24       A      Property value, prostitution,
25   drugs, you know, unwanted people coming from all

```
 1                     K. Montano
 2   types of places.
 3       Q     And these were all things you
 4   learned about before the casino opened?
 5       A     That was when we found out that a
 6   casino was actually being put next door.
 7       Q     And I think we've already covered
 8   this, you said that you don't know whether your
 9   property value has changed since the casino
10   opened?
11       A     I mean, I'm not into -- like, my
12   wife is the one who deals with all of that.
13       Q     Did you ever see any incidences of
14   prostitution in your neighborhood prior to the
15   casino opening?
16       A     No.
17       Q     Did you see any incidences of
18   prostitution in your neighborhood after the
19   casino opening?
20       A     Me myself personally, I have not.
21       Q     By the way, you gave at the
22   beginning several incidents that you were aware
23   of.  I'm not in any way asking you to repeat
24   yourself.  Don't feel like you need to repeat
25   yourself.  That's part of the record.
```

1                    K. Montano

2         A     Okay.

3         Q     Did you ever see any drug deals

4    prior to the casino opening?

5         A     No.

6         Q     Did you ever see any drug deals

7    after the casino opened?

8         A     No, but we smell a lot of

9    marijuana coming from the parking lot.

10        Q     Speaking of parking lots, is there

11   a Park & Ride near your house?

12        A     Yes.

13        Q     Was that facility there when you

14   bought your house?

15        A     Yes.

16        Q     Did you ever have any problems?

17        A     No.

18        Q     Do you know why some of the folks

19   involved with this lawsuit would be concerned

20   about the, quote/unquote, "characters" at the

21   Park & Ride lot?

22        A     No.

23        Q     Were you concerned about moving

24   next to that parking lot?

25        A     No.

 1                    K. Montano
 2        Q      Were there any other issues that
 3   you learned about that concerned you about
 4   casinos?
 5        A      No, just crime in general.  Like,
 6   you know, that's it.  Everything that has to do
 7   with crime.  That was the biggest situation.
 8        Q      Let me ask you to take a look at
 9   Exhibit A again, if I might.  Could you do me a
10   favor and please turn to page 11 and look at
11   paragraph 78.  The last paragraph on that page,
12   just take a moment to re-read that.
13        A      Okay.
14        Q      Are you all set, sir?
15        A      Yes.
16        Q      In that paragraph, do you see
17   where it says "Delaware North's use of the
18   premises is presently causing and effecting and,
19   unless abated, will continue to cause and effect
20   a directly related, local and more intense
21   increase in crime rates, prostitution, public
22   intoxication, gambling and drug addiction and a
23   diminution in the value of Plaintiffs'
24   respective properties," is that what it says?
25        A      Yes.

 1                   K. Montano
 2              MR. BOROVINA:  No, that
 3          person lost the election.
 4      A     All right, so that's how I see it.
 5   I mean, there's an increase and everything you
 6   hear in the news.  Obviously I'm not in the
 7   actual venue so I don't know, you know, about
 8   the actual prostitution, but for what you hear
 9   in the news and what you see in the news, that's
10   what.
11      Q     Okay, are you done?
12      A     Yes.
13      Q     Would you take a look on page 13
14   at paragraph 34?
15      A     13?
16              MR. STANTON:  Paragraph 84.
17      Q     I'm sorry, 84.  Thank you.  Page
18   13, paragraph 84.
19      A     Okay.
20      Q     Do you see where in that paragraph
21   it talks about the potential threats to
22   yourselves and to your children?
23      A     Yes.
24      Q     Are there any other threats other
25   than what you've described or conduct other than

```
                                                         39
 1                     K. Montano
 2        Q     Do you know if there's a fence
 3   around the Park & Ride?
 4        A     I'm not really -- my property
 5   doesn't hit the Park & Ride, so it's, you know,
 6   it's a little further out.
 7        Q     Have you ever thought about your
 8   home as an investment?
 9        A     In what way?
10        Q     Well, you testified that you
11   purchased the home about five years ago and that
12   it's currently worth between 600 and $700,000,
13   right?
14        A     Right.
15        Q     Do you know if the house is worth
16   more now than what you paid for it?
17        A     I don't know how much it's worth
18   but, I mean, any time you buy a piece of
19   property, you know, you expect it to at least
20   hold its equity, right?
21        Q     So you never thought that there
22   was a possibility that the home might decline in
23   value?
24        A     No, definitely not.
25        Q     And has the home increased in
```

1

2                C E R T I F I C A T E

3

4         I, EDWARD LETO, a Notary Public in and

5    for the State of New York, do hereby certify:

6         THAT the witness whose testimony is

7    hereinbefore set forth, was duly sworn by me;

8    and

9         THAT the within transcript is a true

10   record of the testimony given by said witness.

11        I further certify that I am not related,

12   either by blood or marriage, to any of the

13   parties in this action; and

14        THAT I am in no way interested in the

15   outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set

17   my hand this 18th day of October, 2018.

18

19

20

21                    EDWARD LETO

22

23

24

25