# EXHIBIT F

1

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF NEW YORK

------------------------------------------X
In re:                                  Chapter 9

SUFFOLK REGIONAL OFF-TRACK BETTING    Case No.
CORPORATION,                          12-43503-CEC

                    Adjusted Debtor.
------------------------------------------X
JENNIFER TOMASINO, KEVIN MONTANO, RICHARD
MEYER, and APRYL L. MEYER,

                    Plaintiffs,


          -against-                Adv. Proc. No.
                                    18-1033-CEC

INCORPORATED VILLAGE OF ISLANDIA, BOARD OF
TRUSTEES OF THE VILLAGE OF ISLANDIA, DELAWARE
NORTH ISLANDIA PROPERTIES, LLC, aka DELAWARE
NORTH, and SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION,

                    Defendants.
------------------------------------------X
                    October 15, 2018
                    10:18 a.m.

                    100 Motor Parkway
                    Hauppauge, New York


      DEPOSITION of APRYL MEYER, a Plaintiff

herein, taken by Adversarial Parties, pursuant

to Federal Rules of Civil Procedure, and Notice,

held at the above-mentioned time and place,

before Edward Leto, a Notary Public of the State

of New York.

2

1

2   A P P E A R A N C E S :

3

4       LAW OFFICES OF ANTON J. BOROVINA
             Attorneys for Plaintiffs
5            225 Broad Hollow Road, Suite 303
             Melville, New York  11747
6
        BY:  ANTON J. BOROVINA, ESQ.
7

8
        SINNREICH KOSAKOFF MESSINA, LLP
9            Attorneys for Defendants Incorporated
             Village of Islandia and Board of
10           Trustees of the Village of Islandia
             267 Carleton Avenue, Suite 301
11           Central Islip, New York  11722

12      BY:  MICHAEL STANTON, ESQ.

13

14      HODGSON RUSS, LLP
             Attorneys for Defendants Delaware
15           North Islandia Properties, LLC aka
             Delaware North
16           140 Pearl Street, Suite 100
             Buffalo, New York  14202
17
        BY:  CHARLES W. MALCOMB, ESQ.
18

19
        ECKERT SEAMANS CHERIN & MELLOTT, LLC
20           Attorneys for Adjusted
             Debtor/Defendant Suffolk Regional
21           Off-Track Betting Corporation
             10 Bank Street, Suite 700
22           White Plains, New York 10606

23      BY:  CHRISTOPHER F. GRAHAM, ESQ.
             REN-ANN WANG, ESQ., of Counsel
24

25

3

1

2                        FEDERAL STIPULATIONS

3

4          IT IS HEREBY STIPULATED AND AGREED by

5      and between the parties hereto, through their

6      respective counsel, that the certification,

7      sealing and filing of the within examination

8      will be and the same are hereby waived;

9          IT IS FURTHER STIPULATED AND AGREED

10     that all objections, except as to the form of

11     the question, will be reserved to the time of

12     the trial;

13         IT IS FURTHER STIPULATED AND AGREED that

14     the within examination may be signed before any

15     Notary Public with the same force and effect as

16     if signed and sworn to before this Court.

17

18

19

20

21

22

23

24

25

4

```
 1                        A. Meyer

 2    A P R Y L   M E Y E R, the Witness herein,

 3         having been first duly sworn by a Notary

 4         Public in and of the State of New York, was

 5         examined and testified as follows:

 6    EXAMINATION BY

 7    MR. MALCOMB:

 8         Q      Please state your full name for

 9    the record.

10         A      Apryl Meyer.

11         Q      What is your current address?

12         A      1 Dawson Court, Islandia, New York

13    11749.

14                        (A. Meyer Exhibit A,

15                        Amended Complaint, was marked for

16                        identification, as of this date.)

17         Q      Hi, Ms. Meyer.  How are you doing

18    today?

19         A      Good, how are you?

20         Q      Good.  My name is Chuck Malcomb.

21    I'm an attorney with Hodgson Russ.  I represent

22    Delaware North, one of the Defendants in this

23    matter.

24                        Have you ever been deposed before?

25         A      Once before.
```

16

1                        A. Meyer

2    the contractor gave you?

3          A      Yes.

4          Q      And then you wanted some upgrades

5    so you paid that much more, right?

6          A      Right.

7          Q      So, at the time you bought it,

8    there was still an opportunity for you to make

9    changes to the house, right?

10         A      Yes.

11         Q      When you bought your home, did you

12   look at the zoning regulations in the Village of

13   Islandia?

14         A      I didn't.

15         Q      Did you look at the Master Plan?

16         A      I didn't.  I didn't know what a

17   Master Plan even was.

18         Q      So, you didn't rely on the Master

19   Plan when you bought your house?

20         A      No.

21         Q      You didn't rely on the zoning

22   regulations when you bought your house?

23         A      No.

24         Q      Did you investigate the

25   surrounding land uses at the time you bought?

17

1                    A. Meyer

2        A       Meaning?

3        Q       Did you take a drive around and

4    look at what was going on around your proposed

5    location?

6        A       I did.  I actually grew up fairly

7    close to that area, so when we purchased the

8    home I kind of knew the surrounding areas.

9        Q       Where did you grow up?

10        A       In Islip Terrace.

11        Q       So what did you observe when you

12    were kind of doing your investigation of the

13    area?

14        A       I mean, we saw, you know, the

15    casino.  The first thing my husband said was the

16    hotel; he said, you know, do you want to live

17    this close to a hotel, and I said well, I've

18    actually worked in that hotel.  I've done jobs

19    in there and it was always quiet.  Never really

20    any traffic or cars, so it didn't bother us at

21    the time at all.

22        Q       What were the land uses you

23    noticed when you were looking at buying the

24    place around the area?

25        A       Well, there was the Park & Ride

1                    A. Meyer

2    because, I mean, we live in a village and we

3    know that no casinos were allowed to be in the

4    village, so -- I mean, yes, in an industrial

5    area you would assume so, but we don't live in

6    an industrial area.

7         Q      I'm just asking you in a zoning

8    district that allows industrial and

9    manufacturing type uses, warehousing uses, would

10   it be appropriate to locate a VLT facility in

11   that zoning district?

12                    MR. BOROVINA:  Continuing

13                    objection.

14        A      If it was within legal

15   ramifications, yes.

16        Q      Thank you.  I want to go back to

17   the questions that I asked you about Suffolk

18   County Concerned Citizens.  You mentioned that

19   you were the treasurer?

20        A      Yes.

21        Q      In that context, correct me if I'm

22   mistaken, but you said that you were part of

23   founding that group, right?

24        A      Yes.

25        Q      And that you worked together with

44

1                    A. Meyer

2              Do you agree with that statement?

3        A     I do.

4        Q     Could you tell me what you relied

5    upon to make the allegation that your property

6    value has gone down?

7        A     Just a lot of research that we've

8    done.

9        Q     Could you detail that?

10       A     Do I know where I looked

11   specifically?  I looked in a lot of different

12   places that I don't recall off the top of my

13   head, but one of the studies we did, it showed

14   that we were the closest residential area to a

15   casino in North America, and usually it's 20

16   percent loss of value when you're anywhere even

17   near a casino within a one- to two-mile radius.

18   And we're the closest, so.

19       Q     And what information are you

20   basing that 20 percent figure on?

21       A     What do you mean "what

22   information"?  Just the research we've done.

23       Q     What sources did you use?

24       A     I don't remember where I looked it

25   up, but we looked up a lot of different things.

45

1                    A. Meyer

2         Q      Online materials?

3         A      Yes, a lot of that.

4         Q      People in the Concerned Citizens

5    group shared some stuff with you probably,

6    right?

7         A      Yes, and we had some people come

8    in and speak on behalf of where they live.  You

9    know, if they lived close to a casino, they

10   spoke and gave us their stories as well.

11        Q      And what was the information that

12   you derived from that on property value?

13        A      I'm sorry?

14        Q      What information did you get from

15   those speakers about property value?

16        A      That it would be diminished pretty

17   significantly.

18        Q      Did they provide any studies or

19   evaluations that you can recall?

20        A      They did.  They did.

21        Q      Do you remember what they were?

22        A      I don't remember.

23        Q      Did you hire any type of an

24   expert, did you personally or did Concerned

25   Citizens hire any type of an expert on property

46

1                    A. Meyer

2    values?

3         A      No.

4         Q      Did you talk to any appraiser

5    about this issue?

6         A      We have a friend who's an

7    appraiser and he did say that it would go down

8    in value, but he didn't write anything down for

9    us.

10        Q      And he didn't look at your house

11   or look at your area, right?

12        A      No.

13        Q      Look at paragraph 78 if you could.

14   "Delaware North's use of the premises is

15   presently causing and effecting and, unless

16   abated, will continue to cause and effect a

17   directly related, local and more intense

18   increase in crime rates, prostitution, public

19   intoxication, gambling and drug addiction and a

20   diminution of Plaintiffs' respective

21   properties," do you see that?

22        A      Yes.

23        Q      Did I read that accurately?

24        A      Yes.

25        Q      Do you agree with that statement?

1                    A. Meyer

2    documents, all those police reports?

3         A     I'm not sure actually.  We saw

4    some of them.

5         Q     When did you receive the

6    documents?

7         A     We're picking them up today.

8         Q     So you don't actually have them

9    yet?

10        A     No, but we did have one person

11   from Concerned Citizens, he has them in his

12   possession, so we were able to see about a year

13   or two of the police reports.

14        Q     Got it.  Can you talk about the

15   prostitution issue in paragraph 78?  Have you

16   seen any evidence of prostitution?

17        A     No, but it's what I've heard.

18        Q     What have you heard?

19        A     That there was prostitution going

20   on in the casino and around the casino.

21        Q     Who did you hear that from?

22        A     Just people in the neighborhood

23   and my husband's friends who are police officers

24   told us.

25        Q     So, police officers told you that

61

1                          A. Meyer

2          Q      Well, how do you know about it?

3          A      Because they're our friends.  They

4    tell us, "In your backyard there's prostitution

5    going on."

6          Q      Then you used that information to

7    make these allegations?

8          A      I mean, first of all, some of

9    these allegations are just based off what goes

10   on in casinos in general.

11         Q      So this isn't specific to this

12   casino, is that what you're saying?

13         A      My husband had seen so many of

14   them.  He works in the surrounding areas.  He

15   knows which once are prostitutes and which ones

16   are not.  He sees them walking all over the

17   casino.

18         Q      Maybe we can move on from this

19   line of questioning if you can testify that this

20   allegation is not based on the conditions of the

21   VLT facility next to your house.  You're talking

22   about in general, right?

23                        MR. BOROVINA:  Objection to

24                that question.  And she's not

25                making that representation.

1                          A. Meyer

2    with respect to this allegation, you're saying

3    this is casinos in general, not necessarily the

4    Delaware North facility?

5          A      I don't want to testify to that

6    because that's not necessarily the truth.  I

7    mean, that's partially, you know, the reason,

8    but I do know that people had said that there's

9    been prostitution.

10         Q      And I need to know who those

11   people are.

12         A      I can't give you that information.

13         Q      Are you refusing to answer that

14   question?

15         A      They work there -- it's their --

16   yes, I am.

17         Q      You're refusing to answer that

18   question?

19         A      I have to.

20                     MR. MALCOMB:  We'll move

21                on.  Let the record reflect that

22                the witness refused to answer the

23                question.

24         Q      Drug addiction, what information

25   are you basing that allegation on?

67

```
 1                      A. Meyer
 2         A      The same exact thing as the
 3    prostitution; people that work in narcotics and
 4    undercover.
 5         Q      I'm assuming that you're not going
 6    to --
 7         A      I can't.
 8         Q      -- tell me that information
 9    either?
10         A      I can't.
11         Q      So there are these unnamed people
12    making these allegations that you've parroted in
13    this Complaint and we can't ask any questions,
14    right?
15         A      But if there's an undercover
16    officer on a job, how am I supposed to give that
17    information?  It's not my --
18         Q      No, I understand, but let me ask
19    you this because you're married to a police
20    officer, I don't have any family members who are
21    police officers, I don't know all the rules on
22    how it works off the top of my head here, but
23    let me ask you this, to your knowledge, if
24    somebody's working undercover, are they supposed
25    to tell other people?
```

69

```
 1                    A. Meyer
 2                    MR. BOROVINA:  All right.
 3          Q     So are you refusing to answer the
 4    question on drug addiction?
 5                    MR. BOROVINA:  That
 6                    question drug addiction?  What
 7                    question are we talking about?
 8          Q     Are you refusing to answer the
 9    question about your source of knowledge on drug
10    addiction?
11                    MR. BOROVINA:  Other than
12                    what she's already testified to?
13                    MR. MALCOMB:  Correct.
14    A     Yes.
15                    MR. MALCOMB:  She's
16                    testified that it comes from these
17                    people that we can't tell you.
18                    MR. BOROVINA:  That's not
19                    the sole source of her testimony.
20                    That it came from verbal
21                    communications as well.
22                    MR. MALCOMB:  Of course it
23                    came from verbal communications.
24                    That's what we're talking about.
25                    MR. BOROVINA:  She said she
```

87

```
 1                    A. Meyer

 2            identities, that she's not going

 3            to reveal them, and we will be

 4            reserving our right to move to

 5            compel her testimony.

 6                    That's all the questions I

 7            have at this time.

 8   EXAMINATION BY

 9   MR. STANTON:

10       Q    Ms. Meyer, my name is Mike

11   Stanton.  I represent the Village in this

12   proceeding.

13            You testified earlier that when

14   you purchased your home, you did not rely on the

15   Village's Master Plan, do you recall that

16   testimony?

17       A    Yes.

18       Q    That testimony was accurate?

19       A    Yes.

20       Q    Have you ever seen the Village's

21   Master Plan?

22       A    No.

23       Q    Never to this date?

24       A    No.

25       Q    So, it's safe to assume that
```

1                    A. Meyer

2        Q      And then he'll turn it over to us.

3               MR. MALCOMB:  Can we go off

4               the record for a second.

5               (Discussion held off the

6               record.)

7               MR. GRAHAM:  Back on the

8               record.

9        Q      And I believe you testified that

10   to your knowledge, no one has been charged with

11   a crime as a result of any of the phone calls

12   that you made to the police, right?

13       A      No.

14       Q      Is that right?

15       A      That's right.

16       Q      So, you're not aware of anybody

17   being arrested or getting a ticket or anything?

18       A      No.

19       Q      Of these 15 to 20 calls, do you

20   remember in substance what you said on any of

21   these calls to the police officer that answered

22   the phone?

23       A      Well, it would be the responder,

24   right, that I spoke with.

25       Q      All right.

1                      A. Meyer

2    friendly people just looking to get to the

3    casino.

4         Q      You weren't afraid or anything?

5         A      Not with them.  Just the

6    suspicious people.

7         Q      Mr. Malcolm asked you a number of

8    questions about paragraph 78 and, in particular,

9    I'm just going to quote from paragraph 78 of the

10   Complaint which is exhibit, I believe, Meyer A.

11   Look at paragraph 78 on page 11.

12                Do you see that, Ms. Meyer?

13        A      Yes.

14        Q      Do you remember that language

15   where it refers to "intense increase in crime

16   rates," do you see that?

17        A      Yes.

18        Q      You haven't personally seen any

19   criminal activity, have you?

20        A      Me with my own personal eyes?

21        Q      Yes.

22        A      Is urinating like the urination on

23   our trees in front of our home considered a

24   crime?

25        Q      Is there anything else?  So you

1                    A. Meyer

2    your attorney, that would great.

3          A      I'll do that, definitely.

4          Q      So, other than that incident, any

5    other crime that you observed?

6          A      I haven't seen the crime, no, but

7    I also choose not to.

8                    MR. MALCOMB:  Let's index a

9                    demand for that.

10                   MR. GRAHAM:  Yes.

11                   MR. MALCOMB:  It seems like

12                   there's quite a few documents that

13                   haven't been turned over in

14                   discovery.

15                   MR. BOROVINA:  I don't

16                   agree with that characterization,

17                   but to the extent that they're

18                   being identified now.

19         A      And that was with Concerned

20    Citizens.  That was, like --

21                   MR. MALCOMB:  Is it on your

22                   telephone?

23                   THE WITNESS:  What was

24                   that?

25                   MR. MALCOMB:  Where is the

118

```
1

2              C E R T I F I C A T E

3

4          I, EDWARD LETO, a Notary Public in and

5     for the State of New York, do hereby certify:

6          THAT the witness whose testimony is

7     hereinbefore set forth, was duly sworn by me;

8     and

9          THAT the within transcript is a true

10    record of the testimony given by said witness.

11          I further certify that I am not related,

12    either by blood or marriage, to any of the

13    parties in this action; and

14          THAT I am in no way interested in the

15    outcome of this matter.

16          IN WITNESS WHEREOF, I have hereunto set

17    my hand this 18th day of October, 2018.

18

19

20

21                    EDWARD LETO

22

23

24

25
```