**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------)
In re:

SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION,

                Adjusted Debtor.

Chapter 9 Case No. 12-43503-CEC

-----------------------------------------------------------------------)
JENNIFER TOMASINO, KEVIN MONTANO,
RICHARD MEYER and APRYL L. MEYER,

                Plaintiffs,

       -against-

INCORPORATED VILLAGE OF ISLANDIA,
BOARD OF TRUSTEES OF THE VILLAGE OF
ISLANDIA, DELAWARE NORTH ISLANDIA
PROPERTIES, LLC, aka, DELAWARE NORTH,
and SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION,

Adv. Proc. No. 18-1033-CEC

                Defendants.
-----------------------------------------------------------------------)

**TO THE CLERK OF THE COURT: In accordance with the Guidelines for the Division of Business Among District Judges Eastern District § 50.1 (d)(2)(a)(b) and (3), Plaintiffs request that the case be designated a Long Island case because it is a civil proceeding that was removed to the Eastern District Bankruptcy Court as an adversarial proceeding from the New York State Supreme Court located in Suffolk County, all of the parties reside in Suffolk County, all of the events or omissions giving rise to the claim occurred in Suffolk County and such a designation of the action will serve the convenience of the parties and witnesses or is otherwise in the interests of justice.**

**PLAINTIFFS' OBJECTIONS TO BANKRUPTCY COURT'S**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**AS AMPLIIFIED BY THE MEMORANDUM OF LAW IN SUPPORT THEREOF**

Plaintiffs, Jennifer Tomasino, Kevin Montano, Richard Meyer and Apryl L. Meyer (collectively, "Plaintiffs"), by their attorneys, Anton J. Borovina and Paul Sabatino II, respectfully submit the following objections to the Proposed Findings of Fact and Conclusions of Law  recommending dismissal of the complaint ("Proposed Findings") made by the Honorable Carla E. Craig of the United States Bankruptcy Court for the Eastern District of New York in the above adversary proceeding on December 17, 2018 (Doc. No. 100) as further stated and amplified by the accompanying memorandum of law which is incorporated by reference as if more fully set forth herein pursuant to 28 U.S.C. §157(c) and Bankruptcy Rule 9033.

## OBJECTIONS

**Objection No. 1**      Plaintiffs object to the Bankruptcy Court having made findings of fact in the Proposed Findings based upon judicial notice of facts. The Proposed Order does not specify any finding of fact upon which judicial notice was taken. Such finding of fact were improperly made inasmuch as the role of the Bankruptcy Court in resolving Defendants' motions seeking summary dismissal of the first (zoning by contract) and second (spot zone) causes of action alleged in the Amended Complaint was to identify and not resolve issues of disputed material facts.

**Objection No. 2**      Plaintiffs object to the Proposed Findings' recommendation that the contract zone claim be summarily dismissed because they failed to prove the existence of an agreement between the Village and Delaware North in advance of the Local Law No. 3-2017 ("Local Law")'s adoption which required the Village to adopt the Local Law. As discussed at length in the memorandum of law accompanying this Objection, the motion record evidenced the existence of disputed issues of fact regarding the timing and circumstances upon which an agreement  was made between the Village and Delaware North in conjunction with the Village's

adoption of the Local Law pursuant to which the Village agreed to use its zoning powers to adopt the Local Law expressly designed to benefit only Delaware North with the formal execution of that agreement to be deferred until after the Local Law has been actually adopted. The Proposed Finding's factual and legal conclusion that no zoning by contract claim can succeed because Plaintiffs have not shown the existence of an agreement in advance of the Local Law being adopted is based upon the court having made improper and erroneous findings of fact that no such agreement existed despite evidence in the motion record showing otherwise.

**Objection No. 3**       Plaintiffs object to the Proposed Findings' recommendation that the zoning by contract claim be summarily dismissed based upon the court's erroneous legal conclusion that no zoning by contract claim could be established in the absence of an express contract made in advance of the Local Law being adopted. As discussed at length in the memorandum of law accompanying this Objection, the motion record evidenced the existence of disputed issues of fact establishing that an agreement had been made whereby the Village agreed in advance of the Local Law being adopted that it would adopt (not that it was required to adopt) the Local Law if Delaware North agreed that, upon the adoption of the Local Law in a form approved by Delaware North, Delaware North would formally enter into the Amended TRA after the Local Law was adopted whereby it would re-commit itself to abide by the Taxpayer Relief Agreement ("TRA"). The Village's subsequent ratification of that agreement by its formal execution of the Amended Taxpayer Relief Agreement ("Amended TRA") after the Local Law was adopted was also sufficient to establish the making of an agreement upon which a zoning by contract claim may be established.

**Objection No. 4**       Plaintiffs object to the Proposed Findings' recommendation that the zoning by contract claim be summarily dismissed based upon improper and erroneous findings of fact

2

and conclusions of law that the Amended TRA was not and could not have been the basis upon which a zoning by contract claim may be predicated because it was made in accordance with New York Racing, Pari-Mutuel Wagering and Breeding Law § 1316(6) ("Section 1316(6) agreement") or was otherwise an ordinary "mitigation agreement." As discussed at length in the memorandum of law accompanying this Objection, the motion record evidenced the existence of disputed issues of fact which precluded summary determination that the Amended TRA qualified as a Section 1316(6) agreement or a mitigation agreement.

**Objection No. 5**       Plaintiffs object to the Proposed Findings' recommendation that the zoning by contract claim be summarily dismissed based upon improper and erroneous findings of fact and conclusions of law that the Amended TRA was not and could not have been the basis upon which a zoning by contract claim may be predicated because it represented an ordinary mitigation agreement, if not a Section 1316(6) agreement, whereby Delaware North agreed to provide the Village certain benefits or to satisfy conditions upon receipt of a favorable zoning determination. As discussed at length in the memorandum of law accompanying this Objection, the motion record evidenced the existence of disputed issues of fact establishing that, no matter what euphemistic label is placed on the Amended TRA, the Village Board nevertheless adopted the Local Law in conjunction with an agreement whereby it agreed to bargain away its powers and tie its hands by agreeing to adopt the Local Law in the form approved in advance by Delaware North.

**Objection No. 6**       Plaintiffs object to the Proposed Findings' recommendation that the spot zone claim be summarily dismissed based upon improper and erroneous findings of fact and conclusions of law that the Plaintiffs have not and cannot establish a spot zone claim.  As discussed at length in the memorandum of law accompanying this Objection, the motion record

evidenced the existence of disputed issues of fact regarding the sufficiency of the process the Village Board used to adopt the Local Law in accordance with State law prescribing the process by which zoning enactments may be considered and adopted.

**Objection No. 7**    Plaintiffs object to the Proposed Findings' recommendation that the spot zone claim be summarily dismissed because the process the Village Board used to adopt the Local Law was beyond judicial review on account of the withdrawal of a SEQRA challenge to the 2016 Negative Declaration that had been made in a prior State court Article 78 proceeding and the Amended Complaint's failure to allege a SEQRQ claim. As discussed at length in the memorandum of law accompanying this Objection, Plaintiffs were not required to state a SEQRA claim in the Amended Complaint and the sufficiency of the process the Village Board used to adopt the Local Law was not beyond judicial review as to all matters relating to that process because the Amended Complaint did not allege a SEQRA-based claim.

**Objection No. 8**    Plaintiffs object to the Proposed Findings relating to the Bankruptcy Court's conclusion of fact and law that the Village Board was not required to consider other locations and hotels, such as the Hampton Inn located within the Office/Industrial District. As discussed at length in the memorandum of law accompanying this Objection, the motion record evidenced the existence of disputed issues of fact establishing that the Proposed Findings made improper and erroneous findings of fact and conclusions of law to excuse the Village Board from being required to consider other locations for a gaming facility or other use because no other hotel or other landowner was seeking to operate a Gaming Facility within the Village's borders.

**Objection No. 9**    Plaintiffs object to the Proposed Findings' recommendation that the spot zone claim be summarily dismissed because their challenge to the Local Law for want of uniformity was not specifically pled as a separate cause of action. As discussed at length in the

4

memorandum of law accompanying this Objection, the Amended Complaint satisfied Fed. R.

Civ. Proc. Rule 8's requirement for notice-pleading sufficient to bring up for judicial review the

Local Law's invalidity for want of uniformity.

**Objection No. 10**    Plaintiffs object to the Proposed Findings relating to the Bankruptcy

Court's conclusion of fact and law that the Village Board retained the option of amending the

Village Code to prevent the proliferation of the unwanted gaming use in the event another hotel

is granted a gaming license by New York State and in a manner that does not meet the

requirements of the Local Law. As discussed at length in the memorandum of law accompanying

this Objection, the Village Board's ability to prevent the expansion of gaming uses of lands

located within its borders would have no effect on the right of the Premises' owner to continue to

use the Premises as a gaming facility despite the enactment of local laws intending to limit or

disallow expansion of a future gaming use.

## CONCLUSION

Based upon the foregoing objections and memorandum of law submitted in support of those objections, Plaintiffs request an order pursuant to Fed. R. Bankruptcy Proc. Rule 9033(d) rejecting the Proposed Findings and recommitting the matter to the Bankruptcy Court with instructions that it proceed to trial with further appropriate instructions regarding the application of the State's law prescribing the lawful enactment of local zoning laws.

Dated: January 7, 2019
      Melville, New York

                                 Law Office of Anton J. Borovina

                                 By: _____
                                     Anton J. Borovina

                                 225 Broad Hollow Road, Ste. 303
                                 Melville, New York 11747
                                 (631) 630-1101

                                       -and-

                                 Paul Sabatino II
                                 1617 New York Ave.
                                 Huntington Station, New York 11746

                                 Attorneys for Plaintiffs

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------)
In re:
SUFFOLK REGIONAL OFF-TRACK BETTING
CORPORATION,

              Chapter 9 Case No. 12-43503-CEC

              Adjusted Debtor.

-----------------------------------------------------------------------)
JENNIFER TOMASINO, KEVIN MONTANO,
RICHARD MEYER, and APRYL L. MEYER

              Plaintiffs,

      -against-

INCORPORATED VILLAGE OF ISLANDIA,          Adv. Proc. No. 18-1033-CEC
BOARD OF TRUSTEES OF THE VILLAGE OF
ISLANDIA, DELAWARE NORTH ISLANDIA
PROPERTIES, LLC, aka, DELAWARE NORTH,
and SUFFOLK REGIONAL OFF-TRACK
BETTING CORPORATION,

              Defendants.

-----------------------------------------------------------------------)

### PLAINTIFFS' MEMORANDUM OF LAW
### IN SUPPORT OF OBJECTIONS TO PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Anton J. Borovina, Esq.
225 Broadhollow Road, Ste. 303
Melville, New York 11747
(631) 630-1101

-and-

Paul Sabatino II, Esq.
1617 New York Ave.
Huntington Station, New York 11746

*Attorneys for Plaintiffs*

PRELIMINARY STATEMENT... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

FACTS ADDUCED BY THE MOTION RECORD ... . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.    The Master Plan ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    B.    The Village's Historical Implementation of the Master Plan ... . . . . . . . 3

    C.    The Village Board's Issuance of the Permit ... . . . . . . . . . . . . . . . . . . . . 4

    D.    The TRA ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E.    The Vacatur of the Permit ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    F..    The Village's Actions Taken in Response to the
        Order Vacating the Permit ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

            i.    David Wortman ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

            ii.    Joseph Iannucci... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

            iii.    Mayor Dorman ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    G.    The Adoption of the Local Law
        and its "Local Law Conditions"... . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    H.    The Amended TRA ... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

POINT I:    THE BANKRUPTCY COURT ERRED IN RECOMMENDING
               SUMMARY DISMISSAL OF THE ZONING BY CONTRACT CLAIM.. . . . 21

POINT II:    THE BANKRUPTCY COURT ERRED IN RECOMMENDING
               SUMMARY DISMISSAL OF THE SPOT ZONE CLAIM ... . . . . . . . . . . . . 38

POINT III:    THE LOCAL LAW IS NULL AND VOID
               FOR WANT OF UNIFORMITY... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

*CASES*:

*Asian Americans for Equality v Koch, 72 NY2d 121 (1988)* .. . . . . . . . . . . . . . . . . . . 39, 43, 48

*Augenblick v. Town of Cortland,* 104 A.D.2d 806 (2d Dept.),
    *rev'd on dissenting opinion below*, 66 N.Y.2d 775 (1985) . . . . . . . . . . . . . . . . . . . . . 45, 54

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Boyles v Town Bd. of Town of Bethlehem*, 278 A.D.2d 688 (3d. Dept. 2000) .. . . . . . . 23, 49, 50

*Cannon v. Murphy*, 196 A.D.2d 498 (2d. Dept. 1993). .. . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Church v. Town of Islip*, 8 N.Y.2d 254 (1960). .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27

*Citizens to Save Minnewaska v. New Paltz Central School Dist.*,
    95 A.D.2d 532 (3d Dept. 1983).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28, 29

*City of New York v. 17 Vista Associates, 84 N.Y.2d 299 (1994)* .. . . . . . . . . . . . . . . . . . . . . . 22

*Collard v. Incorporated Village of Flower Hill*, 52 N.Y.2d 594 (1981) .. . . . . . . . . . . . . . . . 23

*Crawford v Kelly, 124 A.D.2d 1018 (4th Dept. 1986))* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Daniels v. Van Voris*, 241 A.D.2d 796 (3d Dept. 1997) .. . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*De Paolo v. Town of Ithaca*, 258 A.D.2d 68 (3d Dept. 1999)... . . . . . . . . . . . . . . . . . . . . 22, 32

*Dexter v. Town Bd. of Town of Gates,* 36 N.Y.2d 102 (1975) .. . . . . . . . . . . . . . . . . . . . . . . 36

*Farrell v Johnson*, 266 A.D.2d 873 (4th Dept. 1999) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Golden v. Planning Board of the Ramapo*, 30 N.Y.2d 359 (1972) .. . . . . . . . . . . . . . . . . 23, 38

*Kennedy Park Homes Ass'n v. City of Lackawanna*, 436 F.2d 108 (2d Cir. 1970) .. . . . . . . . . . 39

*Levine v Town of Oyster Bay*, 259 N.Y.S.2d 247 (Nass. Co. Sup. Ct), *aff'd,*
    26 A.D.2d. 583 (2d Dept.1966) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22-24, 26, 43, 46

*Los-Green, Inc. v. Weber*, 156 A.D.2d 994 (4th Dept. 1989) .. . . . . . . . . . . . . . . . . . . . . . . . . 43

*Louhal Properties v Strada*, 191 Misc.2d 746 (Nass. Co. Sup. Ct. 2002),
     aff'd. 307 A.D.2d 1029 (2d. Dept. 2003) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*Municipal Art Soc. of New York v City of New York*, 137 Misc.2d 832
     (NY Co. Sup. Ct. 2014) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Residents for Reasonable Development v City of New York*, 128 A.D.3d 609
     (1st Dept. 2015) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Rodgers v. Vill. of Tarrytown*, 302 N.Y. 115 (1951) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*Save Our Forest Action Coalition v City of Kingston*, 246 A.D.2d 217 (3d. Dept. 1998) .. . . . . 39

*St. Onge v Donovan*, 71 N.Y.2d 507 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Tuxedo Land Trust, Inc. v. Town of Tuxedo*, 34 Misc.3d 1235
     *(Orange Co. Sup. Ct. 2012), aff'd, 112 A.D.3d 726 (2d Dept. 2013)*1968).. . . . . . . . 22, 31

*Tyre ex rel. Dawley v Town Bd. of Town of Tyre*, 51 Misc. 3d 665
     *(Seneca Co. Sup. Ct.), aff'd., 140 A.D.3d 1711 (4th Dept. 2016)*1968).. . . . . . . . . . . . . 37

*Udell v Haas*, 21 N.Y.2d 463 (1968).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44, 53

*Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6 (3d. Dept. 2000) ..25, 44, 47-49, 53

## ***STATUTES and LOCAL LAWS:***

Fed. R. Bankruptcy Proc. Rule 9033(d) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Fed. R. Civ. Proc. Rule 8 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 54

Islandia Village Code §177-71(B) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 41

Islandia Village Code §177-76(A) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 41, 47

Islandia Village Local Law No. 1-2008 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Islandia Village Local Law No. 4-2008 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Islandia Village Local Law No. 3-2017 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

NY CPLR § 7804(e)8-0109 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

NY Envir Conser § 8-0109 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

N Y Racing, Pari-Mutuel Wagering and Breeding Law § 1316(6)262 .. . . . . . . . . . . . . . . . . 36

N.Y. Town Law § 262 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

N.Y. Village Law § 7-700 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

N.Y. Village Law § 7-702 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54, 55

N.Y. Village Law § 7-703 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

N.Y. Village Law § 7-722 .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 40

Village Law § 7-725-a(4) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## PRELIMINARY STATEMENT

Plaintiffs submit this memorandum of law to amplify their Objections to Proposed Findings of Fact and Conclusions of Law ("Proposed Findings"[1]) made by Chief United States Bankruptcy Judge Carla E. Craig dated December 17, 2017 and entered on December 18, 2018 (Doc. No. 100[2]) and to provide the District Court a cohesive narrative upon which the merits of the Objections may be assessed.

## FACTS ADDUCED BY THE MOTION RECORD

The Proposed Findings include a Background (PoF at 2-8) wherein the Bankruptcy Court refers to facts evidenced in the motion record. What follows are references to other facts evidenced in the motion record which Plaintiffs contends is a principal reason why their Objections to the Proposed Findings should be sustained: the Bankruptcy Court improperly and erroneously resolved disputed facts rather than find issues of fact in recommending that the zoning by contract and spot zone claims be summarily dismissed. Plaintiffs will avoid referring to the facts discussed in the Background as much as possible while referring to these other facts.

### A.    The Master Plan.

In 1995, the Village Board of Trustees ("Village Board") prepared and adopted the Comprehensive Plan for the Village of Islandia ("Master Plan").[3] The purpose of the Master Plan was "to serve as a policy-oriented, long-range guide to the future physical development of the Village of Islandia.  The plan examines present conditions, analyzes opportunities and constraints

---

[1]      References to its pages will be cited as "PoF at___"
[2]      References to Docket Numbers are to those appearing in the Docket Report filed with the Clerk of the United States Bankruptcy Court, Eastern District and will be cited as "Doc. No.".
[3]      Doc. No. 62-26.

for development, sets goals and policies for future decision-making, and formulates a comprehensive plan to control and guide growth in the Village for the next ten to twenty years."[4]

The Master Plan recognized constraints and opportunities allowing for the non-residential uses of land within the Village's borders in a manner that preserves the Village's essentially residential character and its values while allowing for economic growth. Thus, the Master Plan refers to having "[s]table, desirable, well-maintained single-family residential neighborhoods buffered from commercial developments and busy roads, and conducive to a good quality of life"[5] while noting the "continuing pressure for large single user retail facilities at unsuitable locations and with the potential for diminishing the quality of life for residents of the Village."[6] The Master Plan also noted "[t]he presence of two well-run hotels servicing visitors and business-related travelers who visit the area"[7] and "[t]he presence of a number of prestigious corporate and speculative office developments which has enhanced Islandia's image as a major commercial center on Long Island"[8] and "[t]he presence of a large number of smaller wholesale, manufacturing, business and professional tenants in Islandia's large industrial/office areas."

To assure that the presence of mixed non-residential uses of land takes place in the manner that is consistent with and preserves the Village's residential character and values, the Master Plan set forth goals of land-use development designed to "[a]void juxtaposing high intensity uses whose hours of operation are outside of the normal working week, and which generate substantial levels of traffic, with existing residential areas of the Village, or locating such uses on already congested secondary or local roads used by Village residents."[9] The Master

---

[4]     Id. at 1.
[5]     Id. at 90.
[6]     Id. at 88.
[7]     Id. at 90.
[8]     Id.
[9]     Doc. No. 62-22 at 95.

Plan envisioned the removal of hotels from retail zoning because they "are more directly tied to the corporate and speculative developments"[10] The Master Plan further stated that "[m]ultiple use centers, hotels, and motels, residential uses, retail uses, and single use wholesale/retail membership establishments <u>would not be permitted</u>." (Emphasis added)[11]

### B.    The Village's Historical Implementation of the Master Plan

The history relating to the Village's implementation of the Master Plan's Goals and Policies shows that the Village Board adopted Article X of the Code prescribing the uses of land permitted in the OI District. Code § 177-71(B) states that "[t]he intent of the Office/Industry District is to continue the orderly mixed-use development consisting of high quality, <u>nonintensive light industrial and warehouse uses</u> along with office development in accordance with appropriate standards of design and site development." Emphasis added.

To further assure that the intent for low intensity, high quality uses of land within the OI District as contemplated by Code § 177-71(B) would be achieved and safeguarded, the Village Board adopted 177-76(A) to permit "accessory uses" of land within the OI District *provided* "that such uses are clearly incidental to the principal use and do not include any activity commonly conducted as a business."[12]

The Village Board also adopted Local Law No. 1 and 4 of 2008 prohibiting gaming and adult entertainment uses of land within the OI District.

---

[10]    Doc. No. 62-22 at 105.
[11]    Doc. No. 62-26 at 121.
[12]    Id. ¶ 25. Justice Ford applied this historically used criteria for an accessory use prescribed by § 177-76(A) in determining to vacate the Permit. Doc. No. 62-23.

**C.      The Village Board's Issuance of the Permit.**

On March 28, 2016, Delaware North applied to the Village Board for a special permit pursuant to the Village's Zoning Code ("Code") §177-76(A)[13] authorizing the construction and use of a video lottery gaming facility ("Gaming Facility"), including, among other things, a video lottery terminal and an off-track-betting simulcast facility ("VLT Application"), as an accessory use of the hotel ("Hotel") located at 3635 Express Drive North, Islandia, NY ("Premises").[14]

It is critical to note at this juncture that Delaware North made its Application seeking a permit allowing an accessory use of the Hotel as a Gaming Facility in order to meet the two narrow criteria prescribed by the Code §177-76(A) which stated that a special use permit may be approved allowing an accessory use of a principal use of property within the Office/Industrial District ("OI District") "provided that such uses are clearly incidental to the principal use and do not include any activity commonly conducted as a business."[15]

It is undisputed that Delaware North made the VLT Application in order to meet the criteria for an accessory use prescribed by the Code §177-76(A) and for the *sole purpose* of obtaining a special use permit from the Village allowing it to have a gaming use as an accessory use of the Hotel located on the Premises. Its application was therefore for a *specific* use, i.e., a gaming use, and for a specific parcel of land owned by the applicant, i.e., the Premises. In accordance with the criteria for an accessory use prescribed by the Code §177-76(A), Delaware North was not required to show and the Village Board was not required to consider if the gaming use being proposed by Delaware North should be allowed on all lands located within the OI District. Thus, in furtherance of the limited nature of the application and relief being requested, Delaware North included studies, compilation of data and analysis that focused ***exclusively*** on

---

[13]      Doc. No. 75, Exh. A.
[14]      Doc. No. 75, Exh. B.
[15]      Doc. No. 75, Exh. A

the use and site-specific relief sought is that application. Delaware North did not submit, nor was it required to submit studies, data or analysis for a gaming use to be located anyplace else within the Village other than at the Premises.

In furtherance of the relief sought in the VLT Application, Delaware North included a report that was prepared by VHB Engineering Surveying Landscape Architecture & Geology, PC ("VHB") located in Hauppauge, NY entitled "Expanded Environmental Assessment Proposed Modification to an Existing Special Permit Islandia Marriott Island Hotel" dated June 2016 ("2016 EAF").[16]

Based upon the use and site-specific focus of the studies, compilation of data and analysis commissioned by Delaware North and included as part of the 2016 EAF, the 2016 EAF concluded that the proposed Gaming Facility as an accessory use of the Hotel would not have significant impact on the Premises or the surrounding neighborhood given the already existing principal use of the Premises. The 2016 EAF based this conclusion on its forecast that the removal of the existing meeting and banquet spaces within the Marriott Hotel and readopting those rooms to accommodate the proposed indoor Gaming Facility would have a "net-zero" impact on density of the Hotel's use, the need for additional parking space, traffic congestion, and impact on the surrounding residential neighborhood and quality of life (the "2016 EAF Forecast"). The 2016 Forecast is best summarized by referring to the 2016 EAF which states in pertinent part:

> Based on information provided by the applicant [i.e., Delaware North], it is anticipated that peak hours of activity associated with the indoor amusement area would be evenings and weekends, which is similar to the peak hours of use for the existing hotel. Meeting and banquet spaces would be replaced by the proposed indoor amusement area; thereby, reducing the number of events the hotel could

---

[16]        Doc. No. 62-14.

accommodate. The increase in visitation that would result from the proposed accessory indoor amusement use would be partially accounted for by the reduction in events and/or functions held in the meeting and banquet spaces. Also, as previously discussed, the surrounding area is developed primarily with office/commercial and industrial uses, proximate to major transportation corridors (i.e., the Long Island Expressway and Motor Parkway). Thus, the proposed accessory use would not prevent the orderly and reasonable use of permitted or legally established uses in the district.[17]

On August 12, 2016, the Village Board adopted a resolution granting the VLT Application "in toto" by issuing a special use permit ("Permit") authorizing a gaming use of the kind it sought in the Application as an accessory use of the Hotel located on the Premises ("Permit Resolution").[18] The Village Board issued the Permit on condition and subject to Delaware North's compliance with certain conditions set forth in the Permit Resolution, in particular, Delaware North entering into an agreement, known today as the Taxpayer Relief Agreement ("TRA"), for the ostensible purpose of mitigating the adverse impacts associated with Delaware North's gaming use of the Hotel ("Permit Conditions"). The Permit Resolution stated that:

> The Applicant and the Village of Islandia shall enter a Taxpayer Relief Agreement within five days of the granting of the Special Permit whereby the Applicant shall have financial obligations to the Village in order to relieve the Village and its taxpayers from any unanticipated burden or expenses on Village services and facilities resulting from the proposed VLT gaming facility and OTB simulcast facility, administration and management, and the Village infrastructure. The Special Permit shall be conditioned on the entry and compliance of the Applicant with the terms of the Taxpayer Relief Agreement. In the event that there is a default on the Taxpayer Relief Agreement by the Applicant, or termination of that Agreement, the Village shall have the

---

[17]    Doc. No. 62-15 at DN000228.
[18]    Doc. No. 62-12

right on thirty (30) days written notice to the Applicant <u>to terminate</u> the Special Permit following a public hearing.[19]

Emphasis added.

### D.    The TRA

On August 16, 2016 and as required by the Permit Conditions, the Village and Delaware North entered into the TRA.[20] As a condition for Delaware North to keep using the Premises as a Gaming Facility, the TRA required it to make certain up-front and annual payments to the Village over the next twenty years totaling in excess of forty-six million dollars as a condition for the Permit remaining in full force and effect ("TRA Payments").[21] According to the Permit Resolution and the TRA, the TRA Payments were put in place to "(i) promote community development in the Village, (ii) to offset the increase in the infrastructure, public safety and emergency services cost of the Village incurred as a result of approving the Application and (iii) to reduce real property taxes of Village residents is in the best interests of the Village and its residents."[22]

As a safeguard against Delaware North or its successor's failure or refusal to make the required TRA Payments, the Village Board reserved the right under the TRA to rescind the Permit at any time if the TRA Payments were not made."[23]

### E.    The Vacatur of the Permit.

On September 13, 2016, Jennifer Tomasino, Apryl Meyer and other interested parties commenced an Article 78 proceeding in the New York State Supreme Court, Suffolk County against the Village, Delaware North and others to set aside and vacate the Village

---

[19]    Id. at 19.
[20]    Doc. No. 62-16.
[21]    Doc. No. 62-16 at 3-6.
[22]    Doc. No. 62-16 at 2, 3.
[23]    Doc. No. 62-16 at 6.

Board's issuance of the Permit, Hon. William G. Ford, J.S.C., presiding ("Article 78

Proceeding"). As required by NY CPLR § 7804(e), the Village responded to the Article 78

Proceeding by submitting the Certified Administrative Return ("Certified Return") to Justice

Ford. The Certified Return included the entire administrative record that was before the Village

Board when it adopted the Permit Resolution and issued the Permit, including the 2016 EAF. As

noted earlier, all land use and traffic studies and other data and information that were included in

the Certified Return *related solely* to Delaware North's use and site-specific Application

allowing a gaming use as an accessory use of the Hotel and for no other use or location. The

Certified Return also included the 2016 EAF and the Village Board's "21-page decision" setting

forth the Board's findings and determination, in which the Board determined that a VLT Facility

was an accessory use allowed by special use permit in the OI Zoning District."[24]

On September 7, 2017 and upon review of the papers included in the Certified Return,

Justice Ford issued an order which, among other things, vacated, set aside and annulled the

Village's approval of the VLT Application and its issuance of the Permit ("Order").[25] Justice

Ford based the Order vacating the Permit on two findings that are important to the issues now

before this Court concerning the recommendation made by the Bankruptcy Court that the first

and second causes of action alleged in the Amended Complaint be summarily dismissed:

> It appears, therefore, not only that the administrative record
> is devoted of evidence on which the Village Board could
> properly base a finding that a VLT gaming and OTB
> simulcast facility is "customarily incidental" to a hotel in
> the OI District, but also that no such finding is possible; in
> so concluding, the court notes that the Village Board's
> resolution adopting a negative declaration pursuant to
> SEQRA is essentially rendered academic. Whatever the
> reason for the absence of local hotels with gaming
> facilities-and the respondents' observation "that gaming

---

[24]     Doc. No. 62, Exh. 2 at 28, 29.

[25]     Doc. No. 62-23.

facilities were, until 2013, prohibited on Long Island" --
they are, in fact, absent.[26]

Emphasis added.

### F.    The Village's Actions Taken in Response to the Order Vacating the Permit.

Eighty-one (81) days elapsed from the date of the Order, September 7, 2017, to the date

the Local Law was adopted, November 28, 2017.[27]  Plaintiffs will now discuss the process that

the Village used during those 81 days as corroborated by the legislative record preceding the

adoption of the Local Law.

Examination of the documents produced by the Village Defendants in response to

plaintiffs discovery demands shows that the form of the Local Law as it reads today was drafted

and supervised under the watchful eyes of Delaware North's counsel and based *exclusively* upon

whatever information and analysis that was included in the Certified Return and upon which

Justice Ford decided to vacate the Permit upon a finding that the Certified Return was "devoid of

evidence on which the Village Board could properly base a finding that a VLT gaming and OTB

simulcast facility is "customarily incidental" to a hotel in the OI District and that no such finding

is possible."[28]

Delaware North's drafting and supervision regarding the content of the Local Law is

evidenced by the exchange of numerous e-mails between Village Counsel and Delaware North's

counsel.[29]  Those e-mails show that, throughout the entire process, Delaware North's counsel

gave and approved draft versions of the proposed local law and the SEQRA Environmental

Assessment Form ("2017 EAF") which the Village Board was to use and approve in connection

---

[26]    Id. at 6.

[27]    Plaintiffs rely on the Village Defendants' representation by its counsel that they produced all documents in
their possession relating to the adoption of the Local Law. Dorman EBT 94: 20-23.

[28]    Doc. No. 62-23 at 6.

[29]    Doc. No. 75, Exh. D.

with its adoption of the proposed local law. Those emails show Delaware North providing a

major talking points memo Mayor Dorman was expected to use in presenting the proposed local

law during the Village Board's meetings and public hearings. The e-mail exchange also shows

Delaware North's counsel sending draft versions of the proposed resolution to be adopted by the

Village Board approving the issuance of a Notice of Determination of Non-Significance ("2017

Negative Declaration") pursuant to SEQRA.[30] This e-mail exchange even shows Delaware North

providing specific step-by-step time lines and milestones for the Mayor and members of the

Village Board to follow in adopting the local law based upon the form Delaware North has

approved.[31]

Nowhere in this exchange of e-mails and documents is there a hint that any new

assessment was being or had been made regarding the zoning, traffic or environmental conditions

and impacts resulting from the enactment of the proposed local law *other than* whatever

assessment Delaware North had already made and submitted to the Village Board at the time it

made the VLT Application in August 2016 and included as part of the Certified Return that was

before Justice Ford.

The motion record includes no e-mail exchange or any other document produced by the

Village Defendants during its document production discussing on what basis the Village Board

determined that a gaming use of land within the Village had to be located only on land with a

---

[30]     Doc. No. 75, Exh. E.

[31]     Doc. No. 75, Exh. F. This exchange of e-mails even shows the Village Attorney correcting local law
language drafted by Delaware North's counsel which would have allowed an as of right gaming use only to those
hotels within the Village having *more than* ten stories, which, if uncorrected would have excluded Delaware North.
To correct Delaware North's error, the Village Attorney advised Delaware North's counsel to re-write the proposed
local law by reducing the threshold number of stories a hotel must have from ten to seven so that Delaware North's
Hotel located at the Premises could thus qualify for the as of right gaming use.  In another e-mail exchange, the
Village Attorney noted that Delaware North's draft environmental assessment forms were "a little light" for SEQRA
purposes and requested that it be re-drafted. Doc. No. 75, Exhs. G and H.

hotel having at least seven stories with at least 150 rooms and abutting the north side of the North Service road of the Long Island Expressway and why the 120-room Hampton Inn also located within the OI District was excluded from consideration as a hotel suitable to have a gaming use on an as of right basis like the one granted to Delaware North -- notwithstanding the Hampton Inn's proximity to Veterans Memorial Highway, another major highway.

The e-mail exchange also reveals that two "consultants" were involved in reviewing and analyzing the zoning, traffic and environmental impacts associated with the adoption of the proposed local law: David Wortman of VHB and Joseph Iannucci, a licensed architect, of Cashin Associates P.C., an engineering firm also located in Hauppauge, NY. Other than architect Iannucci, the Village did not retain or rely upon any other consultant throughout the time it was entertaining the adoption of the Local Law process.[32]

Given the important role these consultants played during the Village Board's process culminating in the adoption of the Local Law, Plaintiffs will now highlight portions of their deposition testimonies describing what they did and did not do during the 81-day process the Village Board used to adopt a local law with the intent to undo the effects of Justice Ford's Order. Plaintiffs will then briefly summarize the salient testimony taken during Mayor Dorman's deposition.

### i.    *David Wortman.*

Wortman testified that he and his assistant Kimberly Trelfall on behalf of VHB prepared the draft 2017 EAF pursuant to the retainer agreement between Delaware North and VHB ("VHB Retainer Agreement").[33] The Scope of Services within that agreement stated as follows:

---

[32]    Doc. No. 75. Exh. 12 at 91:22-25, 92:1-11.

[33]    Doc. No. 75, Exh. 12. The VHB Retainer Agreement is dated November 22, 2017. In an email by Wortman he states that he was assigned by VHB to work on the preparation of the 2017 EAF and other related documents in or about November 6, 2017. Id.

It is our understanding that the Board of Trustees of the [Village] and its counsel, Joseph Prokop, Esq., are considering an amendment to the Village Code to allow, among other things. a Hotel/Gaming Facility as a permitted principal use in the Office/Industry (O/I) zoning district. It is assumed that the proposed amendment would be applicable to your property in the Village at 3635 Express Drive North (the "subject property"), and to no other property as the legislation is currently drafted and as properties in the Village are currently configured. VHB has been asked to provide environmental planning services in preparing relevant New York State Environmental Quality Review Act (SEQRA) documentation for the proposed zoning action, for ultimate consideration by the Board of Trustees, which board is the sponsor of the proposed legislation as well as the only potential involved agency in the proposed action for the purposes of SEQRA.[34]

The VHB Retainer Agreement further delineated the Scope of Services Wortman was expected to provide by reference to an "*assumption*" he and his assistant were to rely upon while performing services contemplated by that agreement. Under that "assumption" Wortman was required to assume without any further inquiry or second-guessing that the conditions existing on the Premises as of November 2017 were those that were predicted by the 2016 EAF Forecast discussed earlier in this memorandum. Thus, the VHB Retainer Agreement stated in pertinent part:

VHB will prepare Parts 2 and 3 of a Full EAF as a draft for consideration and use by the Board of Trustees. As with Part 1 of the EAF, the content and adequacy of these documents will remain with the Board of Trustees, as these are ultimately the responsibility of that agency as the SEQRA Lead Agency. The approach to be taken by VHB in drafting these sections of the EAF will not include any new quantitative analyses of potential environmental impacts. Instead, the draft will refer to and rely upon the results of the relevant analysis presented in the EAF and the Expanded Environmental Assessment (EA) dated June 2016, revised July 2016, prepared by VHB as part of the prior Special Permit application for an accessory Indoor

---

[34]    Id.

Amusement Establishment at the Islandia Marriott Long Island Hotel, for which the Board of Trustees previously adopted a SEQRA Negative Determination.

For the purposes of the draft EAF (Parts 2 and 3), and based on information provided by Mr. Guardino, it will be assumed that the environmental impact conditions (e.g., traffic, parking, land use and zoning impacts, etc.) of the Hotel/Gaming Facility at the former Islandia Marriott Long Island Hotel (which is currently operating) are substantially equivalent to those anticipated within the aforementioned SEQRA documentation for the Special Permit, which was annulled after the Hotel/Gaming Facility began operation. Confirmation of this assumption will be the responsibility of the Board of Trustees, and not VHB. Furthermore, the draft EAF Parts 2 and 3 will assume that that the proposed ordinance would permit a Hotel/Gaming Facility at your property, and no other property in the Village as currently configured, such that the impacts of the proposed legislation are limited to those of the operating facility and that any potential cumulative impacts would be speculative and not addressed in the analysis.

VHB will also prepare a draft SEQRA Determination of Significance for the proposed action, for consideration by the Board of Trustees. For the purposes of this proposal, it is assumed that a Negative Declaration will be prepared indicating that the proposed action does not have the potential to result in a significant adverse environmental impact and that the preparation of an Environmental Impact Statement will not be required. This proposal does not contemplate the preparation of a Positive Declaration.[35]

Emphasis added.

Throughout his deposition, Wortman confirmed again and again that, in accordance with the limitations placed upon him by the VHV Retainer Agreement's Scope of Services, he proceeded with his assignment based upon the "assumption" that all of the 2016 EAF Forecasts made in the 2016 EAF accurately described the existing "environmental impact conditions (e.g., traffic, parking, land use and zoning impacts, etc.) of the Hotel/Gaming Facility at the former

---

[35]    Id.

Islandia Marriott Long Island Hotel...are substantially equivalent to those anticipated within the

aforementioned SEQRA documentation for the Special Permit...". Thus, he testified that he and

his assistant did nothing else above and beyond acquainting himself with July 2016

Environmental Assessment Form ("2016 EAF") VHB had prepared at the time Delaware North

submitted the VLT Application Delaware North to the Village Board in 2016 and

notwithstanding that the 2016 EAF as well as other documents included as part of the Certified

Return had already been found by Justice Ford to be "devoid of evidence" to justify a gaming

facility as an accessory use of the Hotel.[36] He acknowledged that his reliance upon this

"assumption" essentially *limited* the scope of his services in the days leading up to the Village

Board's adoption of the Local Law.[37] Thus, he did nothing to acquaint himself with the Village's

Master Plan.[38] Whatever knowledge he had about the Village having any comprehensive land use

plan at all was limited to whatever was presented in the 2016 EAF.[39] He reiterated that the only

resources available to him while undertaking the drafting of the 2017 EAF was the proposed

Local Law itself, the 2016 EAF and nothing else.[40] He did not bother to look at or to assess any

other lands located within the Village to ascertain if those lands might also be equally, if not

more, suitable for the gaming use as contemplated by the proposed local law.[41] Nor did he bother

to evaluate the potential or cumulative impacts of the proposed local law either at the Premises or

elsewhere in the Village.[42] He conducted no evaluation of existing land use, traffic and parking

conditions currently taking place on the Premises as compared to the 2016 EAF Forecasts.

Instead, he assumed that whatever was predicted in the 2016 EAF with respect to the 2016 EAF

---

[36]     Doc. No. 75, Exh. 11 at 90:14-24, 90: 4-15, 94: 24-25, 95: 1-20.
[37]     Id. at 105: 16-20, 106: 16-20, 106:21-25, 107: 1-25, 108: 1
[38]     Id. at 117: 22-25.
[39]     Id. at 118:14-18.
[40]     Id. at 125: 7-14, 126: 5-19.
[41]     Id. at 138: 14-20. 139: 21-25, 140: 1-10.
[42]     Id. at 142:21-24, 144: 17-25, 145: 9-14.

Forecasts described current conditions at and within the vicinity of the premises.[43] Nor did he even bother to visit the Premises at the time he was undertaking his services.[44]

As hard as it is to imagine, it turns out that the architect, Joseph Iannucci, did even less than Wortman during the time the brief time the Village Board was contemplating its adoption of the proposed local law.

### ii.    *Joseph Iannucci.*

Joseph Iannucci, a licensed architect, is vice-president of Cashin Associates an engineering firm that provides civil, mechanical, electrical and environmental engineering to its clients.[45] Prior to commencing services relating to the Village's adoption of the Local law and before Jake's 58 took over the Hotel, he knew the Premises' "principal use" to be a "typical hotel" run by Marriott with the usual rooms, a restaurant and a banquet hall.[46] The Hotel during the time it was being operated by the Marriott had no accessory use, i.e., no minor use attendant to the Premises' primary use as a hotel.[47]

Iannucci testified that although he was aware of the existence of the Village's Master Plan, he was not familiar with its contents and made no effort to make himself familiar with that document during the entire time the Village Board was considering the adoption of the proposed Local Law.[48] Nor was he familiar with the Plan Update that was adopted in 2003.[49]

Iannucci testified that his sole involvement regarding the Village Board's consideration of the Proposed Local Law was merely to review the 2016 EAF that Delaware North utilized for its

---

[43]    Id. at 156: 12-18.
[44]    Id. at 157: 7-10.
[45]    Doc. No. 75, Exh. 11 at 14: 3-4, 13-15.
[46]    Id. at 23: 23-24, 24:6-7, 8-17.
[47]    Id. at 25: 16-17.
[48]    Id. at 25: 18-25, 26: 1-4, 86: 23-25, 87: 1.
[49]    Id. at 26:5-7.

VLT Application and to perform a "parking analysis" and correct a few grammar errors.[50] His comments to the Village Board were confined to the existing and anticipated "parking space" requirements associated with the gaming use at the Premises.[51]  He provided no other study or comments to the Village Board with respect to the proposed Local Law.[52] He did not perform any evaluation to determine potential or cumulative impacts that would result if the proposed Local Law was actually adopted or the suitability of alternative locations for the proposed gaming facility.[53]

Any doubt about the Village Board's complete charade and contempt for the "deliberative" process it used to evaluate the proposed Local Law is resolved by referring to Iannucci's testimony regarding the representations the Village Board made in the 2017 Negative Declaration that it adopted in conjunction with the Local Law.[54]

In the 2017 Negative Declaration, the Village Board made the following:

> WHEREAS, the Village Engineering Consultant, Cashin Associates, P.C. reviewed the FEAF Part 1 and provided comments that in their expert opinion, there were no potential significant adverse impacts that would result from the proposed action…"[55]

When Iannucci was asked to state the "comments" he made to support this representations made in the Negative Declaration, he testified that the only comments he made concerned a "parking analysis" and to make grammar corrections.[56]

---

[50]  Id. 46: 1-25, 47: 1-25, 48: 1-4, 64: 24-25, 65: 1-7, 83: 12-16, 108:18-25, 109: 1-25.
[51]  Id. 48: 5-14, 49: 5-6, 52: 12-16.
[52]  Id. 50: 11-17.
[53]  Id. 57:25, 58: 1-25.
[54]  Doc. No. 62-19 at 437-438.
[55]  Id. at 437.
[56]  Doc. No. 75, Exh. 11 at 87: 15-19, 88: 7-8, 19-24.

### iii.    *Mayor Dorman.*

Mayor Dorman testified that, until Justice Ford issued the Order, the Village had never thought to amend the Code to allow a gaming use as of right with respect to any land located within the Village's limits. Only after the Order was issued did the Village Board start considering to do that and with the express purpose of nullifying the effects of the Order. Thus, he testified that, shortly after learning about the Order, he and the members of the Village Board determined to take whatever action necessary for sole purpose of nullifying the Order's effects by amending the Code to allow Delaware North to continue its gaming use at the Property without the need for having a special permit in hand to legalize that use.  He started the process rolling by referring the matter to Village Counsel.[57]  He stated that the Village Board did not retain a land use consultant throughout the entire time it was contemplating the adoption of the zoning amendment other than rely upon lawyers.[58]

Mayor Dorman testified that the Village did not consider any other land within the Village's limits as being suitable for a gaming use other than the Premises.[59]  Nor did the Village consider the proximity of other lands to other major highways as it was assessing the Premises' proximity to the Long Island Expressway.[60]  He testified that the *only* traffic study the Village Board considered was the one Delaware North used in connection with the VLT Application.[61]  The Village did not conduct any analysis or study to determine on what basis the proposed gaming use must be located only in a hotel having more than 150 rooms or that it had to be sited

---

[57]    Doc. No. 75, Exh. 12 at 91: 15-21.

[58]    Id. 91: at 22-25, 92: 1-25.

[59]    Doc. No. 75, Exh. 12 at 147: 24-25, 148: 1-13, 149: 8-17.

[60]    Id. at 150: 5-22.

[61]    Id. at150: 3-25, 151: 1-10.

on land greater that seven acres or that it had to be located next to the Long Island Expressway and no other major highway like Veterans Memorial Highway.[62]

Mayor Dorman also testified that he was not familiar with the 1995 Master Plan. [63] He had no recollection of the Village Board receiving any report, memorandum or analysis comparing the proposed local law to the Master Plan.[64] Nor could Plaintiffs find any such report, memorandum or analysis in the Village Defendants' document production.

Mayor Dorman also testified that he had no knowledge of the media covering the community's opposition which led the Town of Brookhaven to reject Delaware North's plans to cite a gaming facility in Medford, a small hamlet located with that town.[65]

He testified that the sole basis for the Village's determination to adopt the Local Law that exclusively benefited Delaware North's use of the Hotel as a Gaming Facility was because "[i]t was already built."[66] He reiterated that the Village did not consider any other lands as eligible for a gaming use other than for Delaware North's gaming facility at the Hotel:

> We didn't look at other properties for gaming facility. This was the applicant's address. This is where they requested to have it. No need to look at anything else.[67]

Emphasis added.

He testified that "[w]e had to enact the Local Law...because the Judge denied the special permit."[68] The sole purpose for the Village adopting the Local

---

[62] Id. at 152: 9-25, 153: 1-9.
[63] Id. at 134: 23-25.
[64] Id. at 135: 1-14.
[65] Id. at 135: 17-21, 136: 1-9; Doc. No. 69 at ¶¶ 15-18; Doc. No. 72, Exhs. 2 and 3.
[66] Id. 148: 18-25, 149: 1-9.
[67] Id. 157: 9-12.
[68] Id. 159: 5-16, 17-25.

Law was in response to Justice Ford's decision vacating the Permit the Village

Board issued to Delaware North.[69]

Mayor Dorman also testified that Jake's 58 has become the "recreation

center for Suffolk County," and "the highlight of Suffolk County and "a lot of

people go there…."[70]

Plaintiffs note at this juncture that Dorman's description of Delaware

North's use of the Hotel as a Gaming Facility as the "recreation center" and

"highlight" of Suffolk County and a place where "a lot of people go" contradicts

predictions that were made in the 2016 EAF Forecast discussed earlier.

### G.   The Adoption of the Local Law and its "Local Law Conditions."

On November 28, 2017, the Village adopted the Local Law[71] in response to State

Supreme Court Justice William Ford's Order[72] vacating the Permit.

The Local Law created a new Use Classification within the OI District known as the

"Hotel/Gaming Facility."[73] According to Local Law § 2.1.2, a "Hotel/Gaming Facility" use of

land within the Village would be allowed "as of right" only on those lands within the OI District

that met certain conditions specified in that local law ("Local Law Conditions").

The Local Law Conditions included seven conditions (Hereinafter referred to as the

"Local Law Conditions") which had to be satisfied in order for land within the Village's limits to

have a Hotel/Gaming Facility use as of right and without the necessity of obtaining a special use

permit as was the case before the Local Law was adopted. The Local Law Conditions consisted

---

[69]   Id. 162: 25, 163: 1-9.
[70]   Id. 130:1-12.
[71]   Doc. No. 62-19.
[72]   Doc. No. 62-23.
[73]   Doc. No. 62-19 at 4.

of the following: 1.) The land must have a hotel with more than 150 rooms, 2.) The hotel must

have an indoor facility capable of accommodating VLTs, 3.) The hotel must be located on land

within the OI District having greater than seven acres, 4.) The hotel must have at least 600 feet of

frontage on the L.I.E and the L.I.E. Service road, 5.) The gaming use must be authorized by the

New York State Tax Law § 1617-a as a VLT gaming facility, 6.) the gaming use must be

authorized by the New York State Gaming Commission to have simulcast off-track betting

simulcast facilities and 7.) the gaming use must be authorized by the New York State Racing,

Pari-Mutuel Wagering and Breeding Law to have simulcast off-track betting simulcast

facilities.[74]

Not surprisingly, the Local Law Conditions precisely mirrored the conditions upon which

the Village Board issued the Permit to Delaware North in 2016. Only one parcel of land within

the Village's territorial jurisdiction could meet those conditions: the Premises.

**H.    The Amended TRA.**

On December 5, 2017, the Village Board adopted a resolution authorizing Mayor Dorman

to sign an agreement amending the TRA to take into account the Local Law that it had adopted

several days earlier.[75]

On February 1, 2018, the Village and Delaware North entered into the Amended and

Restated Taxpayer Relief Agreement ("Amended TRA") pursuant to which the parties expressed

their intention *to amend* the TRA and to continue in full force and effect the covenants and

obligations that were made in the TRA.[76] The Amended TRA stated:

> WHEREAS, in connection with the issuance of the
> Hotel/Gaming Permit, the Village and the Owner desire to
> maintain the covenants and obligations made to each other

---

[74]    Id.

[75]    Doc. No. 75, Exh. J.

[76]    Doc. No. 62-20.

> in the in connection with the prior zoning approval and,
> therefore, desire to amend and restate the Original
> Agreement in its entirety in the manner set forth herein...
>
> * * *
>
> NOW, THEREFORE, the Parties, for and in consideration
> of the mutual promises and agreements of the other party
> hereto and other good and valuable consideration, the
> receipt and sufficiency of which are hereby acknowledged
> by the parties, and intending to be legally bound, do hereby
> amend and restate the Original Agreement in its entirety
> and their mutual obligations thereunder and hereby further
> agree as follows..."[77]

Consistent with the Village Board's determination made in 2016 to issue the Permit

subject to the Permit Conditions discussed above regarding the Village Board's right to rescind

the Permit, the Amended TRA included a provision stating that "[i]n the event that the Owner (a)

fails to pay the required Taxpayer Relief Payment in accordance with the terms and conditions of

this Agreement...the Village Board may elect to terminate this Agreement and revoke the

Hotel/Gaming Permit...".[78]

## POINT I

### THE BANKRUPTCY COURT ERRED IN RECOMMENDING
### SUMMARY DISMISSAL OF THE ZONING BY CONTRACT CLAIM.

Plaintiffs object to the recommendation in the Proposed Findings that the first cause of

action (zoning by contract claim) be summarily dismissed because Defendants have shown that

the Village Board "did not bind itself in advance to enact Local Law No. 3-2017" and thus

Plaintiffs cannot establish the Local Law as an unlawful zoning by contract. PoF at 1, 10. The

Bankruptcy Court used Defendants' motions as a vehicle to make improper and erroneous

findings of fact and conclusions of law. Instead, it should have recommended the motions be

---

[77]      Id.

[78]      Id. at 9.

denied based upon the State's law applicable to the review of local zoning enactments challenged as unlawful zonings by contract with the issues of fact to be resolved by trial.

Courts will declare a zoning enactment void as against public policy and unlawful if the facts show it was adopted by bargaining away or selling the zoning authority's legislative powers in conjunction with an agreement to provide a favorable determination. *City of New York v. 17 Vista Associates,* 84 N.Y.2d 299, 306 (1994); *Church v. Town of Islip,* 8 N.Y.2d 254, 259 (1960); *De Paolo v. Town of Ithaca,* 258 A.D.2d 68, 71 (3d Dept. 1999); *Collard v. Incorporated Village of Flower Hill,* 52 N.Y.2d 594, 601–02 (1981) (stating that "[b]ecause no municipal government has the power to make contracts that control or limit it in the exercise of its legislative powers and duties, restrictive agreements made by a municipality in conjunction with a rezoning are sometimes said to violate public policy."); *Tuxedo Land Trust, Inc. v. Town of Tuxedo,* 34 Misc.3d 1235 (Orange Co. Sup. Ct. 2012), *aff'd,* 112 A.D.3d 726 (2d Dept. 2013).[79]

In *Levine v. Town of Oyster Bay,* 26 A.D.2d. 583 (2d Dept.1966), the Court voided the Town's adoption of a zoning amendment upon facts showing that it was adopted in conjunction with an agreement between a private land developer and a private third party. The agreement upon which the zoning by contract was predicated concerned a contract of sale by private landowners, the Shodnecks, to sell their 14 acre residential parcel of land to a private third-party, Silicon Transistor Corp. on condition that the property is rezoned for industrial use. The Town Board thereafter adopted in toto Shodnecks' application seeking a change of zone to an industrial use. The dispositive factor that caused the *Levine* court to strike the zoning amendment was not that the

---

[79]    Courts also disfavor local legislative action after a law suit is filed that "is designed to stymie litigation, particularly where the public interest is so deeply involved and is of the highest priority" *Kennedy Park Homes Ass'n v. City of Lackawanna,* 436 F.2d 108, 112 (2d Cir. 1970). That is what the Village Board did here by adopting the Local Law while Plaintiffs' lawsuit was proceeding to set aside and enjoin Delaware North's continued gaming use of the Hotel.

zoning amendment was an unlawful "future zone" but because it was "proposed by the applicants for the downzoning and was adopted in toto by the Town Board" the Court stating that:

> However, in this case the condition was proposed by the applicants for the downzoning and was adopted in toto by the Town Board. There was no such circumstance in Church and, unlike Church, there is nothing to show an inexorable march of industry into the properties west of Brush Hollow Road; such an eventuality is impossible due to the maximum utilization of that area for residence purposes. This rezoned parcel is the first industrial intrusion in the area and it seriously upsets the use balance that had been advised and maintained with respect to the zoning on each side of the Brush Hollow Road buffer. Another important consideration indicating the Town Board's over-all plan is the fact that the nonconforming gas station use was not rezoned and was left in the residential district. Thus, the evidence supports the conclusion that this zoning amendment was not made for the general welfare of the town but for the personal benefit of appellants, who petitioned for precisely the change and conditions that were adopted. This constitutes spot or contract zoning."

A.D.2d at 583–84. Emphasis added.

The Bankruptcy Court misread the basis upon which the Appellate Division struck the zoning amendment for being "in futuro" when it stated that "[u]nlike the resolution in *Levine*, Local Law No. 3-2017 became effective immediately upon filing it with the New York Secretary of State on November 28, 2017, and the certificate of occupancy was conditioned on the continued performance of Delaware North under the Amended TRA." PoF at 15. Zoning amendments that become effective only after future conditions have been satisfied are not unlawful, per se. See: *Golden v Planning Bd. of Town of Ramapo*, 334 N.Y.S.2d 138, 156 (1972). In *Boyles v Town Bd. of Town of Bethlehem*, 278 A.D.2d 688, 690 (3d. Dept. 2000), a case cited by the Bankruptcy Court in the Proposed Findings, the Court had before it a rezoning change that was conditioned upon a restriction as to the future use of the site. Instead, the *Levine* Court held that the zoning amendment was unlawfully adopted because all of the conditions included in the

amendment had been proposed by the landowner and then adopted in toto by the Town Board in furtherance of the private agreement that had been made between the landowner and a third-party. The amendment therefore was infirm for being an unlawful zoning by contract.

The facts before the *Levine* Court parallel those evidenced in the motion record before this Court. Here, the Village agreed in advance to codify *in toto* the VLT Application Delaware North sought and then obtained when it issued the Special use Permit in 2016. At that time, the Village Board issued the Permit based exclusively upon the two criteria for an accessory use within the OI District, discussed above, i.e., that Delaware North's proposed accessory use was incidental to the principal use of the Premises as a Hotel and did not include any activity commonly conducted as a business.[80] Those facts show that Delaware North thereafter entered into the TRA to satisfy the condition for the Permit being granted. In executing the TRA, Delaware North acknowledged the Village Board's right to terminate the Gaming Use of the Premises forthwith if Delaware North breached the TRA. After Justice Ford vacated the Permit and before the Local Law was adopted, the Village and Delaware North agreed to modify the TRA whereby the Village Board agreed to bargain away the absolute right it then had to terminate the Gaming Use of the Premises by adopting a local law containing conditions drafted and approved *in advance* by Delaware North. The Village agreed to enact the Local Law in order to induce Delaware North to agree to formally execute the Amended TRA after the Local Law was adopted. Plaintiffs contend that, in order to establish a zoning by contract claim, it was not necessary for the Village to have explicitly agreed in writing to adopt the Local Law prior to enactment in order to extract a promise from Delaware North that it would formally execute the Amended TRA after the Local Law was adopted.

---

[80]    Doc. No. 75, Exh. A

The Village Board and Delaware North then proceeded to consummate their agreement by the Village Board adopting the Local Law inclusive of conditions drafted and approved by Delaware North. In drafting those conditions, which the Village Board ultimately adopted in toto, Delaware North made absolutely certain that no other owner of land located within the Village's borders could have a competitive gaming use of land.  In exchange for the Village Board's giving Delaware North this monopolistic hold, Delaware North recommitted itself to the TRA by formally executing the Amended TRA pursuant to which it agreed to deposit over forth-six (46) million dollars into the Village's coffers so that it can use a few of those dollars to make sure its two Village-roads located within the vicinity of the Premises are kept looking nice and spiffy with any leftover funds applied to reduce the Village's residents' tax burden. But see: *Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6 (3d Dept. 2000) (where the Court rejected the notion that the promotion of economic development is sufficient to relieve a local government's responsibility to adopt zoning laws that are consistent with its comprehensive land use plan.).

Mindful that the Village's receipt of over forty-six (46) million dollars under the Amended TRA might appear to be more than what could conceivably be needed to mitigate the Village's purported infrastructure costs and thus qualify as a garden-variety "mitigation agreement," the Bankruptcy Court erred in its assessment that the excess funds could then be used to "reduce[] the tax burden of Village residents." PoF at 12, 13. Such contracts between a local government and a developer whereby the developer agrees to give cash to fill the government's coffers are illegal. *Municipal Art Soc. of New York v City of New York*, 137 Misc.2d 832 (NY Co. Sup. Ct. 2014). See also: Village Law § 7-703 (which prohibited the Village from entering into these kinds of "tax-reducing" arrangements unless authorized pursuant to a zoning incentive ordinance specifically adopted for such a purpose in the manner prescribed

by § 7-703.) The Local Law, however, was not adopted in accordance with Village Law § 7-703

and did not otherwise condition the as of right gaming use upon the landowner making cash

payments to the Village's treasury  in order to mitigate the Village residents' tax burden.

The Bankruptcy Court's reliance upon *Residents for Reasonable Development v City of*

*New York*, 128 A.D.3d 609 (1st Dept. 2015) for the proposition that "[i]t is not impermissible for

a board to issue a zoning determination if unrelated local benefits are provided" is

distinguishable on the law. PoF at 13. The payments that made by the developer in that case were

made pursuant to the City's adoption of an incentive zoning ordinance.

The facts evidenced in the motion record present an even more compelling basis to

declare the Local Law a null and void zoning by contract as compared to what was before the

Court in *Levine*. Unlike in *Levine,*  where the zoning amendment was adopted in conjunction

with an agreement that was executed between the developer and a private third-party, the Local

Law was adopted in conjunction with an agreement between the Village and Delaware North

whereby Delaware North agreed to give over forty-six million dollars in TRA Payments if the

Village Board exercised its legislative powers in anyway necessary to legalize the use of the

Hotel as a Gaming Facility notwithstanding Justice Ford's Order. That is a far cry from the

arrangement between two private parties in *Levine*.

Moreover and even more significantly, at least in *Levine,* the zoning amendment was to

take effect only at such future time when the developer has regraded certain land in a manner that

is satisfactory to the Town's engineer. Otherwise, the zoning amendment was not effective and

the landowner could derive no benefit from that amendment unless and until the regrading

condition specified in the amendment has been satisfied. Unlike in *Levine*, the Local Law was

intended to apply *immediately* and had the *immediate* (and continuing) effect of allowing

Delaware North to sell the Premises to a new owner who would continue to have the right to use

the Premises as a Gaming Facility while at the same time thumbing its nose at the Amended

TRA. The Village Board's hands would be tied in terming the use under those circumstances

because it previously had bargained away the right it once had to terminate that gaming usin

exchange for inducing Delaware North to execute the Amended TRA. Not only would the

Village be unable to exercise the right it once had to terminate the Gaming Use by that successor

owner, the Village would not be able to enforce Amended TRA by requiring the successor owner

to honor Delaware North's original promise to give millions of dollars to the Village so that it

can offset its purported infrastructure costs. Accordingly and contrary to the conclusion in the

Proposed Finds stating otherwise, the Village Board did "bargain away or sell its powers" in

contravention of the Court's holding in *Church v. Town of Islip*, 8 N.Y.2d 254, 259 (1960) and in

furtherance of an agreement that had the effect of controlling or limiting the exercise of its

legislative powers and duties in contravention of *Collard v. Inc. Vill. of Flower Hill,* 52 N.Y.2d

594, 601 (1981).

The Bankruptcy Court's error is further demonstrated when it stated that the Village

Board still had the right to revoke the certificate of occupancy initially given to Delaware North

pursuant to the Local Law inasmuch as the continuation of the Gaming Use "was conditioned on

the continued performance of Delaware North under the Amended TRA." PoF at 15. But the

Village Board would not have the right to revoke the certificate under those circumstances. The

Local Law allowed Delaware North and successor owners to use the Hotel as a Gaming Facility

by meeting the enumerated conditions prescribed by the Law. Once those conditions have been

met (as was expected to be the case inasmuch as Delaware North wrote the Local Law!!), the

Village's Building Department had the non-discretionary obligation to issue (and did issue) the

certificate of occupancy authorizing the use of the Premises as a Gaming Facility. The right that

the Village Board once had under the TRA to rescind the certificate was effectively bargained

away where Delaware North or continues to use the Premises for such purposes but fails or refuses to abide by the terms of the Amended TRA.

Ironically, the very circumstance upon which the Bankruptcy Court relied upon in recommending that the Local Law not be deemed an unlawful zoning by contract is instead further evidence that the Village Board effectively tied its own hands, viz-a-viz, by its adoption of the Local Law in furtherance of an agreement it had with Delaware North that effectively took away the Village Board's right to revoke the certificate of occupancy. Unlike the prerogatives the Village Board had when the TRA was in place to terminate the Gaming Use if the terms of the TRA were breached by Delaware North or a successor owner of the Premises, the Village Board forfeited that right by adopting the Local Law allowing a Gaming use as of right if the conditions enumerated in that Local law are met. Continued compliance the Amended TRA was not one of those conditions.

The Bankruptcy Court also erred by not applying the Court's holding in *Citizens to Save Minnewaska v. New Paltz Central School Dist.,* 95 A.D.2d 532, 534 (3d. Dept. 1983) to strike the Local Law. In *Citizens to Save Minnewaska,* the Court declared a resolution granting tax exemptions for eligible business facilities within a school district null and void where a corporation considering construction of a hotel applied for an exemption from taxation and submitted an offer to pay 100% of what its taxes would have been without the exemption should casino gambling be legalized in New York. The written contract recited that it would be binding if the school district adopted the required resolution. Even though the contract did not actually require the school district to adopt the resolution, exactly like the TRA and the Amended TRA did not expressly require the Village Board to adopt the Local Law, the *Citizens to Save Minnewaska* Court nevertheless declared the resolution null and void after finding that the school

district had adopted it in conjunction with the terms of a contract and in exchange for a predetermined consideration to provide an expedited and favorable determination.

The Bankruptcy Court erred in refusing to apply *Citizens to Save Minnewaska* to the facts in this case when it said that "[i]n this case, however, there was no prior agreement in exchange for the approval of the permit or the adoption of Local Law No. 3-2017." PoF at 15. Such a conclusion is a finding of fact that ought not to have been summarily decided in Defendants' favor, especially after the Bankruptcy Court's finding that "…the terms of the Amended TRA were negotiated prior to the enactment of Local Law No. 3-2017…" PoF at 13. The parties' agreement to formally execute the Amended TRA after the Local Law is adopted provided it includes land-use conditions written by and for Delaware North's exclusive benefit should be regarded as a sufficient predicate upon which the Local Law is to be held an unlawful zoning by contract.

Thus, the Bankruptcy Court improperly and erroneously made findings of fact when it said that "[t]he timing of the contracts reflect that the Board did not "bind[] itself in advance to exercise its zoning authority in the future for the benefit of a landowner upon the landowner's provision of a consideration. (Citation of case omitted)" PoF at 13. The motion record provided sufficient evidence to establish that the Village Board had agreed in advance of the Local Law's adoption that it would adopt (not that it was required to adopt) the Local Law to be written in a manner so as to benefit Delaware North exclusively.  In the Amended TRA's "WHEREFORE" clause, quoted above, the parties expressly acknowledged their mutual intent to amend the TRA. Mayor Dorman made the same acknowledgment when he said that he signed the Amended TRA in order to be assured about Delaware North's continued commitment to be bound by the TRA after the Local Law was adopted and in exchange for the Village Board agreeing to amend the

Code in a manner favorable to Delaware North's continued operation of the Gaming Facility notwithstanding anything to the contrary in Justice Ford's Order.[81]

Indeed, during the oral arguments that were held before the Bankruptcy Court in connection with Defendants' motions. Counsel for Delaware North admitted to the existence of an agreement between it and the Village that had been made in advance of the Local Law's adoption. In response to a question posed by the Court Delaware North's counsel stated that "I'm not sure honestly why the Village felt it needed to have a second agreement months afterwards. Delaware North was from my position we had an agreement in place, the agreement stayed in place, and the agreement applied."[82]

Delaware North's counsel even admitted to being in agreement with Plaintiffs' counsel's argument that a formal written agreement did not have to be in place before a challenged zoning amendment may be declared an unlawful zoning by contract when he stated that:

> Because I agree with my colleague to the extent he says, wait a minute, if you did something a week before or afterwards you're not fooling anyone. The question is, what does the agreement require you to do. What does the agreement say, and the agreement has not a single word in it as they've admitted in terms of the TRA that obligates the Village Board to take an action, that's why it fails right there, contract zoning is out the window, because they've admitted it doesn't have any obligation to the Village to do this. If the Village basically was in a situation where they had as in the *Save the Citizens* case to adopt a resolution, in other words, they accept the consideration in return they're going at a later date adopt this resolution. That's clearly bargaining away your legislative power. But the Village retained every right to say, you know what, we've had this case where it's been set aside, and we now have a situation where we're voting, and you know what, we've changed our

---

[81]      Doc. No. 75, Exh. 12 at 70:3-10; 72:5-6.

[82]      Transcript of Oral Argument held on November 28, 2018 at pages 49-50. References to the Transcript will hereinafter be cited as "Trans."

mind, no thank you. There's no obligation under the TRA or
the amended TRA to do anything different.[83]

While it is true, as Delaware North counsel states in the transcript just quoted, that "the
agreement has not a single word in it as they've admitted in terms of the TRA that obligates the
Village Board to take an action," nevertheless the omission of such express language in the
Amended TRA or the want of a formal written agreement to that effect existed before the Local
Law was adopted does vitiate the facts evidenced in the motion record that the Village Board had
agreed in advance to adopt (not that it was required to adopt) the Local Law inclusive of
conditions written and approved by Delaware North and designed to benefit only Delaware North
and no other owner of land within the OI District based upon Delaware North's promise that it
would formally recommit itself to honor the payments it had agreed to make under the TRA by
its formal execution of the Amended TRA.

Accordingly, even though there is no written agreement that was made in advance of the
Local Law obligating the Village Board to adopt the Local Law, unlike in *Citizens to Save
Minnewaska,* nevertheless, it should be regarded as sufficient for purposes of establishing the
zoning by contract claim that the Village agreed to adopt (not that it was contractually required to
adopt) a Local Law whose conditions were drafted, reviewed and approved by Delaware North.
Contrary to the conclusion in the Proposed Findings stating otherwise, the Village Board did
commit itself, in advance, to a specific course of action with respect to the zoning amendment in
order to induce Delaware North to execute the Amended TRA upon the Village Board's adoption
of the Local Law in the form written and approved by Delaware North. The Court in *Tuxedo
Land Trust v. Town of Tuxedo,* 34 Misc. 3d 1235 (Orange Co. Sup. Ct. 2012), *aff'd.,* 112 A.D.3d

---

[83]    Trans. at 50-51.

726 (2d Dept. 2013) recognized such a circumstance as a sufficient basis upon which a zoning by contract claim may be sustained.

The Bankruptcy Court's reliance upon *De Paolo v Town of Ithaca*, 258 A.D.2d 68 (3d Dept. 1999) as being similar to the facts at bar is distinguishable. *In De Paolo,* the Town did not commit itself to a specific course of action in exchange for Cornell's granting the Town a 99–year license to use certain property as a public park, thereby allowing continued public access to Cayuga Lake. Here, the motion record evidences facts establishing that the Village agreed (without being required to agree) to adopt the Local Law to include condition drafted and approved by Delaware North in advance of the Local law being adopted in order to induce Delaware North to sign the Amended TRA after the Local law as so approved was adopted.

Critically, this Court's acceptance of the rationale employed by the Bankruptcy Court that there must be an express written agreement existing "in advance" obligating the Village Board to adopt the Local Law would mean that no actionable zoning by contract claim could ever be established in New York. It does not take any imagination for a young local government attorney to figure out that a successful challenge to the enactment of a zoning amendment on the ground that it is an unlawful zoning by contract may easily avoided by making sure there is nothing in writing in advance of the zoning enactment which contractually obligates the local government to adopt the zoning enactment. All that has to be done is for the local government, via a wink and a nod. to informally agree to adopt a zoning enactment if the landowner agrees to execute a formal agreement after the zoning enactment is adopted.

The Bankruptcy Court also erred when it state that no tying of the Village Board's hands can be established because "nothing in the Amended TRA...prevents the Board from amending

or revoking Local Law No. 3-2017 and terminating the Amended TRA,"[84] and "[n]othing in the

TRA or the Amended TRA obligates the Board to continue the Hotel/Gaming Facility as a

permitted use in the District."[85]

Of course, the Village Board can amend or revoke the Local Law. As discussed above,

however, doing that would not divest the owner of the Premises, including its present owner,

Delaware North, to continue to use the Premises as a Gaming Facility with a certificate of

occupancy in hand.

The Bankruptcy Court also erred when it stated that language in the Amended TRA

adequately protects the Village because "the Amended TRA specifically requires Delaware

North to assign the TRA to a new owner in connection with any sale of the Location, and

obligates the subsequent owner to make the annual Tax Relief Payments...In the event Delaware

North or a subsequent owner defaults under the Amended TRA, the certificate of occupancy may

be terminated."[86] To the contrary, the Amended TRA excuses Delaware North from being

obligated to comply its terms, stating that Delaware North "shall only be required to make the

Taxpayer Relief Payments...only if Owner (or an Affiliate of the Owner) is the Owner of the

Premises."[87]

The Bankruptcy Court also mischaracterized Plaintiffs' zoning by contract claim when it

said that "[t]he Plaintiffs argue that, because Local Law No. 3-2017 created an as of right use for

a Hotel/Gaming Facility, the law cannot be vacated or repealed, because such action would

constitute a taking in violation of the Fifth Amendment to the United States Constitution."[88]

---

[84]    PoF at 14.

[85]    PoF at 16.

[86]    Id.

[87]    Doc. No. 62-20 ¶15.

[88]    PoF at 16.

Plaintiffs do not make this argument, nor were they required to do so in order for them to establish their zoning by contract claim. As discussed earlier, Plaintiffs' zoning by contract claim is established by evidencing facts establishing that the Village Board adopted the Local Law in furtherance of the agreement it had with Delaware North that if the Village Board adopted the Local law with conditions approved in advance by Delaware North, Delaware North would recommit itself to the terms of the TRA by its execution of the Amended TRA. For reasons discussed above, the Village Board tied its own hands by proceeding to adopt the Local Law on the basis of such an agreement.

The Bankruptcy Court also erred when it dismissed as irrelevant to the zoning by contract claim Plaintiffs' argument that, in the event New York State law is expanded to permit more gaming licenses, another property owner in the District would have the right to obtain a permit for a Hotel/Gaming Facility. PoF at 17.  In the event the State Legislature allowed additional licensees to operate a Gaming Facility, every owner of land which meets the other conditions prescribed in the Local Law would be able to use their land on an as of right basis without being required to pay the millions of dollars Delaware North agreed to pay pursuant to the TRA. Indeed, Delaware North and its successors in interest would have the right to a certificate of occupancy with respect to its acquisition of other lands located within the OI District – without having to honor the TRA.

In that regard, Iannucci testified that there was a direct correlation between the number of parking spaces needed at the Premises and the number of VLTs being used within the Hotel. The more VLTs, the more parking spaces required.[89]  Under that scenario and in the event the State Legislature authorized more VLTs as contemplated by the Amended TRA,[90] the Village Board

---

[89]    Doc. No. 75, Exh. 11 at 112: 2-25, 113: 1-25, 114: 1-25, 115: 1-8.
[90]    Doc. No. 62-20 at 5.

could do nothing to prevent the subsequent owner from increasing the parking spaces by reconfiguring the Premises is such a way so as to accommodate more parking spaces. The intensity of the gaming use would theoretically sky-rocket and there would be little if anything the Village could do to prevent that from happening.[91]

Unlike the Permit Resolution and the Permit Conditions which established a viable exit strategy enabling the Village to terminate the gaming use on the Premises in the event Delaware North failed or refused to make the required TRA Payments, no such exit strategy was put in place by the adoption of the Local Law. In that regard, Mayor Dorman testified to the importance of the Village Board's right to terminate the gaming use of the Hotel if the TRA Payments were not made as prescribed by the Amended TRA.[92] He testified that the very same "public interest" considerations which induced the Village to issue the Permit in the first place and on condition that Delaware North enters into the TRA were instrumental in causing the Village Board to adopt the Local law based upon its expectation that those payments would continue via the parties' execution of the Amended TRA.[93] Yet, in its haste to get around Justice Ford's Order in order to assure the uninterrupted flow of the TRA Payments into the Village's coffers, Mayor Dorman and the Village Board forfeited all expectation and right they once had to enforce the continued making of those payments thereby preventing it from the realizing whatever purported "impact mitigation" benefits it had in mind when it adopted the Permit Resolution and the Local Law.

---

[91]    Mindful of Iannucci's testimony describing the correlation between the number of parking spaces needed at the Premises and the number of VLTs being used within the Hotel, it is misleading for Defendants to say in their memorandum that "[t]here was no additional parking spaces...added...", Doc. No. 62, Exh. 2 at 3, fn. 1. The number of parking spaces would increase if the State approved the installation of additional VLT and other gaming devices within the Hotel. Delaware North and subsequent owners would be able to install the additional parking spaces on the Premises thereby resulting in even greater intensity of the gaming use at the Premises and greater adverse impacts upon the residential homes located within the vicinity of the Premises and of the kinds alleged in the Amended complaint.

[92]    Doc. No. 75, Exh. 12 at 87:3:11.

[93]    Id. at 61:14-25, 62:1:25; 63: 1-19.

The Bankruptcy Court also erred by stating that the Amended TRA was not and could not be the basis upon which a zoning by contract claim may be predicted because "[i]f the existence of such an agreement constitutes contract zoning, then compliance with New York Racing, Pari-Mutuel Wagering and Breeding Law § 1316(6) would automatically result in a voidable zoning determination. The absurdity of that result is evident."

Triable issues of fact evidenced in the motion record precluded summary determination that the Amended TRA qualified as a Section 1316(6) agreement. Neil Munro, the Village's former deputy mayor, stated in his affidavit that, putting aside its maintenance of a few Village-owned roads within the immediate vicinity of the Premises, the Village does not incur "infrastructure" costs associated with the use of the Premises as a gaming facility.[94] He states that the entire costs for such things as non-Village owned road maintenance and repair, sanitation, sewage-treatment, public safety and emergency services are borne by other levels of government or by private parties and not the Village.[95] Mayor Dorman admitted such to be the case during his deposition when he stated that sanitation, for example, is not a cost incurred by the Village.[96] Thus, Defendants telling us today that the TRA Payments were intended as a means to mitigate the "impacts" of Delaware North's gaming use at the Premises should be regarded as a public-relations ruse to justify the Village's receipt of tens of millions of dollars in hard cash in exchange for its willingness to use its zoning powers to assure Delaware North a safe-harbor with respect to its gaming enterprise at the Premises. But see: *St. Onge v Donovan*, 71 N.Y.2d 507 (1988); *Dexter v. Town Bd. of Town of Gates*, 36 N.Y.2d 102 (1975) (recognizing that there must be a relationship between a condition imposed by the issuance of a special use permit and the impacts associated with the use of the land granted by that permit.)

---

[94]    Doc. No. 74.

[95]    Id. ¶¶ 7-9.

[96]    Doc. No. 75, Exh. 12 at 56:15-16.

The Bankruptcy Court's reliance upon *Tyre ex rel. Dawley v Town Bd. of Town of Tyre*, 51 Misc. 3d 665 (Seneca Co. Sup. Ct.), *aff'd.*, 140 A.D.3d 1711 (4th Dept. 2016) for the proposition that the Local Law is immune from the application of the State's rule against zoning by contract enactments is distinguishable on the law and the facts. No claim was made or facts presented in *Tyre* that the town board had bargained away any prerogative it had by adopting the zoning resolution in conjunction the Community Mitigation Plan which land developer agreed to implement in accordance with Section 1316(6).

Plaintiffs submit the Defendants' effort to label the Amended TRA as an ordinary mitigation plan adopted in accordance with Section 1316(6) or as conditions the Village is authorized to impose in accordance with Village Law § 7-725-a(4) (authorizing villages to impose conditions on the approval of site plans) is a disingenuous effort on their part to hide or obscure the fact that the Village and Delaware North agreed after the Permit was vacated and before the Local law was adopted, that the Village would agree to adopt (not that it committed itself to adopt) the Local Law in the form to be approved by Delaware North, otherwise Delaware North would not execute the Amended TRA after the Local law was adopted. In so doing and as discussed above, the Village Board bargained away its right and tied its hand regarding its ability to terminate the Gaming Use like it once had before the Local law was adopted.

Unlike the entering into "host community agreements" pursuant to which local governments retain their right to terminate the land use referenced in those agreements if the conditions stated therein were not satisfied, the Village's right to terminate the gaming use of the Premises as contemplated by the Permit Resolution, the TRA and the Amended TRA became illusory and ineffectual by virtue of the adoption of the Local Law. Whatever "promises" Delaware North made to the Village in exchange for the issuance of the Permit or the adoption of

the Local Law became unenforceable at least with respect to all other subsequent owners of the

Premises and the owners/developers of other vacant and developed lands within the OI District.

For the above reasons, Plaintiffs request the Court reject the Proposed Findings

recommendation that the zoning by contract claim alleged in the Amended Complaint be

summarily dismissed.

**POINT II**

**THE BANKRUPTCY COURT ERRED IN RECOMMENDING
SUMMARY DISMISSAL OF THE SPOT ZONE CLAIM**

Plaintiffs object to the Proposed Findings' recommendation that the second cause of

action (spot zone claim) should be summarily dismissed because Defendants have shown that the

Local Law was not adopted as an unlawful spot zone.

Unlike ordinary local legislative enactments based upon the local governments possessing

a wide range of local police powers, zoning authorities, such as the Village, enjoy no inherent

right to zone property and must exercise such powers within the bounds specifically or impliedly

set by state law, including N.Y. Village Law § 7-722 which requires villages to adopt land use

regulations "in accordance with a comprehensive plan adopted pursuant to this section." *Golden*

*v. Planning Board of the Ramapo*, 30 N.Y.2d 359, 370 (1972); *Louhal Properties v Strada,* 191

Misc.2d 746 (Nass. Co. Sup. Ct. 2002), *aff'd.* 307 A.D.2d 1029 (2d. Dept. 2003) (holding that a

village's zoning power is delegated pursuant to N.Y. Village Law § 7-700 and is subject to the

same constraint.).

Accordingly, notwithstanding the deference courts are ordinarily inclined to give when

reviewing local legislative enactments, courts will scrutinize zoning enactments that are

challenged as unlawful spot zones. To do that, courts examine the "process" the zoning authority

used to determine whether the challenged zoning enactment was adopted as an unlawful spot

zone. *Cannon v. Murphy*, 196 A.D.2d 498 (2d. Dept. 1993). The criteria used to examine that

process was summarized by the Court in *Save Our Forest Action Coalition v City of Kingston*,

246 A.D.2d 217 (3d. Dept. 1998):

> Although no single factor is dispositive, in evaluating a
> claim of spot zoning a court may consider several factors,
> including whether the rezoning is consistent with a
> comprehensive land use plan, whether it is compatible with
> surrounding uses, the likelihood of harm to surrounding
> properties, the availability and suitability of other parcels,
> and the recommendations of professional planning staff
> (citation to legal authority omitted). However, the ultimate
> test is "whether the change is other than part of a well-
> considered and comprehensive plan calculated to serve the
> general welfare of the community" (citation to cases
> omitted).

A. D.2d at 221.

An important consideration courts use in deciding if a zoning enactment is an unlawful

spot zone was stated in *Asian Americans for Equality v Koch*, 72 NY2d 121 (1988), cited by the

Bankruptcy Court in the Proposed Findings,[97] that "[a]n amendment which has been carefully

studied, prepared and considered meets the general requirement for a well-considered plan and

satisfies the statutory requirement" and will not be set aside as an unlawful spot zone. Id. at 123.

In recommending summary dismissal of the spot zone claim, the Bankruptcy Court

improperly and erroneously made findings of fact by concluding that the Local Law was not a

spot zone because it was adopted only after it had been "carefully studied, prepared and

considered" as required by *Asian Americans for Equality* , *supra.* To the contrary, an

examination of the history of the proceedings leading up to the Village Board's adoption of the

Local Law, as discussed earlier in the Statement of Facts, reveals that it undertook no study, let

alone a careful study, in determining whether the adoption of the Local Law would be in

---

[97]       PoF at 19.

accordance and consistent with the Master Plan as prescribed by N.Y. Village Law § 7-722. The evidence derived from the record of proceedings leading up to the Village's Board's adoption of the Local Law established that, in lieu of conducting any study evidenced in that record, the Village and Delaware North employed land use consultants whose missions were deliberately constrained by their respective retainer agreements *not* to conduct any proper study in evaluating the proposed local law being considered, including consideration of alternative uses and whether its adoption would be in accordance with the Village's Master Plan. Nor did they evaluate the availability and/or suitability of other lands within the Village's borders for the kind of use being envisioned by the proposed local law.

Rather than perform such an evaluation, Wortman and Iannucci testified that they were instructed to assume (and they did assume) that no further study of the proposed use of the Premises and its existing conditions were required to be performed. Instead, the Village and Delaware North placed horse-blinders on these consultants by instructing them to accept as true and reliable the findings, impacts and forecasts Delaware North had originally made when it prepared the 2016 EAF in connection with its submission of the VLT Application to the Village Board. To that end, they each testified they performed no additional study other than Iannucci doing a "parking analysis" and considered no set of facts, impacts or alternatives of any kind. Instead, they each regarded the 2016 EAF to be their bible. They were neither allowed to evaluate, nor did they evaluate, any other alternative uses other than the specific use that was granted by the vacated Permit or the availability or suitability of other lands for the use being proposed other than at the Premises.

The Village did indeed adopt a well-considered Master Plan in 1995 but Mayor Dorman and the land use consultants each testified that they did not review it prior to the Local Law being adopted. Had they bothered to review the Master Plan, they would have noted its constraints and

opportunities and its goals and policies applicable to the non-residential use of land to be located within the OI District as discussed earlier in the Statement of Facts. They also would have given respect to the historical implementation of the Master Plan's Goals and Policies through the Village Board's adoption of Article X of the Code prescribing the uses of land permitted in the OI District, also discussed above. Thus, contrary to the Bankruptcy Court adopting Zaleski's self-serving representation that ""more intensive uses," including manufacturing and warehouse uses"[98] were allowed in the OI District, Code § 177-71(B) states that "[t]he intent of the Office/Industry District is to continue the orderly mixed-use development consisting of high quality, <u>nonintensive light industrial and warehouse uses</u> along with office development in accordance with appropriate standards of design and site development." Emphasis added. Such non-residential uses of land within the OI District was further constrained by the Village Board's adoption of 177-76(A) permitting "accessory uses" of land within the OI District *provided* "that such uses are clearly incidental to the principal use and do not include any activity commonly conducted as a business."[99]

The aforesaid Master Plan's Goals and Polices, when read with the Master Plan in its entirety, show that the Plan was written, adopted and thereafter implemented so as to preserve the values and character of the Village as a residential community with restraints placed on the non-residential uses of land. The Bankruptcy Court therefore erred in its finding at PoF 22 that high-intensity, mixed uses of land within the OI District suggested by Zaleski in his affidavit may be regarded as an appropriate use of such land in accordance with the Master Plan and how that Plan was historically implemented over the years since it was adopted.

---

[98]    PoF at 22.

[99]    Id. ¶ 25. Justice Ford applied this historically used criteria for an accessory use prescribed by § 177-76(A) in determining to vacate the Permit. Doc. No. 62-23.

Moreover, while it is true, as the Defendants argued before the Bankruptcy Court, that a gaming use of land was not legal in 1995 and therefore could not have been considered as a potential use of land when the Master Plan was adopted, it does not follow that the omission of such a consideration in that Plan suddenly gave the Village Board the license to allow high-intensity uses of land as contemplated by its adoption of the Local Law as being consistent with that Plan. Yet, as set forth in the Plaintiffs' respective declarations based upon their personal knowledge, the Premises does have a high-intensity use that was sanctioned as a result of the Local Law's adoption.[100]

Accordingly, even though a gaming use may not have been a legal use at the time the Master Plan was adopted in 1995, what is manifestly evident by the reading of that Plan is that any intense recreational use of land, not merely a gaming use of land within the Village's borders was contemplated to enable the use to become the "recreation center for Suffolk County," and "the highlight of Suffolk County and that "a lot of people go there…."[101] Such a change of use allowed by the Local Law is a change that "is other than part of a well-considered and comprehensive plan calculated to serve the general welfare of the community" and thus an unlawful spot zone. *Daniels v. Van Voris*, 241 A.D.2d 796, 799 (3d Dept. 1997).

In light of what the Master Plan says, how it was historically implemented, the pre-ordained pro-Delaware North process the Village used and the lack of any corroborating evidence in the legislative history preceding the adoption of the Local Law, the Bankruptcy Court erred in finding that the Local Law was not an unlawful spot zone by relying upon the self-serving affidavits of Dorman and Zaleski. Their telling us today through affidavits prepared in litigation that they decided to adopt the Local Law based upon their being generally familiar with

---

[100]    Doc. Nos. 69-72.
[101]    Doc. No. 75, Exh. 12 at 130:1-12.at

the use, availability and suitability of the lands located within the Village's borders is an insufficient basis for the Bankruptcy Court to conclude the Local Law "has been carefully studied, prepared and considered meets the general requirement for a well-considered plan and satisfies the statutory requirement" as required by *Asian Americans for Equality v Koch*, 72 NY2d 121 (1988) in order to avoid the Local Law being declared an unlawful spot zone.

In *Los-Green, Inc. v. Weber*, 156 A.D.2d 994, 994–95 (4th Dept. 1989), the Court rejected the Town Board of the Town of Cheektowaga's defense to a spot zone challenge by submitting affidavits that they had inspected the various sites relevant to the subject matter of the challenged zoning amendment where the legislative record failed to corroborate that any such action had taken place, let alone been studied. In *Levine v Town of Oyster Bay*, 259 N.Y.S.2d 247 (Nass. Co. Sup. Ct), aff'd., 26 A.D.2d. 583 (2d Dept.1966), Justice Suozzi opined that such subjective, uncorroborated thoughts of individual members of local legislative body were, at best, "elusive" and therefore an insufficient basis upon which a zoning law may survive a challenge on spot zone grounds.

Accordingly, Deputy Mayor Michael Zaleski telling the Bankruptcy Court that the Village Board's determination to adopt the "site-specific" Local Law was justified based upon the Village Board members' "knowledge of the community and uses in and surrounding the OI District" and "evaluat[ing] surrounding land uses, including a truck distribution facility, a park and ride, office uses, and a wholesale shopping facility", including the Long Island Expressway and the Long Island Motor Parkway, should have been regarded as an insufficient basis to defeat Plaintiffs' spot zone claim.[102] Other than Zaleski's self-serving declaration in support of Defendants' motions, there is nothing in the record that was before the Village Board discussing what Zaleski says. To the contrary, Mayor Dorman testified that the Village Board did not

---

[102]    Id.

consider any other land within the Village's limits as potentially being suitable for a gaming use other than the Premises.[103]

Nor should the Local Law survive the spot zone challenge given Mayor Dorman testimony that the Village Board adopted the Local Law to benefit Delaware North's Gaming use of the Premises because "[i]t was already built"[104] and that "[w]e didn't look at other properties for gaming facility. This was the applicant's address. This is where they requested to have it. No need to look at anything else"[105] Such a justification made to avoid the finding of a spot zone enactment was rejected in *Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6 (3d Dept. 2000), where the Court stated that "[w]e are not persuaded that, because respondent "has become an integral part of the community", its use is necessarily consistent with the comprehensive plan as developed through actual experience." Id. at 11.

The Bankruptcy Court also erred in making findings of fact based upon Mayor Dorman averring in his affidavit that the Village "utilized its own engineers and consultants to review the material submitted by Delaware North." PoF at 22. The only consultant the Village used was Iannucci who testified that he performed no study or evaluation to confirm the 2016 EAF as accurately describing conditions actually existing at the Premises, other than to conduct a "parking analysis" and to correct a few grammar errors. He provided no other study or comments to the Village Board with respect to the proposed Local Law and did not make an evaluation to determine potential or cumulative impacts that would result if the proposed Local Law was actually adopted or the suitability of alternative locations for the proposed gaming facility.[106]

In *Udell v Haas*, 21 N.Y.2d 463 (1968), the Court rejected as an insufficient basis to sustain a zoning enactment challenged on spot zoning the after-the-fact rationalizations of the

---

[103]   Doc. No. 75, Exh. 12 at 147: 24-25, 148: 1-13, 149: 8-17.
[104]   Id. at 148: 18-25, 149: 1-9.
[105]   Id. at 157: 9-12.
[106]   Id. 50: 11-17, 57:25, 58: 1-25.

kind being made by Iannucci to sustain a zoning amendment challenged as an unlawful spot

zone, stating that:

> Where a community, after a careful and deliberate review
> of "the present and reasonably foreseeable needs of the
> community", adopts a general developmental policy for the
> community as a whole and amends its zoning law in
> accordance with that plan, courts can have some confidence
> that the public interest is being served (citation of cases
> omitted). Where, however, local officials adopt a zoning
> amendment to deal with various problems that have arisen,
> but give no consideration to alternatives which might, and
> then call in the experts to justify the steps already taken in
> contemplation of anticipated litigation, closer judicial
> scrutiny is required to determine whether the amendment
> conforms to the comprehensive plan.
>
> The role of these experts must be more than that of giving
> rationalizations for actions previously decided upon or
> already carried out. In recent years, many experts on land
> use problems have expressed the pessimistic view that the
> task of bringing about a rational allocation of land use in an
> ever more urbanized America will prove impossible. But of
> one thing, we may all be certain. The difficulties involved
> in developing rational schemes of land use controls become
> insuperable when zoning or changes in zoning are followed
> rather than preceded by study and consideration.

N.Y.2d at 470-471.

In *Augenblick v. Town of Cortland,* 104 A.D.2d 806 (2d Dept.) (Lazer, J. dissenting),

*rev'd on dissenting opinion below*, 66 N.Y.2d 775 (1985), the Court upheld a challenge to a

zoning amendment as being an unlawful spot zone where the Court could not ascertain from the

record that the zoning amendment was anything other than the product of "special interest,

irrational ad hocery."

Not only was the Local Law adopted as a "special interest, irrational ad hocery" by

utilizing a process that relied upon after-the-fact rationalizations of the kind the *Udell* Court

condemned, Plaintiffs underscore and Defendants do not dispute, that the Local Law was

intentionally adopted <u>in toto</u> based upon conditions written and approved by Delaware North in advance of the Local Law being adopted in order to induce Delaware North to execute the Amended TRA after the Local Law was adopted. In *Levine, supra,* the Court affirmed the lower court's post-trial order that the challenged zoning amendment was based on the condition that "…was proposed by the applicants for the downzoning and was adopted in toto by the Town Board." A.D.2d at 583–84.

The Bankruptcy Court also erred in finding that the Local Law could not be an unlawful spot zone because the VLT Application was referred to the Suffolk County Planning Commission which issued a report[107] in 2016. That report only concerned the limited nature of the relief that was being sought in the VLT Application. That report which concerns a permit application made in 2016 has no bearing upon the merits of the proposed Local Law that was adopted in 2017.

The Bankruptcy Court also erred in regarding as a sufficient basis to validate the Local Law Deputy Mayor Zaleski telling us that the Village Board noted "the Location's deteriorating condition," and considered the "opportunity for reuse and repurposing of an existing structure in the Village." PoF at 22. Nowhere in the verifiable written record is there any record that the Village Board had considered the Premises deteriorated condition. Even if we are to accept as true the Premises being in a deteriorated condition before Delaware North became its owner, nowhere in the legislative record is there any indication that a unique, high-intensity use of the Premises as a Gaming Facility can or should be allowed as a substitute for what was then existing. Moreover, the mere fact that the Premises might have been in a deteriorated condition before Delaware North arrived at the scene did no relieve the Village's responsibility to adopt the

---

[107]    Doc. No. 62-5.

Local Law consistent with its Master Plan. *Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6

(3d Dept. 2000).

For the reasons discussed above, the Bankruptcy Court also erred in recommending

summary dismissal of the spot zone claim because Plaintiffs failed to explain

> why the zoning, traffic, and environmental impact analysis
> completed in connection with the Special Permit
> Application in 2016 would not be applicable to determining
> the impact of the adoption of Local Law No. 3-2017, which
> was adopted shortly after the Special Permit was vacated by
> the State Court. The Plaintiffs have not articulated a reason
> why the Board would have been required to reinvent the
> wheel. The analysis in both situations is the same: the
> impact of the VLT Facility at the Location.  The means of
> implementation, whether by special permit or by a local law
> creating an as of right use, is irrelevant.[108]

Plaintiffs not only gave such an explanation but what they did say was also evidenced in

the motion record. As Plaintiffs' explained and evidenced, the Village Board did not consider,

nor was it required to consider any Village-wide impacts associated with its issuance of a Permit

granted in 2016 authorizing a gaming use as an accessory use of the Hotel in accordance with the

"accessory use" criteria prescribed by Code §177-76(A). The nature and scope of the Village

Board's inquiry in issuing the Permit and the process I had to use dramatically changed,

however, when it decided to write a Village-wide local law with the specific intent of nullifying

the effect of the State court's order vacating the Permit. The "process" the Village Board

undertook in deciding to issue the Permit, later vacated by the State court, is not the same

"process" the Village Board was required to undertake in order to defeat a spot zone challenge

like what is now before this Court.

Unlike the narrowly focused inquiry and fact-finding process the Village Board used in

connection with its issuance of gaming use permit in 2016, its consideration of a new local law

---

[108]    PoF at 23.

amending the zoning code to permit a gaming use of land on a District-wide as of right basis

required that it undertake an evaluation of alternative uses and impacts and not to ignore or

exclude the availability and suitability of other lands within the Village's borders as being

eligible for such a use. Undertaking such a process is not consistent with the requirement

imposed by the Court in *Asian Americans for Equality v Koch,* supra, that the zoning

amendment be "carefully studied, prepared and considered" in order for it to be said that it has

met the general requirement for a well-considered plan and satisfies the statutory requirement. Id.

at 121. In *Yellow Lantern Kampground, supra,* the Court held the zoning enactment to be

unlawfully adopted rejected the argument that the promotion of economic development relieves a

local government from its responsibility to adopt zoning laws that are consistent with its

comprehensive land use plan, stating that:

> Admittedly, a decision to rezone can be motivated by a
> desire to promote economic development (citation of case
> omitted), but such motivation does not relieve the
> legislative body of its obligation to consider the proposed
> use's compatibility with and impact upon surrounding
> properties and its consistency with the municipality's
> comprehensive zoning plan. Here, the record fails to set
> forth the total area of the subject business district or
> identify the other properties situated in it, the properties
> surrounding respondent's parcels, the size or location of
> those properties, the uses to which they have been devoted
> or the likely affect that the rezoning would have upon them.
> The record establishes, however, that all other properties in
> the district consist of residential and light commercial uses
> and that there are no other industrial users.
>
> Further, the Town Board gave no consideration to
> alternative sites for respondent's operation within the
> industrial district (citation of case omitted) or the extent to
> which respondent's use is consistent with the Town's
> comprehensive plan. We are not persuaded that, because
> respondent "has become an integral part of the
> community", its use is necessarily consistent with the
> comprehensive plan as developed through actual
> experience. As earlier noted, the fact that the proposed use

following rezoning is no different than respondent's current nonconforming use of the property is not a permissible consideration. Although the size of the area to be classified is a valid consideration (citation of legal authority omitted), we are unimpressed by respondent's transparent effort to deflect the claim of spot zoning by purposely and artificially inflating the size of land to be reclassified with the inclusion of two additional parcels of its property, and approximately 25 acres of forest land, upon which no industrial use had ever taken place. In any event, the Town Board did not cite to the size of the parcel as a factor supporting its grant of the rezoning request.

A.D.2d at 10–11.

The facts before the Court in *Yellow Lantern Kampground* are also similar to those before this Court and which compelled that Court to declare the zoning amendment an unlawful spot zone. Here, the motion record evidences the Village Board's failure to consider the proposed "Hotel/Gaming Facility" use's compatibility with and impact upon surrounding properties and its consistency with the Master Plan or to consider alternative locations. Instead, the Village Board deliberately utilized a process that was designed *at its inception* to favor Delaware North by ruling out the consideration of any other possible alternative gaming use of lands other than the use-specific and the site-specific use that Delaware North sought in the VLT Application. The Village Board did nothing else in furtherance of that process except to utilize "experts" to engage in pre-ordained, after-the-fact rationalizations to support a determination the Village Board had already made within two-seconds after the Order was issued, i.e., enable Delaware North to use the Premises as a Gaming Facility.

The Bankruptcy Court's reliance upon *Boyles v Town Board of Town of Bethlehem*, 718 N.Y.S.2d 430 (3d. Dept. 2000) for the proposition that it was sufficient for the Village Board to rely upon the SEQRA analysis and determinations it had made at the time it issued the Gaming Use permit to Delaware North in 2016 such that it was not required to perform yet another

SEQRA analysis and instead was permitted to rely upon what was done in connection with its issuance of the Permit, is distinguishable on the law and facts. Plainitffs' spot zone challenge brought up for review the entire process the Village Board used to adopt the Local Law. Under the notice-pleading requirements prescribed by Fed. R. Civ. Proc. Rule 8, Plaintiffs were not required to separately allege a SEQRA violation in order to establish their spot zone claim through the process that was used.

This case in not like the one that was before the Court in *Boyles.* There, the Town Board had previously approved a site plan application after it had conducted a SEQRA analysis determining. The Town Board thereafter agreed to modify the site plan at the request of the applicant. After the Court sustained the Town Board's approval of the modification based upon substantial evidence in the administrative record supporting the modification, it held that it was not necessary for the Town Board to re-open its earlier SEQRA determination. In this case, the Village Board's issuance of the Gaming Use Permit was vacated and annulled by Order of the State Court. Obviously, its SEQRA-related determination made in connection with its issuance of the Permit became moot and no longer justiciable by virtue of the vacatur. Thereafter and in stark contrast to the facts in *Boyles*, the Village Board adopted the Local Law based upon criteria having nothing to do with the "accessory use" criteria it considered at the time it issued the Permit in 2016. What was before the Village Board in 2017 was entirely different in nature and scope of proceedings than what was before the Village Board at the time it was entertaining the VLT Application. What the Village Board did in 2017 in adopting the Local Law is not comparable to what it did in 2016 to approve the VLT Application.

In the Proposed Findings, the Bankruptcy Court refers to Deputy Mayor Zaleski affidavit where he points out that the 2017 EAF inquires whether "[t]he proposed action is not consistent with the adopted land use plans," to which the Board answered "no," together with a full analysis

annexed thereto. PoF at 21. Later on, the Bankruptcy Court concluded that "[t]he only claims at issue in this case are contract zoning and spot zoning, and therefore, the determination whether the Board complied with SEQRA is beyond the scope of review." PoF at 23. The Bankruptcy Court erred in making these determinations in recommending the summary dismissal of Plaintiffs' spot zone claim. The SEQRA challenge to the 2016 Negative Declaration that was made in the Article 78 proceeding seeking to set aside the Special Use Permit Delaware North received in 2016, became moot when the State court in that proceeding vacated the gaming use permit. This lawsuit, on the other hand, seeks a declaration the Local Law is an unlawful spot zone. The amended complaint challenges the findings the Village Board purportedly made in connection with its adoption of the Local Law. Plaintiffs were not required to allege a separate and distinct SEQRA cause of action in order to obtain judicial review of the findings the Village Board purportedly made in deciding to adopt the Local Law.

Nothing in *Farrell v Johnson*, 266 A.D.2d 873 (4th Dept. 1999), cited in the Proposed Findings at 23, supports the proposition that Plaintiffs' failure to allege a SEQRA violation in the Amended Complaint somehow placed their challenges to the process used and the findings made by the Village Board in adopting the Local Law "beyond judicial review" for purposes of determining their spot zone claim. In *Farrell*, petitioners commenced an Article 78 proceeding challenging determination by town zoning board of appeals which granted the application for use and area variances to permit construction of a cellular telephone site. The Court reversed the lower court's order directing that the ZBA make a new determination of significance pursuant to State Environmental Quality Review Act (SEQRA), N.Y. Env. Cons. Law Art. 8. because the Article 78 petition did not specifically allege a SEQRA claim. In reversing the lower court's order directing the ZBA to undertake a new determination of significance, the Appellate Division invoked the fundamental rule applicable to all Article 78 proceedings that courts may not

consider allegations not raised in the petition, citing *Crawford v Kelly*, 124 A.D.2d 1018 (4th

Dept. 1986). This case is an action based upon the Amended Complaint and is not an Article 78

proceeding. Its allegations satisfy the pleading requirements prescribed by Fed. R. Civ. Proc.

Rule 8 which only require that the allegations in the complaint gives fair notice of what the

plaintiffs' claims are and the grounds upon which they rest. *Bell Atlantic Corp. v. Twombly,* 550

U.S. 544, 560–61 (2007). Those liberal pleading requirements, unlike the pleading requirements

applicable to Article 78 proceedings, did not require Plaintiffs to allege a SEQRA claim in the

spot zone claim which contains more than sufficient allegations regarding the unlawful process

used and the findings made by the Village Board in adopting the Local Law.

The Bankruptcy Court also erred by making improper findings of fact "that the Plaintiffs'

affidavits do not raise a genuine issue of fact with respect to whether Local Law No. 3-2017 was

calculated to serve the community as a whole." PoF at 24. Plaintiff's affidavits, based upon their

personal knowledge, attests to the noise, traffic impacts, congestion, presence of crime and the

degradation of their community as a result of Delaware North's use of the Premises as a Gaming

Facility. Their affidavits evidence the impacts associated with the Gaming Use which the Village

Board was required to assess at the time it was considering the adoption of the Local Law in

2017 as well as the deficiencies in the pro-Delaware North process that the Village used. The

Bankruptcy Court erred by utilizing Defendants' summary judgment motions as the vehicle to

resolve these disputed issues of fact rather than to find issues of fact warranting a trial for their

resolution.

The Bankruptcy Court also erred in its conclusion that Plaintiffs could not raise triable

issues of fact regarding the impacts associated with the Village Board's adoption of the Local

law because they had no vested right to the Village's zoning laws remaining static, citing

*Rodgers v. Vill. of Tarrytown*, 302 N.Y. 115 (1951) PoF at 24. *Rodgers* merely stands for the

proposition that local governments have the right and power to amend their zoning laws to account for changed conditions. Plaintiffs know full well that they as land owners and the Village's citizenry in general do not have vested rights in a particular zoning scheme that would prevent the Village from adopting and amending zoning laws and regulations based on changed conditions. Nevertheless, as discussed above, local governments do not have the right or power to adopt zoning enactments except pursuant to what has been delegated to them by the State Legislature. No local government has the right to adopt local laws that are spot zones. *Rodgers* has nothing to do with a citizen's right to challenge and set aside a local law challenged as such.

The Bankruptcy Court also erred in regarding Plaintiffs' argument "that the Board's process was flawed because it failed to consider other locations, such as the Hampton Inn, which has fewer than 150 rooms that is required by Local Law No. 3-2107. This is irrelevant because no other hotel was seeking to operate a VLT Facility." PoF at 24, 25. The fact that no hotel was seeking a VLT Facility at the time the Village Board was considering the adoption of the Local Law did not relieve the Village Board from its obligation to use a process that required it to consider the availability and suitability of alternative sites and uses in addition to or in lieu of the one being proposed by the Local Law. Zoning laws will be set aside where the process used to consider and adopt the zoning law excludes consideration of alternative uses and sites. *Udell v Haas*, 21 N.Y.2d 463 (1968); *Yellow Lantern Kampground v. Cortlandville*, 279 A.D.2d 6 (3d Dept. 2000).

## POINT III

### THE LOCAL LAW IS NULL AND VOID FOR WANT OF UNIFORMITY.

The Bankruptcy Court erred by refusing to entertain Plaintiffs' challenge to the Local Law as being unlawfully adopted for want of uniformity on the ground that "[t]his claim cannot

be raised for the first time in the Plaintiffs' opposition to the motions for summary judgment." PoF at 26.

Plaintiffs submit that the Amended Complaint gave sufficient fair notice that they were challenging the Local Law for want of uniformity. The Amended Complaint alleges that the use permitted by the Local Law is unique and extraordinary in that nowhere else within the Village's borders, let alone within the OI District, does there exist the kind of use that was approved by the Village Board when it adopted the Local Law and is an unprecedented use of any land located within the territorial jurisdiction of the Village. The amended Complaint also alleges that nowhere else within the Village's borders, let alone within the OI District, may any land be used of the kind that was approved by the Village Board when it adopted the Local Law.[109] These allegations, taken separately or read in conjunction with the other allegations in the Amended Complaint, gave fair notice that Plaintiffs challenge to the Local Law is also predicated on the Village Board's failure to consider other uses of land for purposes of making the use contemplated by the Local Law uniform throughout the OI district. Fed. R. Civ, Proc. Rule 8.

NY Village Law § 7-702 states that:

> For any or all of said purposes the board of trustees may divide the village into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. All such regulations shall be uniform for each class or kind of buildings throughout each district but the regulations in one district may differ from those in other districts.

Emphasis added.

In *Augenblick, supra,* the Court declared a zoning amendment null and void for failing to satisfy the district-uniformity in NY Town Law § 262, which like NY Village Law § 7-702,

---

[109] Doc. No. 43 ¶¶ 58 and 59

requires zoning regulations to be uniformly applicable with respect to each class or kinds of buildings throughout the district. The Court stated:

> The uniformity requirement is intended to assure property holders that all owners in the same district will be treated alike and that there will be no improper discrimination (citation to legal authorities omitted). The likelihood of overreaching is thus reduced because the legislative body preapproves the uses permitted in a district without reference to particular owners (citation to legal authorities omitted). Uniformity requirements may transcend mere statute, however, for it has been held that the Constitution requires that all land in similar circumstances be treated alike (citation to legal authorities omitted).

A hotel does exist within the OI District, the Hampton Inn Hotel, which has 120 rooms (as compared to the Local Law's requirement that a hotel must have more than 150 rooms in order to qualify for a "Hotel/Gaming Facility" use). That hotel is located on Veterans Memorial Highway, which like the Long Island Expressway, is regarded as a major highway. Nevertheless, as discussed above, the Village Board did not consider that hotel when it adopted the Local Law even though it was of the same "class or kind of buildings" as was the Hotel located on the Premises

Moreover, there are numerous other vacant lands and commercially developed lands within the OI District capable of being developed or renovated as a hotel. Those lands once so developed would also be entitled to the "uniformity" benefits contemplated by NY Village Law § 7-702.

The Local Law is therefore invalid, null and void because it was not adopted in accordance with the uniformity standard prescribed by NY Village Law § 7-702.

Plaintiffs did interpose a claim of want of uniformity. It was not raised for the first time in opposing the motions.

# CONCLUSION

Wherefore, Plaintiffs request an order pursuant to Fed. R. Bankruptcy Proc. Rule 9033(d) rejecting the Proposed Findings and recommitting the matter to the Bankruptcy Court with instructions that it proceed to trial with further appropriate instructions regarding the application of the State's law prescribing the lawful enactment of local zoning laws.

Dated: January 7, 2019
      Melville, New York

                        Law Office of Anton J. Borovina

                        By: _____
                              Anton J. Borovina

                        225 Broad Hollow Road, Ste. 303
                        Melville, New York 11747
                        (631) 630-1101

                               -and-

                        Paul Sabatino II
                        1617 New York Ave.
                        Huntington Station, New York 11746

                        Attorneys for Plaintiffs